**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| **FIREARMS POLICY COALITION, INC., SECOND AMENDMENT FOUNDATION, GAVIN PATE, and GEORGE MANDRY,** | |
| *Plaintiffs*, | |
| **v.** | **CIVIL ACTION NO. 4:24-cv-565** |
| **MERRICK GARLAND,** in his official capacity as Attorney General of the United States**,** | |
| *Defendant.* | |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

ARGUMENT ...................................................................................................................... 4

    I.      The Second Amendment's Plain Text Covers Plaintiffs' Conduct ................................ 5

    II.     The Government Cannot Show That The Carry Ban Is Consistent With This Nation's Historical Tradition. ......................................................................................... 6

          A. The Government Will Be Unable To Identify Analogous Restrictions To The Carry Ban. ......................................................................................................... 10

          B. The Carry Ban Is Not Analogous To Permissible "Sensitive Place" Restrictions. . 13

          C. The Government Cannot Justify The Carry Ban On The Ground That It Owns And Operates Post Offices. ........................................................................................ 19

CONCLUSION ................................................................................................................. 21

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
    176 A.3d 632 (Del. 2017) ...........................................................................................18

*Comm'r Pa. State Police v. Lara*,
    No. 24-93, 2024 WL 4486348 (2024) ...................................................................6

*Davenport v. Edward D. Jones & Co., L.P.*,
    891 F.3d 162 (5th Cir. 2018) .............................................................................4, 5

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..............................................................5, 6, 7, 10, 13, 18

*Duncan v. Bonta*,
    No. 17-cv-1017, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023)........................8

*Espinoza v. Mont. Dep't of Revenue*,
    140 S. Ct. 2246 (2020)......................................................................................7, 8

*Ex parte Jackson*,
    96 U.S. 727 (1877)...............................................................................................19

*Garland v. Range*,
    144 S. Ct. 2706 (2024).........................................................................................21

*Koons v. Platkin*,
    673 F. Supp. 3d 515 (D.N.J. 2023) ..........................................................9, 19, 20

*Lara v. Comm'r Pa. State Police*,
    91 F.4th 122 (3d Cir. 2024)..............................................................................6, 8

*May v. Bonta*,
    No. 23-cv-01696, 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023)....................19

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010).......................................................................................13, 19

*McRorey v. Garland*,
    99 F.4th 831 (5th Cir. 2024)...............................................................................13

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012)............................................................................6, 8

*New York State Rifle & Pistol Association v. Bruen*,
    597 U.S. 1 (2022)...............................1, 2, 5, 6, 7, 8, 9, 10, 11, 13, 14, 18, 19, 21

*Range v. Att'y Gen.*,
    69 F.4th 96 (3d Cir. 2023)..................................................................................21

*Siegel v. Platkin*,
    653 F. Supp. 3d 136 (D.N.J. 2023) ...................................................................20

*Solomon v. Cook Cnty. Bd. of Comm'rs*,
    559 F. Supp. 3d 675 (N.D. Ill. 2021) ................................................................20

*United States v. Ayala*,
    No. 8:22-cr-369, 2024 WL 132624 (M.D. Fla. Jan. 12, 2024) ....................... 11, 12, 13, 19

*United States v. Daniels*,
    No. 23-376, 2024 WL 3259662 (2024) .................................................................. 6

*United States v. Daniels*,
    77 F.4th 337 (5th Cir. 2023) ............................................................................. 6, 8

*United States v. Dorosan*,
    350 F. App'x. 874 (5th Cir. 2009) ..................................................................... 18

*United States v. Rahimi*,
    144 S. Ct. 1889 (2024) .......................................................... 2, 5, 7, 8, 9, 10, 18

*Wolford v. Lopez*,
    No. 23-cv-00265, 2023 WL 5043805 (D. Haw. Aug. 8, 2023) ........................... 19

*Worth v. Harrington*,
    666 F. Supp. 3d 902 (D. Minn. 2023) .................................................................. 8

*Worth v. Jacobson*,
    108 F.4th 677 (8th Cir. 2024) ............................................................................. 8

**<u>Constitutional Provisions, Statutes, & Rules</u>**

18 U.S.C.
    § 930(a) ................................................................................................................. 2
    § 930(g)(1) ............................................................................................................ 2

U.S. CONST. art. I, § 8, cl. 7 ................................................................................... 11

MD. CONST. art. 1 §§ 3, 14 (1776) .......................................................................... 17

AN ACT TO ESTABLISH THE POST-OFFICE AND POST-ROADS WITHIN THE UNITED STATES,
    Pub. L. No. 3-23, § 17, 1 Stat. (1794) ............................................................... 11

AN ACT TO ESTABLISH THE POST-OFFICE AND POST-ROADS WITHIN THE UNITED STATES,
    Pub. L. No. 2-7, § 17, 1 Stat. (1792) ............................................................ 11, 12

AN ACT TO ESTABLISH THE POST-OFFICE OF THE UNITED STATES,
    Pub. L. No. 5-43, § 1, 1 Stat. (1799) ................................................................. 12

5TH CIR. R. 47.5.4 ................................................................................................... 18

39 C.F.R.
    § 232.1(a) ........................................................................................................ 2, 3
    § 232.1(p)(2) ........................................................................................................ 3

**<u>Other Authorities</u>**

1 LAWS OF THE STATE OF NEW YORK (Websters & Skinner 2d ed. 1802) .................... 16

1 THE LAWS OF MARYLAND TO WHICH ARE PREFIXED THE ORIGINAL CHARTER, WITH AN
    ENGLISH TRANSLATION, ch. 25 (1799) (1799 law) ............................................ 17

10 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801
    (William Stanley Ray ed., 1904) ....................................................................... 15

2 LAWS OF THE STATE OF DELAWARE, FROM THE FOURTEENTH DAY OF OCTOBER,
ONE THOUSAND SEVEN HUNDRED, TO THE EIGHTEENTH DAY OF AUGUST, ONE THOUSAND
SEVEN HUNDRED AND NINETY-SEVEN (Samuel & John Adams eds., 1797)..........15, 16, 17

2 The LAWS OF THE STATE OF VERMONT 382 (Randolph, Sereno Wright 1808).....................15, 16

A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA (1803).................16

A COMPILATION OF THE LAWS OF THE STATE OF GEORGIA, PASSED BY THE LEGISLATURE
SINCE THE POLITICAL YEAR 1800, TO THE YEAR 1810, INCLUSIVE
(Augustine Smith Clayton ed., Augusta, Adams & Duyckinck 1812).............................15

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 471 (Robert & George Watkins eds.,
Phila., R. Aitken 1800) (1792 law) ..........................................................16, 17

A JOURNAL OF THE PROCEEDINGS OF THE HONORABLE SENATE OF THE STATE OF
NEW-HAMPSHIRE (1801)..................................................................................16

A MANUAL OF THE LAWS OF NORTH-CAROLINA (John Haywood ed., 3d ed. 1814).....................17

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA
(Augustine Davis ed., 1796) ............................................................................17

ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA
(New London, Timothy Green 1784).................................................................16

ACTS AND RESOLVES OF MASSACHUSETTS, 1786-87 (Boston, Adams & Nourse 1893)
(1786 law) ..................................................................................................17

Amici Br. of Angus Kirk McClellan, et al., *Wolford v. Lopez*, No. 23-16164 (9th Cir. Nov. 9,
2023), Doc. 48-2 ....................................................................................14, 15

AN ACT FOR THE SUPPORT OF THE GOVERNMENT, *in* 1 LAWS OF THE STATE OF NEW YORK (Charles
R. & George Webster 1802)..........................................................................15

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on
the Right to Bear Arms*, 13 CHARLESTON L. REV. 204 (2018)..........................................14

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:
An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443
(2009)...............................................................................................20, 21

JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA
(Richmond, Thomas W. White 1828) ...............................................................15

LAWS OF THE STATE OF NEW JERSEY, COMPILED AND PUBLISHED, UNDER THE AUTHORITY OF THE
LEGISLATURE (Joseph Bloomfield ed., Trenton, James J. Wilson 1811) .........................16

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791,
not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022),
https://bit.ly/3RRRSmD...................................................................................7

Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders:
Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and
Bear Arms*, 2020 PEPP. L. REV. 71 (2020) .......................................................20

*Our Mission Began at the Birth of Our Nation*, U.S. POSTAL INSPECTION SERV., https://bit.ly/3BrHGeo (last visited Oct. 18, 2024) ............................................................12

*Passports*, USPS, https://bit.ly/3YrD55e (last visited Oct. 18, 2024) ...........................................2

*Postal Facts: Size and Scope*, USPS, https://bit.ly/3Ydqgdd (last visited Oct. 18, 2024) ..........1, 2

*United States Postal Service: An American History*, OFF. OF THE HISTORIAN, CORP. AFFAIRS (2022), https://bit.ly/3XRPJdr ..........................................................................10, 11, 12, 13

PROVINCIAL CONGRESS, JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY: HELD AT TRENTON IN THE MONTH OF OCTOBER (Burlington, Isaac Collins, *reprinted* Woodbury, Joseph Sailer 1835) ..............................15

THE LAWS OF THE STATE OF NEW HAMPSHIRE (1797)................................................................17

THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND (Providence, Carter & Wilkinson 1798) ....................................................................15, 16

THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA (Phila., R. Aitken & Son 1790)...15, 16, 17

THOMAS JEFFERSON, JEFFERSON'S LEGAL COMMONPLACE BOOK (David T. Konig & Michael Zucker eds., Princeton Univ. Press 2019)............................20

VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND, OCTOBER SESSION, 1780 (1797) ..............................................................................................16

VOTES AND PROCEEDINGS OF THE SENATE OF THE STATE OF MARYLAND, NOVEMBER SESSION, 1791 (1792)..........................................................................................................................16

Plaintiffs Firearms Policy Coalition, Inc., Second Amendment Foundation, Gavin Pate, and George Mandry respectfully submit this Memorandum in Support of their Motion for Summary Judgment under Federal Rule of Civil Procedure 56.

## INTRODUCTION

In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court held that the law-abiding citizens of this Nation have a general right to carry firearms for self-defense, which can only be restricted in "exceptional circumstances." 597 U.S. 1, 38 (2022). The ban on carrying firearms in U.S. Post Offices in 18 U.S.C. § 930(a) and 39 C.F.R. § 232.1(l) (collectively "the Carry Ban") fails to respect these principles. The Carry Ban is sweeping. It prohibits the carriage and storage of firearms at all U.S. Post Offices and includes the U.S. Postal Service property on which those offices sit. And effectively, the Carry Ban imposes a much broader burden on Second Amendment rights than merely disarming individuals inside post offices—which itself is unconstitutional. Rather, because firearms cannot be carried on postal property at all, an individual's rights are infringed before, during, and after picking up letters, cashing money orders, or otherwise visiting one of the 31,123 post offices to complete an essential task. *See Postal Facts: Size and Scope*, USPS, https://bit.ly/3Ydqgdd (last visited Oct. 18, 2024) (hereinafter "USPS, *Facts*").

Plaintiffs—law-abiding citizens licensed to carry in Texas and two non-profit membership associations with members who are licensed in Texas, including individual Plaintiffs—desire to carry their firearms for self-defense while visiting the Post Office but have not done so for fear of arrest and prosecution. The Carry Ban, to the extent it bars the possession and carriage of firearms in post offices and on postal property, infringes their Second Amendment rights and must be declared unconstitutional and enjoined. *Bruen* reaffirms that any Second Amendment regulation is

1

constitutional only if the government "demonstrate[s] that [it] is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17; *see also United States v. Rahimi*, 144 S. Ct. 1889, 1896 (2024). But there is no historical tradition supporting the ban on lawful firearm carriage in post offices and on postal property. The postal system dates to the Founding, but there is no tradition of banning firearms in Post Offices. On the contrary, there is a historical tradition of protecting the mail through materially different means. Plaintiffs thus respectfully ask this Court to permanently enjoin enforcement of the Carry Ban, to the extent they bar the possession and carriage of firearms in Post Offices and on postal property.

## STATEMENT OF FACTS

Post offices are a fixture in the routine lives of many Texans who rely on the Postal Service to, among other things, receive mail, process money orders, and apply for passports. In 2023 alone, about 665 million customers visited a post office. USPS, *Facts*, *supra*. Those visits generated $11.6 billion in retail revenue for the Postal Service. *Id.* And during those retail visits, the "Postal Service issued 63.3 million money orders, which equates to roughly more than 209,000 money orders each day." *Id.* Moreover, in 2023, "[t]he Postal Service accepted 8.6 million passport applications," of which all first-time applications were submitted in person. *Id.*; *Passports*, USPS, https://bit.ly/3YrD55e (last visited Oct. 18, 2024). But despite the size and scope of the Postal Service's operations, the Carry Ban bars individuals from carrying for self-defense in post offices and on postal property. Under 18 U.S.C. § 930(a) & (g)(1), the knowing possession of firearms in federal facilities, defined as a building owned or leased by the federal government, where federal employees are regularly present to perform their official duties is punishable by a fine, a term of imprisonment less than a year, or both. And by regulation, carrying or storing firearms on "postal

property" is barred, except for official purposes. 39 C.F.R. § 232.1(a). Violations are punishable by a fine, a term of imprisonment less than 30 days, or both. *Id.* § 232.1(p)(2).

Plaintiffs are two law-abiding citizens licensed to carry in Texas, as well as two non-profit membership associations—Firearms Policy Coalition, Inc. ("FPC") and the Second Amendment Foundation ("SAF")—both of which have members licensed in Texas, including individual Plaintiffs. Ex. A, Decl. of Gavin Pate ¶¶ 2, 4, 6–7 (App.4–7) ("Pate Decl."); Ex. B, Decl. of George Mandry ¶¶ 2, 4, 6–7 (App.8–11) ("Mandry Decl."); Ex. C, Decl. of Brandon Combs ¶¶ 2, 5–6, 10 (App.12–15) ("Combs Decl."); Ex. D, Decl. of Adam Kraut ¶¶ 2, 5–6 (App.16–19) ("Kraut Decl."). FPC exists to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms, and to protecting the means by which individuals may exercise the right to carry and use firearms. Combs Decl. ¶¶ 3–4. Likewise, SAF seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutionally protected right to possess firearms and firearm ammunition, and the consequences of gun control. Kraut Decl. ¶¶ 3–4.

Both individual Plaintiffs intend and desire to keep and bear firearms in Post Offices and on postal property in Texas, and only decline to do so for fear of arrest and prosecution. Pate Decl. ¶ 10; Mandry Decl. ¶ 10. For example, Plaintiff Gavin Pate, an Anglican priest working to establish a church in Texas, avoids visiting his United States Post Office and has done so in months. Pate Decl. ¶ 3, 9–10. Because he does not like to disarm and surrender his ability to defend himself, he mostly uses a private post office. *Id.* at ¶ 9. He would go to his local United States Post Office once or twice a month if he did not have to disarm. *Id.* Similarly, Plaintiff George Mandry, a small business owner who served in the U.S. Navy, visits his local United States Post Office every few

3

months to cash money orders paid to him by customers of his small business. Mandry Decl. ¶ 3, 9–10. He would go to his local United States Post Office once a week if he did not have to disarm and lose the ability to defend himself. *Id.* ¶ 9. Both Mandry and Pate would carry firearms with them on United States Post Office property if it were not for the laws at issue. Pate Decl. ¶ 10; Mandry Decl. ¶ 10. Correspondingly, organizational Plaintiffs have members in this District, including Plaintiffs Pate and Mandry, who would go to carry firearms at the Post Office if it were legal for them to do so. Combs Decl. ¶¶ 7 – 10; Kraut Decl. ¶¶ 7–10. Without the ability to carry handguns in United States Post Offices, Plaintiffs cannot meaningfully defend themselves in case of confrontation. Pate Decl. ¶ 11; Mandry Decl. ¶ 11; Combs Decl. ¶ 9; Kraut Decl. ¶ 9

## ARGUMENT

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 167 (5th Cir. 2018) (quoting FED. R. CIV. P. 56(a)).

"[T]he Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may "'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33. Accordingly, firearm carriage cannot be restricted absent the "exceptional circumstances" in which such restrictions historically have been allowed. *Id.* at 38. To determine whether a governmental restriction on the right is constitutional, *Bruen* requires that Courts first assess whether the Second Amendment's text covers an individual's conduct, and if so, the Constitution presumptively protects that conduct. *See id.* at 22–24. The only way the government can justify its regulation and defeat that presumption is "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. In other words, it is the Government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the

4

outer bounds of the right to keep and bear arms." *Id.* at 19; *see also Rahimi*, 144 S. Ct. at 1897("[W]hen the Government regulates arms-bearing conduct . . . it bears the burden to 'justify its regulation.'" (quoting *Bruen*, 597 U.S. at 24)). In doing so, this Court's task is to assess whether the Carry Ban is consistent "with the principles that underpin our regulatory tradition," in short, that whatever principles support the Government's historical analogues, would extend equally strongly to cover the Carry Ban today. *Rahimi*, 144 S. Ct. at 1898. In this case, the Government will be unable to show that the Carry Ban is part of a historical tradition of firearm restrictions or analogous to a permissible "sensitive place[]" restriction. *Bruen*, 597 U.S. at 30. Thus, this Court must enjoin the Carry Ban to the extent it prohibits firearm possession and carriage in Post Offices and on postal service property.

## I.    The Second Amendment's Plain Text Covers Plaintiffs' Conduct.

Plaintiffs' proposed course of conduct—licensed carry on postal property—falls within the Second Amendment's plain text. *Id.* at 31–32. As a result, "the Constitution presumptively protects that conduct." *Id.* at 24.

The Supreme Court has already defined the Second Amendment's key terms. "[T]he people" includes "all Americans"; "Arms" includes "all instruments that constitute bearable arms," including handguns; and, to "bear" simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008); *Bruen*, 597 U.S. at 32–33. Importantly, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Bruen*, 597 U.S. at 32. Similarly, nothing in the Second Amendment's text draws a distinction between Post Offices and other public places.

The Supreme Court's binding interpretation of these words and phrases establishes that Plaintiffs' proposed conduct is presumptively protected by the Second Amendment. Individual

Plaintiffs are law-abiding Americans who seek to carry bearable arms (handguns) for self-defense during their daily lives, including while visiting Post Offices. As in *Bruen*, these undisputed facts end the textual inquiry. *See id.* at 31–32.

## II.   The Government Cannot Show That The Carry Ban Is Consistent With This Nation's Historical Tradition.

Under *Bruen*, the burden now shifts to the Government. It must show that Carry Ban is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 34. And it must do so by offering persuasive legal history. *See id.* at 24–25 & 25 n.6 (Courts "decide a case based on the historical record compiled by the parties.") (collecting cases). But no historical tradition of analogous regulation exists. Under *Bruen*, three considerations must guide this Court's consideration of the historical evidence.

First, evidence from the Founding era, when the Second Amendment was ratified and applied against the federal government, controls. *See id.* at 34–35; *accord United States v. Daniels*, 77 F.4th 337, 348 (5th Cir. 2023) ("A tradition cannot inform the original meaning of the Bill of Rights if it emerges one hundred years later."), *cert. granted, judgment vacated*, No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024); *Lara v. Comm'r Pa. State Police*, 91 F. 4th 122, 133–136 (3d Cir. 2024), (holding that 1791 is the most probative period when evaluating restrictions on carry by 18-to-20-year-olds), *cert. granted, judgment vacated*, No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024); *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (calling 1791 the "critical year for determining the [Second] [A]mendment's historical meaning"). *Bruen* was explicit that "not all history is created equal." 597 U.S. at 34; *see also id.* at 36–37 (Sources originating "'75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.'" (quoting *Heller*, 554 U.S. at 614)). This is so because

6

"[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them[.]" *Heller*, 554 U.S. at 634–35. The people adopted the Second Amendment in 1791, so the public understanding of the right around that time is crucial to understanding any questions surrounding content of the right. *Bruen*, 597 U.S. at 37; *see also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD. Consequently, evidence that long pre- or post-dates 1791 is less probative, *Bruen*, 597 U.S. at 35–37, and laws from the 20th-century are categorically too late to matter. *Id*. at 66 n.28.

 *Bruen*'s reasoning underscores that the Founding era is the key period for historical analysis. After initially rejecting "medieval English regulations," *id*. at 40; *accord Rahimi*, 144 S. Ct. at 1899 (rejecting English traditions that failed to make it to "this side of the Atlantic"), *Bruen* turned to sources leading up to the ratification of the Second Amendment, including the 1689 English Bill of Rights, *see* 597 U.S. at 44–45. After finding these sources somewhat probative of the Amendment's *general* original meaning, the Court focused on "the history of the Colonies and early Republic," plus "the first decade after [the Second Amendment's] adoption." *Id.* at 46–50. And it found that the challenged law had "no historical basis" because no analogue in that relevant historical period supported it. *Id.* at 50. Later evidence was much less important. Only after canvassing the historical evidence from English, colonial, Early Republican, and Reconstruction periods did the Court discuss post-1868 sources and the late-19th century. *Id.* at 60–70. But the Court found that much of this later evidence "conflict[s] with the Nation's earlier approach to firearm regulation" and is "most unlikely to reflect 'the origins and continuing significance of the Second Amendment.'" *Id.* at 67 (quoting *Heller*, 554 U.S. at 614). Thus, the Court declined to rely on such laws and regulations. *See Bruen*, 597 U.S. at 66–68; *accord Espinoza v. Mont. Dep't of*

*Revenue*, 140 S. Ct. 2246, 2258–59 (2020) (holding that "more than 30" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions were not grounded in Founding era practice). *Bruen* thus cautioned lower courts to "guard against giving postenactment history more weight than it can rightly bear." 597 U.S. at 35.

In other words, *Bruen*'s reasoning strongly supports the conclusion that the Founding era is the benchmark against which historical evidence from later time periods must be measured, even if the Court formally left open the question whether 1791 or 1868 is the controlling date for constitutional analysis. *See id.* at 37 (noting that "19th-century evidence [has been] treated as mere confirmation of what the Court thought had already been established" (internal quotation marks omitted)); *accord Moore*, 702 F.3d at 935; *Lara*, 91 F.4th at 134–36; *Duncan v. Bonta*, No. 17-cv-1017, 2023 WL 6180472, at *20 (S.D. Cal. Sept. 22, 2023) ("*Bruen* teaches the most significant historical evidence comes from 1791"); *Worth v. Harrington*, 666 F. Supp. 3d 902, 919 (D. Minn. 2023) (noting the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters"), *aff'd*, 108 F.4th 677 (8th Cir. 2024).  Restrictions on the right to keep and bear arms adopted prior to or during the Reconstruction era may be confirmatory of earlier legislation but cannot alone establish the historical tradition of regulation required by *Bruen*. *See Daniels*, 77 F.4th at 348 ("When 19th-century practice is inconsistent with the categorical protection of the Second Amendment, the text controls." (cleaned up)). Only "enduring" and "well-established" restrictions with roots in the Founding are relevant in assessing whether the challenged restrictions comport with the text's "unqualified command." *Bruen*, 597 U.S. at 17, 30–31 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)); *see also Rahimi*, 144 S. Ct. at 1898.

Second, *Bruen* held that forming a historical tradition requires proof of representative, relevantly similar analogues. As *Rahimi* explained, such historical laws must evidence the "principles that underpin our regulatory tradition" and that "underly[] the Second Amendment." *Rahimi*, 144 S Ct. at 1898. Analogues are representative, therefore, if they are broadly applicable and widely accepted. On the other hand, a handful of state laws that are unconnected, in principle, to earlier or later enactments is not a "historical tradition" of regulation sufficient to inform the original public meaning of the right at the Founding. *Bruen*, 597 U.S. at 65 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 46 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation" (emphasis omitted); rejecting regulations applying to only 1% of the population). Put differently, laws existing in only a few jurisdictions—historical "outliers"—should be disregarded. *Id.* at 30 (internal quotation marks omitted); *see also Koons v. Platkin*, 673 F. Supp. 3d 515, 622 (D.N.J. 2023) (finding three Reconstruction era laws non-representative); *see also id.* at 642 (finding one state law and 25 local ordinances, covering less than 10% of nation's population, insufficient). Similarly, laws in the territories are afforded "little weight" because they were "localized," "rarely subject to judicial scrutiny," and "short lived." *Bruen*, 597 U.S. at 67–69.

Third, any analogues must be "relevantly similar" based on "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id*. The analysis of this relevant similarity yields, under *Rahimi*, the sort of "principles" to be applied in assessing a modern enactment. 144 S. Ct. at 1898. This requirement means that Founding era laws arising in different contexts, and for different reasons, will be inapt comparators to a modern law, since they are not motivated by the same

underlying principles. *See id., e.g.*, ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.").

### A. The Government Will Be Unable To Identify Analogous Restrictions To The Carry Ban.

In this case the Carry Ban falls into two of the three buckets of unconstitutionality that *Bruen* labelled "fairly straightforward." 597 U.S. at 26. As *Bruen* explained, where the government seeks to address a "perceived societal problem," such as threats to Post Offices, and it "employ[s] a regulation" that the "Founders themselves could have adopted to confront that problem," such as a ban on carriage of guns in Post Offices, the absence of any such bans from the Founding is proof that a modern ban is "unconstitutional." *Id.* at 26–27 (citing *Heller*, 554 U.S. at 631, 634). Moreover, *Bruen* also instructs that a modern law is likely unconstitutional "if earlier generations addressed the societal problem, but did so through materially different means." 597 U.S. at 26. In this case, both are true. The Founders did not bar carriage of firearms in Post Offices. Instead, they regulated the improper, threatening, and violent use of weapons in Post Offices. Later generations confirmed this historical tradition by protecting mail carriers with bounties and *facilitating* carriage, not banning firearms.

Post Offices have been a feature of our country from before we were a country, and concerns about threats to Post Offices are as old as Post Offices themselves. From 1707 until the Revolution, the British government operated the postal system in North America. *See The United States Postal Service: An American History* at 2–3, OFF. OF THE HISTORIAN, CORP. AFFAIRS (2022), https://bit.ly/3XRPJdr [hereinafter "*An American History*"]. But in the run up to the colonies' declaring independence, Americans launched their own, competing postal system, with "30 Post

Offices operat[ing] between Williamsburg[, Virginia] and Portsmouth, New Hampshire." *See id.* at 3. After independence and acting on Constitutional authority to enlarge the postal system, *see* U.S. CONST. art. I, § 8, cl. 7, Congress rapidly expanded the number of Post Offices and postal employees. "Between 1790 and 1828, the Post Office grew from 75 offices to 7,530. 'By 1831, postal employees accounted for 76 percent of the civilian federal workforce.'" *United States v. Ayala*, No. 8:22-cr-369, 2024 WL 132624, at *5 (M.D. Fla. Jan. 12, 2024) (quoting *An American History* at 8–9).

During this expansion, Congress was aware of threats to Post Offices. *See Bruen*, 597 U.S. at 26 (noting the relevance of "when a challenged regulation addresses a general societal problem that has persisted since the 18th century"). Thus, in 1792, Congress provided for the punishment of "any person [who] shall rob the mail . . . or shall steal and take . . . from or out of any post-office, any letter or packet." AN ACT TO ESTABLISH THE POST-OFFICE AND POST-ROADS WITHIN THE UNITED STATES, Pub. L. No. 2-7, § 17, 1 Stat. 232 (1792) (App.144); *accord* AN ACT TO ESTABLISH THE POST-OFFICE AND POST-ROADS WITHIN THE UNITED STATES, Pub. L. No. 3-23, § 17, 1 Stat. 354 (1794) (App.156).

Yet, to Plaintiffs' knowledge, Congress passed no restrictions on the carriage of firearms in U.S. Post Offices during the Founding era, suggesting that the Carry Ban is unconstitutional. *See Bruen*, 597 U.S. at 26 ("[T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."). The government agrees. *See Ayala*, 2024 WL 132624, at *5 ("As the United States acknowledges, the first prohibition on firearms possession in government buildings was not codified until 1964. And the first regulation specifically banning arms on post office property was codified in 1972." (internal citations omitted)).

11

Historically, Congress took entirely different approaches to the problem. For one, Congress sought to deter robbery of the mail by punishing it with death. *See* AN ACT TO ESTABLISH THE POST-OFFICE AND POST-ROADS (1792), *supra*, § 17 (App.144). For another, Congress appears to have responded with greater law enforcement. *See Our Mission Began at the Birth of Our Nation*, U.S. POSTAL INSPECTION SERV., https://bit.ly/3BrHGeo (last visited Oct. 18, 2024) (discussing the Postmaster General's hiring of Noah Webster to investigate a string postal thefts); *accord* AN ACT TO ESTABLISH THE POST-OFFICE OF THE UNITED STATES, Pub. L. No. 5-43, § 1, 1 Stat. 733 (1799) (App.164) (granting the postmaster power to "prosecute offenses against the post-office establishment."). But perhaps most tellingly, Congress in 1799, concerned about violence towards postal employees, prohibited "threatening [such employees] with dangerous weapons" but did not outright ban the carriage of "dangerous" weapons (let alone all weapons) on postal property. *See* AN ACT TO ESTABLISH THE POST-OFFICE (1799), *supra*, § 15 (App.167).

Later history confirms an utter absence of Founding era regulation on carry in Post Offices and on postal property. Again, later Congresses were aware of violent threats to the mail. For example, "[p]assengers of nineteenth-century stagecoaches, which carried mail, 'risked death or injury if coaches were attacked by robbers or Indians.'" *Ayala*, 2024 WL 132624, at *5 (quoting *An American History* at 5, 17). And "[i]n the latter half of the nineteenth century," as well as the early twentieth century, "bandits threatened postal workers aboard trains." *Ayala*, 2024 WL 132624, at *5 (citing *Colorado Train Robbers* at 8, N.Y. TIMES (Sept. 2, 1891)). To protect against robbery, Congress "in the first half of the nineteenth century appropriated money to reward individuals who helped apprehend postal robbers." *Id.* (citing AN ACT FOR THE RELIEF OF D.W. HALEY, Pub. L. No. 25-66, 6 Stat. 713 (1838)). And in the early twentieth century, the United

States addressed the robbery problem by arming railway mail clerks. *Id.* (citing *An American History* at 23, 107).

In sum, the Government will be unable to identify any relevantly similar Founding era regulations that ban firearm carriage in Post Offices and on postal property. *Accord Ayala*, 2024 WL 132624, at *1 (dismissing charge brought under Federal Facility Ban for firearm carriage in a Post Office because the government failed to meet its historical burden). Under *Bruen*, the lack of any comparable regulation is dispositive.

**B.  The Carry Ban Is Not Analogous To Permissible "Sensitive Place" Restrictions.**

Lacking historical evidence to support restrictions of firearm carriage in Post Offices, the Government will likely fall back on *Bruen*'s suggestion that carry can be restricted in certain "sensitive places." 597 U.S. at 30. As an initial matter, *Heller* and *McDonald* do not exempt alleged "sensitive places" restrictions from the *Bruen* analysis or flatly justify carry bans in all government buildings. *See Heller*, 554 U.S. at 626–27 n.26; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) (quoting *Heller*, 554 U.S. at 626–27)). The Fifth Circuit recently rejected the idea that the "sensitive places" language in *Heller* could have controlling effect in a case, noting that because such laws "are likely captured by the plain text of the Second Amendment" they are, therefore "likely subject to *Bruen*'s historical analysis." *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024).

Conducting that analysis now, the Government will not be able to show that the "how and why" of historical regulations on sensitive places could extend to Post Offices today. *Bruen*, 597 U.S. at 29. Recall that the Federal Facility Ban bars firearm carriage in Post Offices and the Postal Property Regulation prohibits carriage and storage on any property under the Postal Service's

13

control. The Carry Ban thus sweeps quite broadly. Individuals who visit a Post Office may not have a firearm in their car if they park at the Post Office or on their person if they walk or take the bus to the Post Office, and they may not have a firearm when they leave the Post Office to travel elsewhere. Indeed, for those who must visit Post Offices in their daily lives, the Carry Ban effectively renders licensed carry outside of the home impossible in many circumstances, a much broader restriction than a carefully limited prohibition on carry in a "sensitive place."

And even if that were not the case, Post Offices are simply not sensitive places. While the *Bruen* Court did not delineate an all-encompassing list of sensitive places, it mentioned only three such locations at the Founding "where weapons were altogether prohibited": legislative assemblies, polling places, and courthouses. *See id.* at 30; *see also* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 204, 289–90 (2018). Accordingly, this Court may analogize to "*those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Bruen*, 597 U.S. at 30 (emphasis added). But there is no way to connect the Post Office to these discrete categories.

Understanding *why* these places were deemed sensitive at the Founding requires analysis of what they have in common. And the three sensitive places *Bruen* identified all shared a key characteristic at the Founding. Legislative assemblies, polling places, and courthouses were all protected by heightened, government-provided security, reducing the public's need for individual weapons. *See e.g.*, Kopel & Greenlee, *supra*, at 290 ("When armed guards are present, the government takes the responsibility for having armed force at the ready to protect citizens.");

Amici Br. of Angus Kirk McClellan, et al. at 9–18, *Wolford v. Lopez*, No. 23-16164 (9th Cir. Nov. 9, 2023), Doc. 48-2.

Founding era examples of government-provided security in these locations abound. Start with legislatures. Rhode Island, Delaware, Pennsylvania, South Carolina, New York, Georgia, New Jersey, Virginia, and Vermont enacted statutes compensating law enforcement to attend and provide security for legislatures. *See* THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND 220, 222 (Providence, Carter & Wilkinson 1798) (providing fees for sheriffs, town sergeants, and constables to attend general assembly) (App.20–23); 2 LAWS OF THE STATE OF DELAWARE, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE EIGHTEENTH DAY OF AUGUST, ONE THOUSAND SEVEN HUNDRED AND NINETY-SEVEN 1100, 1118 (Samuel & John Adams eds., 1797) (App.29–30) (similar) ; 10 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801 376, 378 (William Stanley Ray ed., 1904) (referencing sergeant-at-arms and door-keeper for legislature) (App.32–35); THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 426, 427 (Phila., R. Aitken & Son 1790) (providing payment of door-keepers for legislature) (App.43–44); AN ACT FOR THE SUPPORT OF THE GOVERNMENT, *in* 1 LAWS OF THE STATE OF NEW YORK 532 (Charles R. & George Webster 1802) (App.128–129) (similar); A COMPILATION OF THE LAWS OF THE STATE OF GEORGIA, PASSED BY THE LEGISLATURE SINCE THE POLITICAL YEAR 1800, TO THE YEAR 1810, INCLUSIVE 372–73 (Augustine Smith Clayton ed., Augusta, Adams & Duyckinck 1812) (App.45–48) (similar); PROVINCIAL CONGRESS, JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY: HELD AT TRENTON IN THE MONTH OF OCTOBER 239, 240 (Burlington, Isaac Collins, *reprinted* Woodbury, Joseph Sailer 1835) (App.49–52) (similar); JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA 77 (Richmond, Thomas W. White 1828) (App.55) (similar); 2 THE LAWS OF THE STATE OF VERMONT

382, 387 (Randolph, Sereno Wright 1808) (App.56–59) (similar). Likewise, Maryland and New Hampshire appointed sergeants-at-arms or door-keepers. *See* VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND, OCTOBER SESSION, 1780 at 2 (1797) (App.60–63) (recording appointment of sergeant-at-arms and door-keeper); VOTES AND PROCEEDINGS OF THE SENATE OF THE STATE OF MARYLAND, NOVEMBER SESSION, 1791 at 1 (1792) (App.64–67) (similar); A JOURNAL OF THE PROCEEDINGS OF THE HONORABLE SENATE OF THE STATE OF NEW-HAMPSHIRE 6 (1801) (App.68–73) (similar).

The same was true of courthouses. South Carolina, Virginia, Delaware, New Jersey, New York, and Pennsylvania by statute required law enforcement officials to attend court. *See* THE PUBLIC LAWS OF SOUTH CAROLINA, *supra*, at 268, 271 (App.38–39) ("The Said sheriffs by themselves, or lawful deputies, shall attend all the courts in their respective districts."); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 69–71 (1803) (App.74–78) (similar); 2 LAWS OF THE STATE OF DELAWARE, *supra*, at 1088, 1091 (App.27–28) (similar); LAWS OF THE STATE OF NEW JERSEY, COMPILED AND PUBLISHED, UNDER THE AUTHORITY OF THE LEGISLATURE 49, 50, 58 (Joseph Bloomfield ed., Trenton, James J. Wilson 1811) (App.79–84) (similar); 1 LAWS OF THE STATE OF NEW YORK 176 (Websters & Skinner 2d ed. 1802) (App.85–93) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons… . And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); STATUTES AT LARGE OF PENNSYLVANIA, *supra*, at 57 (App.33) (similar). Beyond these statutory requirements, the legislative record in other states indicates that law enforcement officials were compensated for attending judicial proceedings. *See* ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA 63–65 (New London, Timothy Green 1784) (App.94–98); A DIGEST OF THE LAWS OF THE STATE

16

OF GEORGIA 471, 473–74, 478 (Robert & George Watkins eds., Phila., R. Aitken 1800) (1792 law) (App.99–105); 1 THE LAWS OF MARYLAND TO WHICH ARE PREFIXED THE ORIGINAL CHARTER, WITH AN ENGLISH TRANSLATION, ch. 25 (1799) (1799 law) (App.106–109); ACTS AND RESOLVES OF MASSACHUSETTS, 1786-87 at 235 (Boston, Adams & Nourse 1893) (1786 law) (App.110–113); THE LAWS OF THE STATE OF NEW HAMPSHIRE 112–16 (1797) (App.114–120); A MANUAL OF THE LAWS OF NORTH-CAROLINA 190–91, 196 (John Haywood ed., 3d ed. 1814) (App.121–126); THE PUBLIC LAWS OF THE STATE OF RHODE ISLAND, *supra*, at 220, 222 (App.20–23); LAWS OF VERMONT, *supra*, at 382, 387 (1798 law) (App.56–59).

Polling places were similarly secured by government-provided security at the Founding, including in Georgia, Virginia, New Jersey, Maryland, Delaware, and South Carolina. *See* A DIGEST OF THE LAWS OF GEORGIA, *supra*, at 611  (App.105) ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (Augustine Davis ed., 1796) (App.130–132) (similar); LAWS OF THE STATE OF NEW JERSEY, *supra*, at 36  (App.81) (providing security at polling places); MD. CONST. art. 1 §§ 3, 14 (1776) (App.134–136) (similar); 2 LAWS OF THE STATE OF DELAWARE, *supra*, at 984 (App.26) (similar); THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA, *supra*, at 386–88 (App.40–42) (table of fees includes payment to sheriffs for polling-place security).

In other words, the historical principle underlying these regulations was that legislative assemblies, polling places, and courthouses were sensitive because the government treated them as such by providing comprehensive security. Their sensitive nature was never a matter of simple government fiat.

As in *Rahimi*, that history teaches that the government can prohibit firearms only in places secured by its own comprehensive security "confirm[s] what common sense suggests." 144 S. Ct. at 1901. The point of the Second Amendment is ensuring that Americans can be "'armed and ready'" for "ordinary self-defense needs." *Bruen*, 597 U.S. at 32, 60 (quoting *Heller*, 554 U.S. at 584). But when the government secures a location and protects those in it, there is less of a need for ordinary, law-abiding Americans to be ready to defend themselves. The problem for the Government is that its Post Offices do not have these features. Visitors are not "screened by security," and Post Offices "do not have controlled entry points." *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 659 (Del. 2017). More, "[w]hereas courthouses are supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders," Post Offices may be comparatively "remote" and "the intervention of society on [individuals'] behalf may be too late to prevent injury." *See id.* (internal quotation marks omitted).

The principle that a place is "sensitive" if the Government chooses to make it so by providing comprehensive security is inapplicable to unsecured Post Offices, and so the Carry Ban fail *Bruen*'s historical test. And the Government cannot avoid this framework. *Bruen* makes clear that *Heller* and *McDonald* dicta do not create an "exception" for government buildings—an exception erroneously adopted in the unpublished, pre-*Bruen*, two-page opinion in *United States v. Dorosan*, 350 F. App'x 874, 875–76 (5th Cir. 2009); *see also* 5TH CIR. R. 47.5.4 ("Unpublished opinions issued on or after January 1, 1996, are not precedent, except under the doctrine of res judicata, collateral estoppel or law of the case (or similarly to show double jeopardy, notice, sanctionable conduct, entitlement to attorney's fees, or the like)."). When the Court in *Bruen* identified legislative assemblies, polling places, and courthouses as "'sensitive places' where arms carrying could be prohibited consistent with Second Amendment," it endorsed carriage restrictions

18

in a subset of government buildings, but not all government buildings. *See Bruen*, 597 U.S. at 30; *accord Ayala*, 2024 WL 132624, at *12. What is more, it confirmed that *Bruen*'s history-based, analogical-reasoning method applies to purported sensitive places.

### C.   The Government Cannot Justify The Carry Ban On The Ground That It Owns And Operates Post Offices.

Just as the government cannot simply declare land it owns and operates "sensitive" and make it so, there is no "government proprietor" exception to the Second Amendment, or to any other constitutional right. *Koons*, 673 F. Supp. 3d at 603 (Even "where the government is acting as a[] . . . proprietor or market participant, allegations of government infringement are nevertheless resolved according to the applicable analytic framework." (cleaned up)); *Ayala*, 2024 WL 132624, at *14 (similar); *Wolford v. Lopez*, No. 23-cv-00265, 2023 WL 5043805, at *20 (D. Haw. Aug. 8, 2023) (rejecting government proprietor argument as irrelevant under *Bruen*'s test); *May v. Bonta*, No. 23-cv-01696, 2023 WL 8946212, at *17 (C.D. Cal. Dec. 20, 2023) (same). The Government also "owns"—and provides funding to maintain—sidewalks, streets, and other public places, but it cannot bar the exercise of constitutional rights there based solely on its status as proprietor. Surely the government—acting as proprietor and seeking to ensure safety within places it funds—cannot decree that there is no right against unreasonable search and seizure within Post Offices. *Cf. Ex parte Jackson*, 96 U.S. 727, 732–33 (1877). The same must be true for the Second Amendment, because it is "not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780 (plurality opinion)); *see also id.* at 17 n.3 (The Second Amendment "is not the only constitutional right that has controversial public safety implications." (quoting *McDonald*, 561 U.S. at 783 (plurality opinion))). In other words, "before a state's regulation can pass constitutional

19

muster, it must satisfy *Bruen* regardless of whether the Government is the proprietor." *Siegel v. Platkin*, 653 F. Supp. 3d 136, 155 (D.N.J. 2023).

Moreover, the Government does not act as "proprietor" in enforcing the Carry Ban but as sovereign. *Accord Koons*, 673 F. Supp. at 600–01; *Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F. Supp. 3d 675, 694 (N.D. Ill. 2021). The challenged provisions are part of the criminal code and are backed by criminal penalties, which normal proprietors cannot enact or enforce, and they directly regulate constitutional conduct, which normal proprietors cannot do.

*   *   *

In sum, the Government has impermissibly deemed the routes to and from Post Offices, and all Post Offices, gun-free zones. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1525 (2009) (calling burdens on carry "to and from" locations "substantial" because individuals must avoid a wide range of places to continue bearing arms in self-defense). Or, more accurately, gun-free for the law-abiding. As the Founders knew, violent criminals are unlikely to meticulously follow restrictions on public carry, and therefore "[s]uch laws make things worse for the assaulted and better for the assailants." Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms*, 2020 PEPP. L. REV. 71, 83 (2020) (explaining that the Founders were influenced by prominent Enlightenment thinker Cesare Beccaria, who was critical of gun control laws for this reason); THOMAS JEFFERSON, JEFFERSON'S LEGAL COMMONPLACE BOOK 521 (David T. Konig & Michael Zuckert eds., Princeton Univ. Press 2019) (quoting Beccaria on this point).

20

The Government thus ignores the Supreme Court's instruction that "sensitive places" are "few" and "exceptional." *Bruen*, 597 U.S. at 30, 38; *Range v. Att'y Gen.*, 69 F.4th 96, 105 (3d Cir. 2023), *cert. granted, judgment vacated*, 144 S. Ct. 2706 (2024) ("[H]istorical restrictions on firearms in 'sensitive places' do not empower legislatures to designate any place 'sensitive' and then ban firearms there[.]"). Individuals who visit Post Offices are not only deprived of their Second Amendment rights at the Post Office but also may be in *every place* that they travel to and from—every neighborhood, every restaurant, every store, every time they leave the house to go to the Post Office. This effect is particularly pernicious on individuals who "have to walk some distance through a high-crime area" after departing the Post Office. *See* Tr. of Oral Arg. at 67, *Bruen*, 597 U.S. 1 (2022) (No. 20-843). By effectively prohibiting carrying before the visit, during the visit, and after the visit, "law-abiding citizens are stripped of the ability to bear arms in self-defense," Volokh, *supra*, at 1525. There is no historical justification for such a sweeping denial of Second Amendment rights.

## CONCLUSION

For all these reasons, this Court should grant Plaintiffs' motion for summary judgment and permanently enjoin enforcement of the Carry Ban to the extent it bars the possession and carrying of firearms in U.S. Post Offices and on Postal Service postal property.

Dated: October 21, 2024                                    Respectfully submitted,

21

R. Brent Cooper
TX Bar No. 04783250
Brent.cooper@cooperscully.com
S. Hunter Walton
TX Bar No. 04783250
hunterwalton@cooperscully.com
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 74202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

/s/ David H. Thompson
David H. Thompson*
DC Bar No. 450503
dthompson@cooperkirk.com
Peter A. Patterson*
DC Bar No. 998558
ppatterson@cooperkirk.com
Megan M. Wold*
DC Bar No. 198005
mwold@cooperkirk.com
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601

*admitted pro hac vice*

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on October 21, 2024, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

/s/ David H. Thompson
David H. Thompson