**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORHTERN DISTRICT OF TEXAS**

| | |
|---|---|
| FIREARMS POLICY COALITION, INC., *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 4:24-cv-565 |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States, | |
| Defendant. | |

## DEFENDANT'S COMBINED MOTION FOR SUMMARY JUDGMENT & OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Defendant Merrick Garland, in his official capacity as the Attorney General of the United States, hereby files this combined motion for summary judgment and opposition to Plaintiffs' motion for summary judgment, ECF No. 23 ("Pls. Mot."). In accordance with Local Civil Rules 56.3(b) and 56.4(b), Defendant will address each claim as to which he seeks summary judgment, and explain why he opposes Plaintiffs' motion for summary judgment, in his brief.

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

I.    The Challenged Prohibitions. ..................................................................................... 2

II.   Prior Challenges To These Prohibitions. .................................................................. 3

LEGAL STANDARD ............................................................................................................... 4

ARGUMENT ............................................................................................................................ 5

I.    The Regulation of Firearms in Government Buildings is Presumptively Constitutional. ........................................................................................................... 5

II.   Plaintiffs Have Not Carried Their Burden to Overcome That Presumption. ............. 7

    A.  The Language from *Heller* and *McDonald* Cannot Be Dismissed As "Dicta." ........... 7

    B.  Post Offices Are "Sensitive Places." ........................................................................... 9

        1.  The challenged prohibitions must be assessed on their terms. ............................... 9

        2.  The presumption that the government may regulate firearms on its own property is informed by other constitutional provisions......................................................... 10

        3.  Plaintiffs cannot draw any logical or historical contrast between Post Offices and legislative assemblies, polling places, or courthouses. ......................................... 12

            a)  Legislative assemblies. ...................................................................................... 13

            b)  Polling places. .................................................................................................... 16

            c)  Courthouses........................................................................................................ 18

III.  Even if Defendant Bore the Burden Under *Bruen*, the Challenged Prohibitions Would Pass Muster. ................................................................................................. 22

    A.  There Is A History and Tradition of Safekeeping Places Where Government Business Was Conducted. .......................................................................................................... 23

    B.  Plaintiffs' Historical Arguments Reflect the Misunderstanding of *Bruen* That *Rahimi* Corrected.......................................................................................................... 24

IV.  Plaintiffs' Proposed Injunction Would Be Overbroad................................................ 27

CONCLUSION ....................................................................................................................... 29

## TABLE OF AUTHORITIES

CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................ 4, 5

*Antonyuk v. James*,
    -- 4th --, No. 22-2908, 2023 WL 11963034 (2d Cir. Oct. 24, 2024) ........................................ 6

*Baker v. Fort Worth*,
    506 F. Supp. 3d 413 (N.D. Tex. 2020) ........................................................................ 4

*Bonidy v. U.S. Postal Service*,
    790 F.3d 1121 (10th Cir. 2015),
    *cert. denied*, 577 U.S. 1216 (2016) ............................................................... 4, 8, 11, 13

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
    176 A.3d 632 (Del. 2017) ................................................................................. 13, 14

*Carey v. Musladin*,
    549 U.S. 70 (2006) ......................................................................................... 7, 8

*Dist. of Columbia v. Heller*,
    554 U.S. 570 (2008) ................................................................................... *passim*

*Gill v. Whitford*,
    585 U.S. 48 (2018),
    *rev'd and remanded on other grounds sub nom. Murthy v. Missouri*, 603 U.S. 43 (2024) ...... 28

*Ex parte Jackson*,
    96 U.S. 727 (1877) ......................................................................................... 11

*Jennings v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    No. 5:10-CV-140-C, 2011 WL 13183239 (N.D. Tex. Sept. 29, 2011),
    *aff'd sub nom. Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, &
    Explosives*, 700 F.3d 185 (5th Cir. 2012). ................................................................. 3

*McDonald v. Chicago*,
    561 U.S. 742 (2010) .................................................................................. 1, 5, 7, 10

*McRorey v. Garland*,
    99 F.4th 831 (5th Cir. 2024) ............................................................................... 8

*Md. Shall Issue, Inc. v. Moore*,
    116 F.4th 211 (4th Cir. 2024) ............................................................................. 6

*Missouri v. Biden*,
  83 F.4th 350 (5th Cir. 2023) ............................................................. 28

*Nekrilov v. City of Jersey City*,
  45 F.4th 662 (3d Cir. 2022) .............................................................. 12

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022)......................................................................... *passim*

*Rocky Mountain Gun Owners v. Polis*,
  -- F.4th. --, No. 23-1251, 2024 WL 4677573 (10th Cir. Nov. 5, 2024)...................... 6

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996)............................................................................ 8

*United States v. Allam*,
  677 F. Supp. 3d 545 (E.D. Tex. 2023) ..................................................... 3

*United States v. Ayala*,
  711 F. Supp. 3d 1333 (M.D. Fla. Jan. 12, 2024)...................................... 4, 26

*United States v. Bundy*,
  No. 3:16-cr-00051-BR, 2016 WL 3156309 (D. Or. June 3, 2016)........................... 4

*United States v. City & Cnty. of San Francisco*,
  310 U.S. 16 (1940)........................................................................... 10

*United States v. Class*,
  930 F.3d 460 (D.C. Cir. 2019) ........................................................... 9, 11

*United States v. Dorosan*,
  350 Fed. App'x 874 (5th Cir. 2009) ............................................... 3, 10, 13

*United States v. Gailes*,
  118 F.4th 822 (6th Cir. 2024) ............................................................. 6

*United States v. Giraitis*,
  127 F. Supp. 3d 1 (D.R.I. 2015)........................................................... 4

*United States v. Gliatta*,
  580 F.2d 156 (5th Cir. 1978) ...................................................... 1, 3, 10, 26

*United States v. Jackson*,
  69 F.4th 495 (8th Cir. 2023) .............................................................. 8

*United States v. Rahimi,*
  61 F.4th 443 (5th Cir. 2023) ............................................................... 6

*United States v. Rahimi,*
  144 S. Ct. 1889 (2024) ............................................................. *passim*

*U.S. Postal Serv. v. Flamingo Indus.,*
  540 U.S. 736 (2004) ........................................................................... 11

*Walker v. Sears, Roebuck & Co.,*
  853 F.2d 355 (5th Cir. 1988) ............................................................... 5

*Wolford v. Lopez,*
  116 F.4th 959 (9th Cir. 2024) .............................................................. 6

**CONSTITUTIONS**

U.S. Const. art. I, § 8, cl. 7 ................................................................... 11

U.S. Const. art. IV, § 3, cl. 2 ............................................................... 10

Del. Const. Art. 28 ............................................................................... 23

**STATUTES**

18 U.S.C. § 930 ...................................................................................... 4

18 U.S.C. § 930(a) ............................................................................ 4, 22

18 U.S.C. § 930(g)(1) ........................................................................... 13

18 U.S.C. § 3061(b)(4) ........................................................................... 2

39 U.S.C. § 401 ...................................................................................... 2

Anti-Drug Abuse Act of 1988,
  Pub. L. No. 100-690, 102 Stat. 4181 ................................................... 2

**REGULATIONS**

37 Fed. Reg. 24,346 (Nov. 16, 1972) ..................................................... 2

39 C.F.R. § 232.1(l) ...................................................................... 2, 3, 22

**RULES**

Fed. R. Civ. P. 56(a) .............................................................................. 4

**OTHER AUTHORITIES**

1647 Md. Laws 216 ............................................................................................... 23

1650 Md. Laws 273 ............................................................................................... 23

1786 Va. Acts 33, ch.21 ........................................................................................ 23

2 Edw. 3 c. 3 (1328) ............................................................................................. 23

7 Edw. 2, 170 (1313) ............................................................................................ 23

Act of Jan. 26, 1787 N.Y. Laws 345 .................................................................... 23

Archives of Maryland (Biographical Series): Cornelius Mills (c.1755–1823),
    https://msa.maryland.gov/megafile/msa/speccol/sc3500/sc3520/016700/016711/
    html/16711bio.html............................................................................................ 15

Kopel & Greenlee, *The "Sensitive Places" Doctrine: Locational Limits onthe Right to Bear
    Arms, 13 Charl*eston L. Rev. 204 (2018)........................................................... 14

Randy J. Kozel, *The Scope of Precedent*, 113 Mich. L. Rev. 179 (2014) .................................... 7

The Charter and Ordinances of the City of Providence, with the Acts of the General Assembly
    Relating to the City Page 60, Image 61 (1835)................................................. 24

William Michael Treanor, *The Original Understanding of the Takings Clause and the Political
    Process*, 95 Colum. L. Rev. 782 (1995) ........................................................... 11

**INTRODUCTION**

By this action, Plaintiffs seek to invalidate, on constitutional grounds, longstanding regulatory and statutory prohibitions against carrying firearms on U.S. Postal Service property. Plaintiffs' arguments misinterpret both legal and historical precedent.

Notwithstanding the individual right to keep and bear arms under the Second Amendment, the Supreme Court has repeated, time and again, that the government may regulate firearms in "sensitive places," which include "government buildings." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008)); *McDonald v. Chicago*, 561 U.S. 742, 786 (2010). Despite this clear guidance, Plaintiffs urge an incoherent and ahistorical theory that "sensitive places" are only those where the government provided heightened, armed, and comprehensive security at the Founding. Plaintiffs fail to amass any historical evidence to support that interpretation. Nor do Plaintiffs grapple meaningfully with the fact that, when regulating its own property, the government draws upon the Property Clause and (in this case) the Post Office Clause of the Constitution, both of which enable the federal government to regulate postal property in ways that it could not regulate State or private property. *See United States v. Gliatta*, 580 F.2d 156, 160 (5th Cir. 1978). Finally, even if the "sensitive places" presumption did not apply, the government demonstrates below that the challenged prohibitions are consistent with the principles of Founding Era firearms regulation. Plaintiffs' insistence on a "dead ringer" or "historical twin" is the exact misinterpretation of *Bruen* that the Supreme Court corrected in *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024).

Neither the Supreme Court nor the Fifth Circuit has ever invalidated a regulation of firearms on federal property. Especially given Plaintiffs' failure to muster any historical evidence to support their theory, this case makes a poor vehicle to break new ground. The Court should deny Plaintiffs' motion for summary judgment, grant this motion, and close the case.

1

## BACKGROUND

### I.    THE CHALLENGED PROHIBITIONS.

On November 16, 1972, the United States Postal Service amended its regulations to prohibit certain conduct on postal property. *See* 37 Fed. Reg. 24,346 (Nov. 16, 1972). As relevant here, and as since amended, the regulation provides:

> (l) *Weapons and explosives.* Notwithstanding the provisions of any other law, rule or regulation, no person while on postal property may carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, or store the same on postal property, except for official purposes.

39 C.F.R. § 232.1(l).

The statutory sources of the regulation are 39 U.S.C. § 401 (which generally empowers the Postal Service to acquire, maintain, and regulate property that it owns or leases) and 18 U.S.C. § 3061(b)(4) (which allows the Postmaster General to regulate property owned or occupied by the Postal Service, including the imposition of "reasonable penalties" for violations of said regulations).

On November 18, 1988, Congress passed the Anti-Drug Abuse Act of 1988. *See* Pub. L. No. 100-690, 102 Stat. 4181. Section 6215 of that Act prohibited firearms in federal facilities, in pertinent part, as follows:

> (a) Except as provided in subsection (c), whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility, or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both.
>
> . . .
>
> (e) As used in this section:
>
> > (1) The term 'Federal facility' means a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties.

*Id.* § 6215, 102 Stat. at 4361.

2

## II.    PRIOR CHALLENGES TO THESE PROHIBITIONS.

For more than half a century, it has been illegal to possess firearms on Postal Service property except for official purposes. In those 52 years, to Defendant's knowledge, there have been only two challenges to the Postal Service's regulatory ban as violative of the Second Amendment.

The first was *United States v. Dorosan*, 350 Fed. App'x 874 (5th Cir. 2009). Mr. Dorosan, a Postal Service employee, was convicted for violating 39 C.F.R. § 232.1(l) for bringing a handgun onto a Postal Service parking lot. 350 Fed. App'x at 875. His sole argument on appeal was that § 232.1(l) violated the Second Amendment. *Id.* The Fifth Circuit rejected that argument for two reasons. First, unlike the exercise of "police power" at issue in *Heller*, 39 C.F.R. § 232.1(l) concerns the ability of the government to regulate its own property. *Id.* at 875 (citing *Gliatta*, 580 F.2d at 160 ("[The Post Office Clause] has been construed expansively to encompass all sorts of measures relating to the safe and efficient transmission of the mail."); *id.* at 160 ("Beyond doubt, the Property Clause authorizes the enactment and enforcement of regulations which, like those at issue in this case, are designed to maintain safety and order on government property.")). Second, because the Postal Service "used the parking lot for loading mail and staging its mail trucks[,]" it was a "sensitive place" under *Heller*. *See* 350 Fed. App'x at 875–76.

To be sure, Plaintiffs are correct that *Dorosan*—as an unpublished decision post-dating January 1, 1996—is not "precedent." Pls. Mot. 18 (citing 5th Cir. R. 47.5.4.). For that reason, Defendant does not suggest that *Dorosan* binds this Court. Nevertheless, the per curiam opinion is the best evidence of the Fifth Circuit's views on these issues. *Cf. United States v. Allam*, 677 F. Supp. 3d 545, 558 (E.D. Tex. 2023) (discussing *Dorosan* as good law); *Jennings v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 5:10-CV-140-C, 2011 WL 13183239, at *6 (N.D. Tex. Sept. 29, 2011) (same).[1]

---

[1] *Aff'd sub nom. Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012).

The only other challenge known to Defendant is *Bonidy v. United States Postal Service*, 790 F.3d 1121 (10th Cir. 2015). The Tenth Circuit upheld the regulation as it applied to postal buildings and to adjacent parking lots, on the ground that *Heller*'s admonition about government buildings "applies with the same force to the parking lot as to the building itself." *Id.* at 1125. The Tenth Circuit held that the "sensitive places" language in *Heller* is not dicta and that "federal buildings, such as post offices," are among such sensitive places. *Id.* The Supreme Court denied a petition for *certiorari* in *Bonidy* over no registered dissents. *See* 577 U.S. 1216 (2016).

As to the broader prohibitions in 18 U.S.C. § 930(a), Defendant knows of only one constitutional challenge in the 36 years that the statute has been in effect: *United States v. Ayala*, 711 F. Supp. 3d 1333 (M.D. Fla. Jan. 12, 2024).[2] The United States has appealed from that decision, which predated *Rahimi*, and briefing is ongoing. *See United States v. Ayala*, No. 24-10462 (11th Cir. Feb. 14, 2024).

## LEGAL STANDARD

"The Court may grant summary judgment where the pleadings and evidence show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Baker v. Fort Worth*, 506 F. Supp. 3d 413, 418 (N.D. Tex. 2020) (O'Connor, J.) (quoting Fed. R. Civ. P. 56(a)). "[T]he substantive law will identify which facts are material." *Id.* (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "When reviewing the evidence on a motion for summary judgment, courts must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant." *Id.* (citing *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988)).

---

[2] Defendant is aware of other (failed) challenges to separate parts of 18 U.S.C. § 930. *See United States v. Bundy*, No. 3:16-cr-00051-BR, 2016 WL 3156309, at *4 & n.3 (D. Or. June 3, 2016) (upholding § 930(b)); *United States v. Giraitis*, 127 F. Supp. 3d 1, 3 (D.R.I. 2015) (upholding 18 U.S.C. § 930(e)(1)).

## ARGUMENT

I.    **THE REGULATION OF FIREARMS IN GOVERNMENT BUILDINGS IS PRESUMPTIVELY CONSTITUTIONAL.**

There is no question that *Bruen* changed the mode of analysis for Second Amendment claims. But *Bruen* did not disturb the Court's prior and repeated assurances, starting with *District of Columbia v. Heller*, 554 U.S. 570 (2008), that the constitutionality of regulating firearms in government buildings is settled.

*Heller* began by observing that, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. With that principle in mind, *Heller* explained that its decision to strike down a local ordinance that had prohibited the keeping of handguns in homes "should [not] be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* The Court identified such sensitive-place restrictions as but one example in a non-exhaustive list of "presumptively lawful regulatory measures" that do not clash with the Second Amendment. *Id.* at 627 n.26. The Court also singled out "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. In making those assurances, the *Heller* Court explained that it would "expound upon the historical justifications for the exceptions [it had] mentioned if and when those exceptions come before [it]." *Id.* at 635. Then, in *McDonald v. City of Chicago*, the Supreme Court "repeat[ed] those assurances," reiterating that it had "made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as . . . 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings,' [etc.]." 561 U.S. 742, 786 (2010) (quoting *Heller*). Finally, in *Bruen*, the Court reaffirmed those exceptions yet again, *see* 597 U.S. at 30–31, even as it invalidated New York's

proper-cause licensing regime.

Plaintiffs argue that *Bruen* somehow limited the scope of presumptively constitutional regulations to "a subset of government buildings, but not all government buildings." Pls. Mot. 19. To the contrary, *Bruen* quoted the term "government buildings" from *Heller* without modification or caveat. 597 U.S. at 30. The majority later explained that its holding was "consistent with *Heller* and *McDonald*," *Bruen*, 597 U.S. at 10, and "[i]n keeping with *Heller*," *id*. at 17. Indeed, two of the concurring opinions in *Bruen*—votes that would have been necessary to garner a majority— emphasized that *Bruen* does not "disturb[] anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns[,]" *id*. at 72 (Alito, J., concurring), and (more specifically) that *Bruen* casts no "doubt on longstanding prohibitions on the . . . carrying of firearms in sensitive places such as schools and government buildings" (or other longstanding prohibitions recognized in *Heller* and *McDonald*), *id*. at 81 (Kavanaugh, J., concurring, in which Roberts, C.J., joined).[3]

At least six circuits, including the Fifth Circuit, seem to agree. *Rocky Mountain Gun Owners v. Polis*, -- F.4th. --, No. 23-1251, 2024 WL 4677573, at *15 (10th Cir. Nov. 5, 2024); *Antonyuk v. James*, -- F.4th --, No. 22-2908, 2023 WL 11963034, at *8 (2d Cir. Oct. 24, 2024); *United States v. Gailes*, 118 F.4th 822, 824–25 (6th Cir. 2024); *Wolford v. Lopez*, 116 F.4th 959, 970 (9th Cir. 2024); *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222 (4th Cir. 2024); *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023).[4] All of those opinions, issued well after *Bruen*

---

[3] Plaintiffs' reading would also create a contradiction within *Bruen*. The majority opinion offers "legislative assemblies, polling places, and courthouses" as examples of "sensitive places such as schools and government buildings." 597 U.S. at 30. But the former cannot be a definitive list of the latter, as the former contains no examples of "schools." *Id.* Thus, even putting aside the "*e.g.*" that precedes "legislative assemblies, polling places, and courthouses," that list cannot have been meant to narrow "government buildings" to a "subset." Pls. Mem. 19.

[4] The Fifth Circuit's decision in *Rahimi* was, of course, reversed. *See* 144 S. Ct. 1889. But the salient point is that the panel decision in *Rahimi* did not blink at the words "government buildings" or read *Bruen* to cabin that term to a "subset."

was decided, still understood "government buildings" writ large to be "sensitive places" where firearms regulations were presumptively constitutional. Defendant is not aware of any federal appellate decision—and Plaintiffs do not cite any—that understood *Bruen* to narrow *Heller* and *McDonald* to a "subset" (Pls. Mot. 19) of government buildings.

## II.    PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN TO OVERCOME THAT PRESUMPTION.

### A.    The Language from *Heller* and *McDonald* Cannot Be Dismissed As "Dicta."

The Supreme Court has said many times, in many ways, that the Second Amendment does not undermine firearm prohibitions in government buildings. *See Bruen*, 597 U.S. at 30; *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786. Nevertheless, Plaintiffs argue (albeit obliquely) that the "government buildings" language from *Heller* and *McDonald* is "dicta" and therefore should not control. Pls. Mot. 18. That is wrong.

"Virtually every one of the [Supreme] Court's opinions announcing a new application of a constitutional principle contains some explanatory language that is intended to provide guidance to lawyers and judges in future cases." *Carey v. Musladin*, 549 U.S. 70, 79 (2006) (Stevens, J., concurring). "By their very nature, doctrinal frameworks sweep far beyond the facts at hand to address other situations not concurrently before the court." Randy J. Kozel, *The Scope of Precedent*, 113 Mich. L. Rev. 179, 193 (2014). Given the relatively small number of cases the Supreme Court decides, applying conventional "what is a holding" principles to those decisions would hamstring the Court, trivialize its most important pronouncements, and beget circuit conflicts. "It is quite wrong to invite [lower-court] judges to discount the importance of such guidance on the ground that it may not have been strictly necessary as an explanation of the Court's specific holding in the case." *Musladin*, 549 U.S. at 79. The Supreme Court itself recognizes that a "well-established rationale upon which the Court based the results of its earlier decisions" is entitled to as much deference as the results themselves. *Seminole Tribe of Fla. v. Florida*, 517 U.S.

44, 66–67 (1996). "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Id.* at 67.

But beyond that, *Heller* identified classes of presumptively lawful regulations—including "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"—as part of its historical analysis of the Second Amendment's meaning. 554 U.S. at 626. To be sure, *Heller* said that the Court would expound on the historical justifications for those permissible regulations when a case raising them comes before it, but the Court expressed no doubt that those regulations would likely be permissible, and it described these classes as "*presumptively lawful* regulatory measures," *id.* at 635 n.26 (emphasis added). Thus, this Court need not start from scratch. *Cf. Bonidy*, 790 F.3d at 1136 (Tymkovich, J., concurring in part and dissenting in part) (dissenting on the grounds that the sensitive-places language is dicta but noting that, even if it is dicta, *Heller* "placed a thumb on the scale" in favor of government buildings being sensitive places). Rather, as the Eighth Circuit concluded, it is "more likely that the Court presumed that the regulations are constitutional because they are constitutional, but termed the conclusion presumptive because the specific regulations were not at issue in *Heller*." *United States v. Jackson*, 69 F.4th 495, 505 n.3 (8th Cir. 2023).[5]

The Supreme Court was clear that "nothing in [*Heller*] should be taken to cast doubt" on

---

[5] The Fifth Circuit recently suggested—in dicta—that *Heller*'s "sensitive places" language may have been supplanted by *Bruen*. *See McRorey v. Garland*, 99 F.4th 831, 838 & n.16 (5th Cir. 2024). But *McRorey* involved background checks for firearms purchasers under age 21; it was not a "sensitive places" case, and nothing in the decision turned on the court's discussion of that doctrine. Moreover, the court's discussion depends on treating *Bruen* as a "sensitive places" case, which it was not. *See id.* ("Plaintiffs' best response is that the Court applied the historical test to 'sensitive place' restrictions when it noted that 'there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place.'" (quoting *Bruen*, 597 U.S. at 31). New York's restriction did not apply to "sensitive places," but rather to the City generally. And whether or not the respondents asked the Supreme Court to declare New York City a "sensitive place" writ large, metropolises *per se* have never been one of the enumerated sensitive places that the Supreme Court has said may presumptively be regulated. Thus, this case fits squarely within *Heller*'s presumption as recognized by *Bruen*.

regulations of firearms in government buildings. *Heller*, 554 U.S. at 626. Plaintiffs are ill-positioned to cast doubt on them now.

### B.    Post Offices Are "Sensitive Places."

Because there is a presumption that federal buildings are sensitive places, Plaintiffs bear the burden of demonstrating that post offices and postal property are non-sensitive. *Cf. United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (observing that post offices, as government buildings, are "the paradigmatic 'sensitive places' identified in" *Heller*). To overcome that presumption in this case, Plaintiffs must show (at a minimum) that post offices are sufficiently dissimilar from "legislative assemblies, polling places, and courthouses," which *Bruen* expressly (but not exhaustively) identified as examples of "sensitive places" where firearms may be prohibited. Plaintiffs fail that test.

### 1.    The challenged prohibitions must be assessed on their terms.

Plaintiffs first argue that the challenged laws sweep more broadly than just post offices and postal property. *See* Pls. Mot. 14 ("Individuals who visit a Post Office may not have a firearm in their car if they park at the Post Office or on their person if they walk or take the bus to the Post Office, and they may not have a firearm when they leave the Post Office to travel elsewhere."). But the same could be said of legislative assemblies, polling places, and courthouses. Many people work daily at those locations or otherwise have to visit them on a regular basis. And yet, on Plaintiffs' theory, the prohibitions on carrying in those sensitive places—which Plaintiffs concede are constitutional—would "effectively render[] licensed carry outside of the home impossible in many circumstances." *Id.* at 14. Positing that the "Carry Ban" prohibits carrying even *off* Postal property—which of course, it does not even purport to do—cannot be a reason to invalidate it.

Indeed, the Fifth Circuit rejected exactly this argument in its unpublished opinion in *Dorosan*, 350 F. App'x at 876 ("If Dorosan wanted to carry a gun in his car but abide by the ban,

he ostensibly could have secured alternative parking arrangements off site. Thus, Dorosan fails to demonstrate that § 232.1(l) has placed any significant burden on his ability to exercise his claimed Second Amendment right."). Mr. Dorosan was a letter carrier, bound by his employment to visit the Post Office daily. If *his* Second Amendment rights were not significantly burdened, then it is hard to imagine such a burden befalling plaintiffs, who only wish occasionally to visit a post office.

### 2. The presumption that the government may regulate firearms on its own property is informed by other constitutional provisions.

The constitutional dimensions are different here than in the Supreme Court's recent cases. *Heller* concerned the possession of handguns in the home. 554 U.S. at 628. *McDonald* concerned the prohibition on handguns within city limits. 561 U.S. at 751. *Bruen* concerned "good cause" and "proper cause" requirements to possess handguns inside the home and within city limits, respectively. 597 U.S. at 12. And *Rahimi* considered a statutory ban on firearm possession by one subject to a domestic-violence restraining order. 144 S. Ct. 1889. In every case, the question was whether (or to what extent) the government could regulate firearms outside its property.

The critical difference here is that the government owns (or at least leases) the property at issue. The Constitution grants Congress the "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]" U.S. Const. art. IV, § 3, cl. 2. "The power over the public land thus entrusted to Congress is without limitations." *United States v. City & Cnty. of San Francisco*, 310 U.S. 16, 29 (1940). "Beyond doubt, the Property Clause authorizes the enactment and enforcement of regulations which, like those at issue in this case, are designed to maintain safety and order on government property." *Gliatta*, 580 F.2d at 160 (5th Cir. 1978); *see also id.* ("Th[e Post Office] clause has been construed expansively to encompass all sorts of measures relating to the safe and efficient transmission of the mail[.]") (citing U.S. Const. art. I, § 8, cl. 7 and collecting cases); *Ex parte Jackson*, 96 U.S. 727, 728 (1877) (Congress' power "'to establish post-offices and post-roads' has been practically

construed, since the foundation of the government, to authorize not merely the designation of the routes over which the mail shall be carried, and the offices where letters and other documents shall be received to be distributed or forwarded, but the carriage of the mail, and all measures necessary to secure its safe and speedy transit, and the prompt delivery of its contents."). "As a government-owned business acting as a proprietor rather than as a sovereign, the USPS has broad discretion to govern its business operations according to the rules it deems appropriate." *Bonidy*, 790 F.3d at 1126; *cf. U.S. Postal Serv. v. Flamingo Indus.*, 540 U.S. 736, 739 (2004) (acknowledging the Postal Service to be "the nation's oldest and largest public business") (citation omitted). "In light of that discretion, the contrast between the regulation challenged here and the bans struck down in *Heller* and *McDonald* is stark." *Bonidy*, 790 F.3d at 1126.

Since the framing of the Constitution, the Property Clause has conferred power upon the federal government to regulate its own buildings. *Cf. Class*, 930 F.3d at 463–64 (holding, pre-*Bruen*, that prohibiting guns on grounds of the U.S. Capitol "does not impinge upon a right protected by the Second Amendment" (cleaned up), and affirming the prohibition partly because "as the owner of the Maryland Avenue lot [which was part of the Capitol grounds], the government—like private property owners—has the power to regulate conduct on its property"). Our Founders understood that property owners had the right to exclude others from their property and, along with it, the lesser power to restrict the actions or conduct of visitors as a condition of admittance. *See* William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 826–27 (1995) ("The individual's right of property 'consists in the free use, enjoyment, and disposal of all acquisitions, without any control of diminution, save only by the laws of the land.'" (quoting Blackstone's Commentaries)); *see also Nekrilov v. City of Jersey City*, 45 F.4th 662, 683–84 (3d Cir. 2022) (Bibas, J., concurring) (similarly describing the Founders' "broad conception" of property rights (also citing Blackstone's

11

Commentaries)). Taken together with the settled historical examples that the Supreme Court identified—firearm prohibitions in legislative assemblies, polling places, and courthouses—the Property Clause demonstrates a historical understanding of the government's authority to restrict firearms in its own buildings, without exception, and a tradition of doing so.

### 3. Plaintiffs cannot draw any logical or historical contrast between Post Offices and legislative assemblies, polling places, or courthouses.

Plaintiffs' most robust argument is that "Post Offices are simply not sensitive places." Pls. Mot. 14–19. Plaintiffs posit that a place is "sensitive" only if it is "protected by heightened, government-provided security, reducing the public's need for individual weapons." *Id.* at 14. And because there is no security screening or controlled entry points at most post offices, they are not "sensitive." *Id.* at 18. That argument fails for several reasons.

Begin with the contradictions in Plaintiffs' argument. They posit that "sensitive nature was never a matter of simple government fiat[,]" *id.* at 17, but also that sensitivity turns on whether "the Government chooses to make it so by providing comprehensive security," *id.* at 18. That would seem to concede that the government's intent determines whether or not a place is sensitive, yet (inexplicably) turns on whether that intent manifests by metal detectors and security guards or by regulations and legislation. Under Plaintiffs' interpretation, a courthouse might be a sensitive place one day, by virtue of its security guards, but cease to be sensitive the next day if the guards are absent for some reason. By the same token, post offices may be "sensitive places" if Postal Inspection Service officers are present at the site due to a security threat, but cease to be sensitive once those officers leave the building. On Plaintiffs' theory, then, the constitutionality of firearm regulations in a certain locale could ebb and flow with annual appropriations or the current force-protection posture—which, Plaintiffs elsewhere concede, cannot be correct.

Instead, as described in Section III below, the presumptive validity of historical arms restrictions in "government buildings" is rooted in the need to safeguard government business

being conducted there—not the presence or absence of armed security guards. That rationale undergirded *Bonidy* and *Dorosan*, both of which concluded that the postal parking lots at issue were "sensitive places" because of the government activity there. *See Bonidy*, 790 F.3d at 1125 ("There is, in fact, a drop-off box for the post office in the parking lot, meaning that postal transactions take place in the parking lot as well as in the building. Thus, the previously quoted language in *Heller* applies with the same force to the parking lot as to the building itself."); *Dorosan*, 350 Fed. App'x at 875 ("Moreover, the Postal Service used the parking lot for loading mail and staging its mail trucks. *Given this usage of the parking lot by the Postal Service as a place of regular government business*, it falls under the "sensitive places" exception recognized by *Heller*." (emphasis added)). And it accords with 18 U.S.C. § 930(g)(1), which limits the definition of "Federal facility" to buildings "where Federal employees are regularly present for the purpose of performing their official duties."

Turning to Plaintiffs' historical evidence, it fails to substantiate the premise of their arguments with respect to legislatures (Pls. Mot. 15), polling places (*id.* at 17), or courthouses (*id.* at 16–17). Recall that Plaintiffs will ultimately argue that a post office is not a "sensitive place" because "[v]isitors are not 'screened by security'" and there are not "controlled entry points." *Id.* at 18 (quoting *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 659 (Del. 2017)). But Plaintiffs have not demonstrated that any of *Bruen*'s enumerated "sensitive places" bore either of these characteristics—or anything comparable to them—historically.

### a)    Legislative assemblies.

With respect to legislatures, Plaintiffs' lengthy string cite (Pls. Mot. 15–16) is carefully described as a list of "statutes compensating law enforcement to attend and provide security for

legislatures." *Id.* at 15.[6] And indeed, seven of the nine examples in that string cite are merely fee schedules that compensate various types of officers for attending proceedings. *See* Pls. App'x 21–23 (Rhode Island), 29–30 (Delaware), 32–35 (Pennsylvania), 43–44 (South Carolina), 128–29 (New York), 45–48 (Georgia), and 49–52 (New Jersey).[7] Taking the first example, the Rhode Island legislature merely authorized compensation of $1/day for any sheriff attending the General Assembly or court proceedings and $0.75/day for any town sergeant or constable doing the same. *See id.* at 21–23. None of Plaintiffs' examples requires any sheriff, constable, etc. to be present for legislative assemblies. Let alone does any example describe "comprehensive security" being provided at those assemblies.

Other evidence merely memorializes that a "sergeant at arms" or "door-keeper" was appointed. *See, e.g.*, *id.* at 62 (Maryland). None of the cited statutes provides any security measures for legislative assemblies, let alone "controlled entry points" or a requirement that visitors be "screened by security," which Plaintiffs elsewhere argue are the hallmarks of a "sensitive place." Pls. Mot. 18 (quoting *Bridgeville Rifle & Pistol Club, Ltd*, 176 A.3d at 659). And importantly, none of Plaintiffs' examples requires the officer(s) in attendance—when they do attend—to be *armed*. That undermines the thesis of Plaintiffs' Second Amendment argument: "When *armed* guards are present, the government takes the responsibility for having *armed* force at the ready to protect citizens." *Id.* at 14 (emphasis added) (quoting Kopel & Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 204, 289–90 (2018)). Plaintiffs have not proved that any Founding-Era government required "armed guards" to

---

[6] Even still, the description is misleading. None of the fee schedules says "provide security for" or any variant of that. They merely reimburse for attendance. And for reasons explained more fully below, there is little reason to think that the attendance of a sheriff or constable was exclusively, or even primarily, to perform a security function.

[7] Without a pin citation or direct quote, it is not clear what Plaintiffs rely on with respect to New York (Pls. App'x 128–29) or Virginia (Pls. App'x 55). If Plaintiffs specify what they rely on from the cited pages, Defendant will respond in his reply brief.

be present at its legislative assembly.

One of Plaintiffs' examples stands out: Maryland. The first cited document, Notes and Proceedings of the House of Delegates from the November 1791 Session (Pls. App'x 60–63), does not address security of that session. *Id.* It does not require the presence of guards (armed or not), the screening of visitors, or anything of the sort. *Id.* (That is despite meticulously prescribing *thirty-one* rules of procedure, governing everything from the wearing of hats to the order in which members would sit and stand. *Id.* at 62–63.) Instead, the cited document merely records that "[t]he house appointed Mr. Cornelius Mills sergeant at arms, and Mr. Charles Hogg door-keeper." *Id.* at 62. Like the examples above, the document is silent on those gentlemen's roles. *See id.* But the Maryland State Archives shed some light: "During the October 1778 session, the House of Delegates first appointed Cornelius Mills as doorkeeper. *His tasks included supplying wood for the use of the General Assembly and maintaining the furniture.* In 1782, Mills was also paid separately for crafting a chair for the Speaker." *See* Archives of Maryland (Biographical Series): Cornelius Mills (c.1755–1823) (emphasis added) (footnotes omitted).[8] There is no mention of Mr. Mills' having any law-enforcement experience to speak of, which is not surprising given that "[d]uring this time, Mills also worked on the James Brice House in Annapolis as a carpenter/joiner, ran a boardinghouse, and advertised his experience as an auctioneer." *Id.* And yet, he was later appointed the sergeant-at-arms for the House of Delegates. *Id.* There is nothing in Plaintiffs' evidence to suggest that appointing Mr. Mills as door-keeper, and later as sergeant at arms, somehow supplied "comprehensive security." Pls. Mot. 17.[9]

---

[8]  *Available at* https://msa.maryland.gov/megafile/msa/speccol/sc3500/sc3520/016700/016711/html/16711bio.html.

[9] On the Maryland Senate side, there is not even a mention of a "sergeant at arms." *Compare* Pls. App'x 65 (Votes and Proceedings of the Maryland Senate for the November 1791 Session) ("William Tuck was appointed messenger, and Edward Roberts door-keeper. ORDERED That they be qualified.").

Maryland is but an illustrative example. Plaintiffs have not mustered evidence that any Founding-Era legislative assembly was comprehensively secured, by armed guards or otherwise. Which is to say, Plaintiffs have not substantiated their theory that prohibiting firearms in "legislative assemblies" is only presumptively constitutional (per *Bruen*, 597 U.S. at 30) "because the government treated them as such by providing comprehensive security." Pls. Mot. 17.

> **b)    Polling places.**

The same holds true with respect to polling places. Here, at least, Plaintiffs have found two examples where the State required law-enforcement presence at the relevant "sensitive place." *See* Pls. App'x 105 (Georgia) ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); *id.* at 136 (Maryland) ("[T]he Sheriff of each county, or in case of sickness, his Deputy (summoning two Justices of the county, who are required to attend, for the preservation of the peace), shall hold and be judge of the said election[.]"). But that only serves to contrast the 11 "legislative assemblies" examples offered by Plaintiffs (Pls. Mot. 15–16)—which, notably, included Georgia—none of which required sheriffs or other law enforcement to attend. In other words, Georgia seems to have required sheriffs to attend polling places but not legislative assemblies. In any event, neither of these two examples (Georgia or Maryland) requires the attendant sheriffs to be armed—a prerequisite to any "sensitive place" under Plaintiffs' theory.

The two examples above also form a stark contrast with the other "polling places" examples. The Virginia statute, for example, underscores the disunity in Plaintiffs' record. *See id.* at 132. The "election" at issue in that statute was to fill vacancies in unincorporated towns' trustees or directors; the statute did not govern elections more generally. *Id.* In any event, upon such a vacancy, the remaining trustee(s)/director(s) was to notify the sheriff, who would then notify the "freeholders of the said town" and "requir[e] them to appear at a certain place" to elect a

replacement. *Id.* It is no surprise, therefore, that the sheriff was required to "attend and take the poll at such election." *Id.* But that was so that he could "enter[] the names of the persons voted for in a distinct column" and then report the votes to the county court. *Id.* It was not—as in the Georgia example—to "preserv[e] good order." *See id.* at 105.

The 1811 New Jersey statute cited by Plaintiffs (*id.* at 81) is also inapposite. The cited portion provides that "for the preservation of good order, as well as for the security of the election officers from insult and personal abuse, the said officers are hereby authorized and empowered to commit any person or persons who shall conduct in a riotous or disorderly manner, and persist in such conduct after being warned of the consequences, either into the custody of a constable, or the keeper or a common [jail]." *Id.* While mentioning "a constable," and empowering election officers to commit persistent malfeasants to those constables' custody, the statute conspicuously does *not* require any such constable to attend the election process, or that they be armed.

Furthermore, under Plaintiffs' logic, New Jersey would seem to have dealt with the threat to its elections "through materially different means" than staffing such places with armed government security. Pls. Mot. 10 (quoting *Bruen*, 597 U.S. at 26). Instead, and in contrast to the Georgia example, New Jersey seems merely to have upped the penalties for threatening elections—precisely what Plaintiffs say *does not* suffice with respect to post offices. *See id.* ("The Founders did not bar carriage of firearms in Post Offices. Instead, they regulated the improper, threatening, and violent use of weapons in Post Offices.").

As regards Delaware and South Carolina, neither example carries Plaintiffs' burden. Delaware sheriffs were—along with "every other officer and person whose duty it was to attend, conduct, and regulate the General Election"—"required to attend, conduct, and regulate the election herein directed to be held for the purpose aforesaid, in like manner as in and by the said election laws." Pls. App'x 26. But that does not imply any law-enforcement purpose(s) in those

sheriffs' attendance, unlike the Georgia and Maryland examples above. Nor do the "Tables of Fees" from South Carolina, cited by Plaintiffs at Pls. App'x 40–42.[10] They provide reimbursement for "publishing writs for electing members to the General Assembly, taking the ballots and returning the writ." Def. App'x 3. Despite the reference to elections, there is no mention of polling places (the relevant "sensitive places"). And the following fee table, applicable to constables, mentions "serving a warrant," "summoning a witness," and "serving an execution or attachment returnable to the County Court"—but no reimbursement for service at legislative assemblies or polling places. Neither example proves that Delaware or South Carolina was providing "comprehensive security" (Pls. Mot. 17) to its polling places.

**c)    Courthouses.**

Defendant will concede that at least some Founding-Era governments—namely, South Carolina (Pls. App'x 39), Virginia (*id.* at 77), and Delaware (*id.* at 27)—required sheriffs to "attend" the "courts." But that does not establish that "courthouses" are only "sensitive places" (per *Bruen*, 597 U.S. at 30) because "the government treated them as such by providing comprehensive security." Pls. Mot. 17.

None of the three examples elaborates on what it means for a sheriff to "attend" a court in the late 18th century. *See generally* Pls. App'x 27, 39, 77. There is no mention of screening visitors, of controlling access to the courthouses, or of otherwise securing the property. *Id.* None of the three examples requires more than one sheriff (or sheriff's deputy) to attend the court, which cannot plausibly qualify as "comprehensive security" within Plaintiffs' meaning. *Id.* At least one of the examples (Delaware) suggests that "attend[ing]" court had nothing to do with securing the courthouse. *See id.* at 28 ("the Sheriff of Kent county, for the time being, shall be attendant on the said High Court of Errors and Appeals during the sitting thereof, *and be the officer for the purpose*

---

[10] Defendant attaches a more legible version of this three-page table at Def. App'x 1–3.

*of executing the . . . process of the said court* [.]" (emphasis added)). Other examples, too, suggest

that "attend" connoted ministerial and administrative duties. *See id.* at 90–91 (New York example)

(requiring sheriffs to bring grand and petit jurors to court, transport prisoners, facilitate witnesses,

etc.).[11]

With respect to Pennsylvania, the only duty prescribed to sheriffs on the cited page (*id.* at

33) is to summon a grand jury. It does not even require that the sheriff "attend" the ensuing action.

*Id.* In any event, that reference is a minor dovetail on a provision governing appeals from orders

issued by "regulators" appointed by municipal commissioners to review applications to "lay any

foundation or party wall within [the] district" of Southwark. Def. App'x 11.[12] This has nothing to

do with securing courthouses.

That leaves Plaintiffs' New Jersey example. *See* Pls. App'x 83. Though they do not specify,

Plaintiffs presumably refer to this passage: "That the constables of the several townships in such

county shall be the ministerial officers of the said court[.]" *Id.* But the statute goes on to specify

those constables' roles: "to execute and return all precepts, summons, warrants, writs and other

process, issuing out of the said court, and to them or any of them directed and delivered, and to

perform all matters, acts, and things appertaining to their offices aforesaid." Def. App'x 20–21.[13]

No mention of courthouse security. One of the constables' duties was to "attend the jury," as

---

[11] Plaintiffs quote this part of the New York Statute: "all justices of the peace, coroners, bailiffs, and constables within their respective counties [must] be then and there in their own persons . . . And the said respective sheriffs and their officers shall then and there attend in their own proper persons." Pls. Mot. 16 (quoting Pls. App'x 91). But that simply requires officers to attend and do their jobs. It does not explain *what* their job is, let alone that their job includes providing comprehensive security by, for example, disarming all visitors.

[12] Because it is important to understand the context of the entire statute—which has nothing to do with securing courts, but rather with incorporating the district of Southwark, a suburb of Philadelphia—Defendant is attaching the entire statute for the Court's convenience. *See* Def. App'x 4–18.

[13] Once again, Defendant is attaching the full statute for context and the Court's convenience. *See* Def. App'x 19–39.

explained at Pls. App'x 84: the constable would swear to "keep every person sworn (or affirmed) on this jury together in some private and convenient place, without meat or drink, water excepted," and not to "suffer any person to speak to them," "until they have agreed on their verdict." In other words, New Jersey constables were charged with keeping jurors sober, sequestered, and safe while they deliberated. But that only highlights the glaring absence of any parallel charge to keep *the courthouse* safe as a general matter.

In the entire 21-page New Jersey statute at issue, which was meant to "constitut[e] courts for the trial of small causes," there is no mention whatsoever of securing courthouses. There is one mention of local sheriffs, but only in the context of capturing escaped prisoners. *See* Def. App'x 31. There are many mentions of constables, but—as noted above—their jobs were mostly ministerial and procedural. And none of these statutes specified that those persons must be armed while carrying out their duties.

Finally, Plaintiffs suggest that "the legislative record in other states indicates that law enforcement officials were compensated for attending judicial proceedings." Pls. Mot 16–17 (citing examples). But that suffers from the same problem as the legislative-assemblies argument: those fee schedules compensate for, but do not require, law-enforcement attendance. Plaintiffs' first example proves the point. *See* Pls. App'x 97–98. Connecticut sheriffs and constables were reimbursed one shilling and a six-pence for "[a]ttending a Justice's Court, on Trial of each Action *when obliged to attend*." *Id.* at 98 (emphasis added). Apparently, these officers were not even required to attend every day of a trial—let alone provide "comprehensive security" (Pls. Mot. 16) at every courthouse on a regular basis. And because these sheriffs and constables were charged with other duties—many of which, by definition, could only be performed outside the courthouse (and sometimes outside the district)—these statutes are good evidence that the sheriffs could not, in fact, have been playing the security role that Plaintiffs ascribe to them.

\*       \*       \*

"Government buildings" have always been "sensitive places," *Bruen*, 597 U.S. at 30, but not because "the government treated them as such by providing comprehensive security," Pls. Mot. 17. On that theory, the sensitivity of a given facility would turn on the vicissitudes of governmental choices whether (and to what extent) to secure the facility. It would leave the scope of the Second Amendment up to "a matter of simple government fiat," Pls. Mot. 17, which Plaintiffs acknowledge cannot be the case.

More importantly, Plaintiffs' theory is ahistorical. Based on the detailed accounting above, it is no exaggeration to say that Plaintiffs have failed to prove that *any* State in the Founding Era provided "comprehensive security" to legislative assemblies, courthouses, or polling places—let alone to all three categorically. Nor does Plaintiffs' theory account for schools, which *Heller* and *Bruen* likewise described as "sensitive places," and which no one could seriously suggest were secured by armed, government-provided security at the Founding. As such, Plaintiffs have failed to offer any meaningful distinction between Post Offices and those government buildings that are concededly "sensitive places."

That is because Plaintiffs' understanding of the Second Amendment is fundamentally mistaken. CIA Headquarters is not a "sensitive place" because armed guards roam its perimeter. Rather, government buildings (like schools) are "sensitive places" because of the functions performed inside them. That is why, despite expanding Second Amendment rights in *Heller*, *McDonald*, and *Bruen*, the Supreme Court took pains to remind us that firearms regulations in schools and government buildings are still presumptively constitutional. This Court should decline Plaintiffs' invitation to disregard those repeated admonitions—especially when the ostensible justification is logically and historically flawed.

**III.     EVEN IF DEFENDANT BORE THE BURDEN UNDER *BRUEN*, THE CHALLENGED PROHIBITIONS WOULD PASS MUSTER.**

Although the Court need not address this point, as Plaintiffs have not dispelled the presumption that 18 U.S.C. § 930(a) and 39 C.F.R. 232.1(l) (as arms prohibitions applied to government buildings) are constitutional, Defendant would prevail even if he bore the burden of justifying the statute and regulation as consistent with our national history and tradition of firearms regulations.

Where *Bruen*'s presumption applies—that is, where the Second Amendment's plain text covers the plaintiff's conduct—then the government must prove that the firearms regulation "is consistent with this Nation's historical tradition." 597 U.S. at 17. The historical inquiry, *Bruen* explained, "will often involve reasoning by analogy," in which courts examine "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. at 28–29. That "analogical reasoning" should be "neither a regulatory straightjacket nor a regulatory blank check." *Id*. at 30. A court should not uphold modern laws simply because they remotely resemble historical outliers. *Id*. But neither should a court search in vain for a "historical *twin*"; "a well-established and representative historical *analogue*" will suffice. *Id*. (emphases in original). Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*.

Despite this guidance, some lower courts misunderstood *Bruen* to require too close of an historical analogy to the modern regulation at issue. *See Rahimi*, 144 S. Ct. at 1897. The Supreme Court reiterated that *Bruen*, *McDonald*, and *Heller* "were not meant to suggest a law trapped in amber." *Rahimi*, 144 S. Ct. at 1898. Rather, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* (citing *Bruen*, 597 U.S. at 26–31). So a court "must ascertain whether the new law is 'relevantly

22

similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (alteration in original) (quoting *Bruen*, 597 U.S. at 29 & n.7).

To that end, *Rahimi* held that our historical tradition of surety laws and going-armed laws, which could lead to jail for individuals who threatened the physical safety of others, suffices to justify a modern law that disarms subjects of domestic-violence restraining orders, even though historically there were no such specific restrictions. *Id.* at 1901. In reversing the Fifth Circuit, the Court recognized the adequacy of an appropriately analogous, "relevantly similar" restriction, and it squarely rejected the notion that a match was required.

### A. There Is A History and Tradition of Safekeeping Places Where Government Business Was Conducted.

Laws prohibiting the carrying of weapons in places of government business trace their roots to 14th century England. In 1313, a law was passed providing that, for those who appear in Parliament, "every Man shall come without all Force and Armour." 7 Edw. 2, 170 (1313). That law was followed in 1328 by the Statute of Northampton, which prohibited the carrying of arms "before the King's justices" and "other of the King's ministers doing their office." *Bruen*, 597 U.S. at 40 (citing 2 Edw. 3 c. 3 (1328)).

That general proposition remained in place for centuries and laid the groundwork for similar laws in the colonies. For example, in 1647, Maryland outlawed firearms in the House of Assembly during session. *See* 1647 Md. Laws 216; *see also* 1650 Md. Laws 273. In 1786, Virginia's legislature enacted a prohibition similar to the Statute of Northampton that forbade most people from "com[ing] before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms." 1786 Va. Acts 33, ch.21. In 1776 and 1778, Delaware and New York enacted laws that prohibited individuals from bringing arms to a polling place during an election. *See* Del. Const. Art. 28; Act of Jan. 26, 1787 N.Y. Laws 345. Similarly, in 1835,

Providence, Rhode Island, decreed that "No person shall fire any gun, pistol, rifle or other fire-arm . . . on any public lands within said city[.]" The Charter and Ordinances of the City of Providence, with the Acts of the General Assembly Relating to the City Page 60, Image 61 (1835). In sum, there are numerous examples from the Founding Era in which jurisdictions adopted laws against bringing arms to places where government business was being conducted, as the Supreme Court noted in *Bruen*, 597 U.S. at 30, 40.[14]

 **B. Plaintiffs' Historical Arguments Reflect the Misunderstanding of *Bruen* That *Rahimi* Corrected.**

 Plaintiffs argue that section 930(a) is unconstitutional as applied to Post Offices because firearm restrictions on government property had not yet expanded to post offices by the time of the Founding. *See generally* Pls. Mot. 10–13. But whether a firearm regulation is permissible, *Bruen* explains, depends on whether it is "consistent with"—not necessarily part of—that tradition. 597 U.S. at 19, 24. *Rahimi* emphasized and relied on that distinction. *See* 144 S. Ct. at 1898. Nevertheless, Plaintiffs insist that the firearms regulations at issue "fall[] into two of the three buckets of unconstitutionality that *Bruen* labelled 'fairly straightforward.'" Pls. Mot. 10 (quoting *Bruen*, 597 U.S. at 26).

 First, Plaintiffs argue that the government is employing a regulation (banning firearms in post offices) that it could have, but did not, employ at the Founding. *Id.* But the lack of Founding-era, post-office-specific firearm restrictions is neither dispositive nor surprising, because dedicated postal buildings were rare or non-existent at that time. The British Government furnished no postal buildings in the North American colonies, and the lack of dedicated accommodations continued long after the early American period. *See* Def. App'x 41 (Ruth Lapham Butler, *Doctor Franklin,*

---

[14] This is consistent with Defendant's arguments above. While there are examples of firearms regulation in government buildings, which provide the historical analogues for the modern prohibitions, "comprehensive security" was not—contrary to Plaintiffs' argument—the historical *sine qua non* of "sensitive places."

*Postmaster General* (1928)). Letters were left at public gathering spots such as taverns or inns, and local postmasters exercised their office from private residences. *Id.* Rather than existing in "government buildings," early post offices "moved with any change of the Postmasters in charge." *Id*. The first known colonial post office was a private tavern and residence designated by the General Court of Massachusetts in 1639. *See id.* at 42 (Post Office Department, 7 Collections of the Massachusetts Historical Society 3, 48 (1838)). New York City's first post office, opened in 1642, was housed in a succession of coffee houses until 1804. *See id.* at 47 (James Bruns, *Great American Post Offices,* at xii & 3 (1998)). There are no federal records on the buildings occupied by most early post offices. *See id.* at 69 (U.S. Postal Service, *Publication 119: Sources of Historical Information on Posts Offices, Postal Employees, Mail Routes, and Mail Contractors*, at 14 (Nov. 2022)). Until the early 1900s, most post office quarters were provided by the postmaster at no charge to the Post Office Department (often in the postmaster's home or other place of business, such as a general store). *Id*. Accordingly, the lack of firearm prohibitions in "post offices" at the time of the founding is not inconsistent with a contemporaneous understanding that firearms could nevertheless be restricted in "government buildings," which post offices would only later become. *See, e.g.*, *Bruen*, 597 U.S. at 30. And firearms were indeed restricted in several types of government buildings at the time of the founding, as explained above.

Second, Plaintiffs argue that our Founders perceived the same threat as Congress did in the 20th century but addressed that problem "through materially different means." Pls. Mot. 10 (quoting *Bruen*, 597 U.S. at 26). To wit, our Founders "regulated the improper, threatening, and violent use of weapons in Post Offices" instead of banning firearms there. *Id.* But the Founders could not have perceived a threat to "Post Offices" in the modern sense because—as explained above—those did not exist. *See, e.g.*, Def. App'x 69 (explaining that, until the early 1900s, most "post offices" were in fact the postmaster's home or place of other business).

That is likely why the death-penalty enhancement in the 1799 statute cited by Plaintiffs (Pls. App'x 167) applies when using "dangerous weapons" to wound or jeopardize the life of "any *carrier of* the mail," *id.* (emphasis added), not using such weapons to rob a modern-style post office. Likewise, Congress only punished the use of "dangerous weapons" to threaten "the person having custody" of the mail, *id.* (emphasis added), not to threaten postal property generally. The statute does prohibit stealing (or attempting to steal) mail "from or out of any post-office," but conspicuously does *not* mention "dangerous weapons" in those provisions. *See id.* at 168. Given this and other textual evidence—for example, the references to "falling upon *the person* having custody [of the mail]" and "shooting at him or his horses," *id.* at 167 (emphasis added)—it seems that Congress was addressing the threat of robbing the mail and those who carry it, not threats to "postal property" generally. Pls. Mot. 12.

Plaintiffs also cite perceived threats to "stagecoaches" and "trains" and stress that "later Congresses" responded by putting bounties on robbers and arming mail carriers—not by banning firearms. Pls. Mot. 12–13. But it is not clear how Congress could have banned firearm carriage by "robbers or Indians" riding horseback alongside stagecoaches or trains. *Id.* at 12 (quoting *Ayala*, 711 F. Supp. 3d at 1341). Holding those Congresses to an impossible standard adds little to the analysis, and is precisely the misunderstanding of *Bruen* that *Rahimi* corrected.

\*     \*     \*

The fundamental flaw in Plaintiffs' historical analysis is its myopic focus on post offices—which did not exist at the Founding as we know them now—largely to the exclusion of other government premises. That focus conflicts with *Bruen*'s directives, discussed above, and it renders firearm regulation almost impossible in most arenas, given the changes that have taken place over the past 250 years—including, especially, with respect to the federal government. As *Rahimi* emphasized through vivid metaphor, the Second Amendment does not countenance "law trapped

in amber." *Rahimi*, 144 S. Ct. at 1897. Yet Plaintiffs' argument *is* trapped in amber: it can be distilled to, "because there was no ban on firearms in post offices in the 18th century, there cannot be one today." *Cf.* Pls. Mot. 10–13.

The relevant question is whether a modern ban on firearms in Post Offices "is consistent with the *principles* that underpin our regulatory tradition," not whether it is identical to historical regulations. *Rahimi*, 144 S. Ct. at 1898 (emphasis added). Thus, "[t]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Id*. at 1897–98. The Court should reject Plaintiffs' over-exacting demand for restrictions on buildings that had not yet come into widespread existence and hold, for the reasons above, that the text and historical understanding of the Second Amendment are consistent with firearm restrictions in government buildings, including post offices.

## IV.    PLAINTIFFS' PROPOSED INJUNCTION WOULD BE OVERBROAD.

This case is being litigated on the stipulation that at least one Plaintiff has standing, such that the Court can reach the merits of the constitutional claim presented. However, Defendant reserved all jurisdictional defenses—including the argument that any of the Plaintiffs lack standing. *See* Joint Report Regarding Contents of the Scheduling Order 1 (Sep. 25, 2024), ECF No. 20. In the meet-and-confer preceding that report, undersigned counsel suggested that Plaintiffs specify the injunctive relief they seek in this case. Because they did not, Defendant can only assume that Plaintiffs seek the injunction proposed at the end of their Complaint: "a permanent injunction enjoining enforcement of 18 U.S.C. § 930(a) and 39 C.F.R. § 232.1(l) to the extent they bar the possession and carrying of firearms on United States Post Office property." Compl. for Declaratory & Injunctive Relief 7 (Prayer for Relief), ECF No. 1 ("Compl."). Assuming so, that injunction would be overbroad in several respects.

First, any injunctive relief should be tailored to the Plaintiffs in this case. "This requirement that a 'plaintiff's remedy must be tailored to redress the plaintiff's particular injury' is in recognition of a federal court's 'constitutionally prescribed role . . . to vindicate the individual rights of the people appearing before it,'" not "generalized partisan preferences." *Missouri v. Biden*, 83 F.4th 350, 394 (5th Cir. 2023) (quoting *Gill v. Whitford*, 585 U.S. 48, 72–73 (2018)), *rev'd and remanded on other grounds sub nom. Murthy v. Missouri*, 603 U.S. 43 (2024).

Second, the Constitution only affords the right for "ordinary, law-abiding, adult citizens" to bear arms for self-defense. *Bruen*, 597 U.S. at 31. The Supreme Court has not questioned, for example, "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626. One of the organizational Plaintiffs in this case boasts "over 720,0000 members and supports nationwide, including thousands of members in Texas." Compl. ¶ 7. It is far from certain that all members of the Plaintiff organizations would qualify as "ordinary" and "law-abiding" under *Heller* and *Bruen*. Others may not be "adult[s]." *Bruen*, 597 U.S. at 31. And still others may not be licensed to carry firearms, which is another important (and accepted) limitation on the Second Amendment right. *See Heller*, 554 U.S. at 627. In any case, injunctive relief should be tailored to those who enjoy a Second Amendment right to bear arms for self-defense—which is not (as Plaintiffs' proposed injunction might otherwise suggest) everyone.

Third, some "United States Post Office property" (Compl. 7) would be a "sensitive place" even on Plaintiffs' theory. For example, there is a post office at the Pentagon, and another at the State Department. There are post offices on military bases across the country. Any injunctive relief would need to exclude postal property that is comprehensively secured and is, therefore, a "sensitive place" even under Plaintiffs' (incorrect) definition.

The Court need not wade into these issues now—primarily because Plaintiffs should not prevail on the merits. But even if they do, an appropriate next step would be to order the Parties to

meet, confer, and propose a schedule for addressing the scope of any injunctive relief.

## CONCLUSION

The Court should grant this motion, deny Plaintiffs' motion for summary judgment, and close the case.

Dated: November 27, 2024                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            BRIGHAM J. BOWEN
                                            Assistant Branch Director

                                            /s/ *Jason C. Lynch*
                                            JASON LYNCH (D.C. Bar No. 1016319)
                                            Trial Attorney
                                            Federal Programs Branch
                                            U.S. Department of Justice, Civil Division
                                            1100 L Street, NW
                                            Washington, DC 20005
                                            Telephone: (202) 514-1359
                                            Email: Jason.Lynch@usdoj.gov

                                            *Counsel for Defendant*