## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORHTERN DISTRICT OF TEXAS

|  |  |
|---|---|
| FIREARMS POLICY COALITION, INC., *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States,<br><br>        Defendant. | Case No. 4:24-cv-565 |

## <u>APPENDIX TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Per Local Civil Rule 7.1(i), Defendant hereby enclose an appendix of materials supporting his accompanying motion for summary judgment and opposition to Plaintiffs' motion for summary judgment (ECF No. 23):

| # | App'x | Description |
|---|---|---|
| 1 | 001–003 | South Carolina Tables of Fees (pp. 386–88 of *The Public Laws of South Carolina*, cited in Plaintiffs' Appendix) (more legible version). |
| 2 | 004–018 | An Act to Incorporate the District of Southwark (pp. 49–63 of *The Statutes at Large of Pennsylvania* (1794), cited in Plaintiffs' Appendix). |
| 3 | 019–039 | An Act Constituting Courts For the Trial of Small Causes (pp. 49–69 of *Laws of the State of New Jersey* (1811), cited in Plaintiffs' Appendix). |
| 4 | 040–041 | Ruth Lapham Butler, *Doctor Franklin, Postmaster General* 48 (Doubleday, Doran & Co., Inc. 1928). |
| 5 | 042 | Post Office Department, 7 Collections of the Massachusetts Historical Society 3, 48 (1838). |
| 6 | 043–053 | James Bruns, *Great American Post Offices,* at xii & 3 (1998). |
| 7 | 054–069 | U.S. Postal Service, *Publication 119: Sources of Historical Information on Posts Offices, Postal Employees, Mail Routes, and Mail Contractors*, at 10 (Nov. 2022). |

Dated:  November 27, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

/s/ *Jason C. Lynch*
JASON LYNCH (D.C. Bar No. 1016319)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 514-1359
Email: Jason.Lynch@usdoj.gov

*Counsel for Defendant*

A. D. 1785. declared incapable of serving in the fame or any other office in this State. And the clerk of

No. 1395. the County Court fhall be allowed for recording every inftrument of writing 3d. per copy fheet, which copy fheet fhall not contain lefs than 90 words, and for every copy of fuch inftrument of writing 2d. per copy fheet, containing not lefs than 90 words.

## TABLES OF FEES.

### *County Court Clerk's Fees.*

|  | £. | s. | d. |
|---|---|---|---|
| County court clerk. | | | |
| \*For the whole fee of a tavern licence and bond | 0 | 9 | 4 |
| For every fearch for any thing above a year's ftanding | 0 | 1 | 0 |
| For fearching and reading, or fhewing to be read, any paper or record filed within the office, whereof a copy is not defired | 0 | 1 | 0 |

#### *In Actions and other Suits.*

|  | £. | s. | d. |
|---|---|---|---|
| For every writ other than fuch as are herein after particularly mentioned | 0 | 2 | 6 |
| For every copy of each writ | 0 | 1 | 0 |
| For every writ of *fieri facias, capias ad fatisfaciendum,* or *fcire facias* | 0 | 2 | 6 |
| For a copy thereof | 0 | 1 | 6 |
| For a writ of attachment in any action | 0 | 2 | 6 |
| For recording the return thereof 3d. per copy fheet. | | | |
| For an attachment granted by the Juftice of Peace returnable to the court, and putting the fame upon the docket | 0 | 2 | 6 |
| For every fummons to fummon any perfon on fuch attachment | 0 | 1 | 6 |
| Filing every bail bond or entering the bail returned | 0 | 1 | 6 |
| For docketing every caufe except by fummons or petition, to be charged but once | 0 | 1 | 0 |
| For a copy of the return of any writ | 0 | 0 | 6 |
| For entering any fpecial bail | 0 | 2 | 0 |
| For entering fecurity for cofts for perfons out of the county | 0 | 2 | 0 |
| For entering the appearance of the defendant or defendants, where there is no attorney, in any fuit except by fummons and petition | 0 | 0 | 6 |
| For entering one or more attornies for each party | 0 | 1 | 0 |
| For every petition, declaration, plea, demurrer, or joinder, &c. except in petitions for debt, detinue, affumpfit, or trover | 0 | 2 | 0 |
| For a copy of any declaration, fpecial pleading, or demurrer | 0 | 2 | 0 |
| For every trial, fwearing the jury and witneffes, filing all papers, and receiving and recording general verdict | 0 | 4 | 8 |
| For every trial where there is a fpecial verdict, or cafe agreed, and recording the fame | 0 | 6 | 0 |
| For fwearing the witneffes in every other caufe where there is no jury, or cafe agreed | 0 | 1 | 0 |
| For filing the papers of each party in every caufe and where there is a jury or cafe agreed | 0 | 2 | 0 |
| For a copy of a fpecial verdict or cafe agreed, and every thing therein fet forth, or for making up a full and complete record of any caufe, for every ninety words | 0 | 0 | 2 |
| For entering every judgment or for a copy thereof | 0 | 1 | 0 |
| For every depofition taken in court or a copy thereof | 0 | 1 | 0 |
| For adminiftering an oath in court not relating to the trial of any caufe there | 0 | 1 | 0 |
| For every recognizance in court | 0 | 2 | 0 |
| For entering the order or orders in any caufe in one court | 0 | 2 | 6 |
| For every order for a witnefs or other perfon's attendance | 0 | 2 | 0 |
| For a copy of any order 2d. per copy fheet | | | |
| For recording the report of a jury in the county before a furveyor, auditor, or viewer | 0 | 3 | 6 |
| For a copy thereof | 0 | 2 | 6 |
| | | | For |

\* See A. A. 1788.

## of South-Carolina.

|  | £. | s. | d. |
|---|---|---|---|
| For taxing cofts to any judgment, or decree where cofts are recovered, or for a copy of a bill of cofts if required | 0 | 2 | 0 |
| For a copy of an account | 0 | 2 | 0 |
| For entering an appeal and taking bond to profecute it | 0 | 4 | 0 |
| For a copy of the bond | 0 | 1 | 0 |
| For returning appeal and fecurity to the office of clerk of the Supreme Court | 0 | 4 | 8 |
| For returning writ of *fuperfedeas, certiorari,* or *habeas corpus* | 0 | 4 | 6 |
| For a copy of the proceedings of the caufe wherein the appeal is granted, for every 90 words | 0 | 0 | 3 |
| For recording the acknowledgment of the fatisfaction of a judgment | 0 | 2 | 0 |
| For entering each order for a witnefs's attendance, to be charged to the party in whofe behalf the witnefs is fummoned, and taxed in the bill of cofts if fuch party recover | 0 | 1 | 6 |
| For a copy thereof to be taxed and charged in like manner | 0 | 1 | 0 |
| For an attachment thereon to be charged to the party againft whom fuch attachment fhall be iffued | 0 | 1 | 6 |
| For the whole fee chargeable for every fummons and petition for debt, detinue, affumpfit or trover, and all the proceedings therein, including a copy of the judgment and taxing cofts if required, except the refpective fees for fummoning witneffes, entering attornies, for every order for continuance, and for iffuing execution where fuch matters happen | 0 | 10 | 0 |
| For a fummons for feveral witneffes living in 1 county if fummonfes for all be taken out at 1 time | 0 | 2 | 6 |
| For recording any writings not herein particularly mentioned, or for a copy thereof, for every 90 words | 0 | 0 | 3 |
| For a public fervices of the clerk, viz. entering and iffuing copies of orders, for appointing overfeers of high-ways, appointing conftables, grand-juries, drawing juries, iffuing venires, taking lift of taxables, entering guardians accounts, and all matters relating thereto, binding out poor orphans and appointing guardians, entering county affeffment and copies thereof, entering and iffuing orders for recommending Sheriffs and Juftices of Peace, and all other public fervices, for which no particular fee is allowed (to be affeffed and levied annually by the Juftices of the county)* | 15 | 0 | 0 |

And where more attornies than 1 fhall be employed in any caufe on 1 fide, if fuch attornies take out more than 1 copy of any thing neceffarily relating to the fuit, yet no more than one copy fhall be allowed in the bill of cofts; neither fhall the clerks tax any fee in the bill of cofts, for entering any more than 1 attorney, although cofts, fhall be adjudged againft the adverfe party; and where any fuiter fhall retain all the attornies practifing at the court wherein fuch fuit is brought, on the petition of the defendant, the court fhall affign 1 of the faid attornies to appear and defend fuch defendant for the legal and accuftomed fees, and fuch attorney fhall be compellable by the court to undertake fuch defence, under the pain of being filenced and disfranchifed in fuch court.

### To the S H E R I F F.

|  | £. | s. | d. |
|---|---|---|---|
| For an arreft, bail bond and return | 0 | 4 | 8 |
| For returning any procefs *non eft inventus* | 0 | 2 | 0 |
| For ferving a writ of *fcire facias* | 0 | 2 | 6 |
| For ferving any perfon with an order of court and making return thereof, to be paid by fuch perfons | 0 | 3 | 6 |
| For putting any perfon in the pillory | 0 | 4 | 8 |
| For putting into the ftocks | 0 | 4 | 8 |
| For putting in prifon, and releafement | 0 | 4 | 8 |
| For ferving a fubpœna in chancery | 0 | 3 | 6 |
| For ferving a fummons or petition for debt, detinue, affumpfit or trover | 0 | 3 | 6 |
| For ferving a fubpœna for a witnefs in any caufe in court, except fummoned in court | 0 | 2 | 6 |
| For fummoning an appraifer, viewer or witnefs to any deed, will or writing, if required be fummoned and not elfe | 0 | 2 | 6 |

For

* Altered by A. A. 1786, to £.5.

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)
Def. App'x 002

A. D. 1785.
Nᵒ. 1395.

| | £. | s. | d. |
|---|---|---|---|
| For summoning and impannelling a jury in every case where a jury shall be sworn | 0 | 2 | 0 |
| For removing every criminal from the County gaol to the District gaol, for every mile in going and returning, to be paid by the public per mile | 0 | 0 | 3 |
| For removing any person by *habeas corpus* from the County gaol or other confinement to the public gaol, or before any Judge of the Circuit Court, to be paid by the person applying for the same, unless removed by public order, in which case to be paid by the public for every mile going and returning | 0 | 0 | 3 |
| For executing any condemned person and all fees incident | 1 | 0 | 0 |
| For summoning a jury upon any inquisition, survey, writ of dower or partition, if the jury appear | 1 | 10 | 0 |
| For the same if the jury do not appear | 0 | 15 | 0 |
| For making return of any writ of dower or partition | 0 | 7 | 6 |
| For every days attendance upon a jury in the County after they are sworn, or attendance on a survey or when ordered by the Court | 0 | 7 | 6 |
| For serving a writ of *habere facias fiesinam*, or *habere facias posesssionem* | 0 | 7 | 6 |
| For serving an attachment upon the body | 0 | 5 | 0 |
| For serving declaration in ejectment if against any one tenant | 0 | 4 | 8 |
| And if against more tenants than one, for serving the same on every such tenant | 0 | 3 | 6 |
| For whipping a slave by order of Court, to be paid by the County | 0 | 5 | 0 |
| For serving any execution of a judgment 5 *per cent.* commission on the first £100, and 2 *per cent.* for all above | | | |
| For serving an attachment on goods exceeding £5 if sold, the same fee as for serving execution where the goods do not exceed that value or are not sold | 0 | 5 | 0 |
| For every person on attachment summoned | 0 | 2 | 6 |
| For serving and returning a writ, summons or order from the Circuit Court, where the same is not comprehended in any of the foregoing articles | 0 | 5 | 0 |
| For keeping and providing a debtor in gaol each day | 0 | 1 | 0 |
| For keeping and providing for a runaway slave or criminal in gaol, the former to be paid by the owner, the latter by the public | 0 | 1 | 0 |
| For serving a warrant of a Justice of peace | 0 | 2 | 6 |
| For summoning witness before a Justice | 0 | 1 | 0 |
| For all public services of the Sheriff, to wit, attending Courts of claims, summoning and empannelling grand juries, publishing writs for electing members to the General Assembly, taking the ballots and returning the writ, serving all public orders of Court, and all other public and county service, for which there is no specified fee, to be annually assessed and levied by the County Courts.* | 0 | 15 | 0 |

### To the C O R O N E R.

To a coroner.

| | £. | s. | d. |
|---|---|---|---|
| For taking an Inquisition on a dead body, to be paid out of the deceased's estate if sufficient, if not by the county | 1 | 0 | 0 |
| For all other business done by him, the same fees as are allowed the sheriff for the same services. | | | |

### To the C O N S T A B L E.

To a constable.

| | £. | s. | d. |
|---|---|---|---|
| For serving a warrant | 0 | 2 | 6 |
| For summoning a witness | 0 | 1 | 6 |
| For summoning a Coroner, jury, and witnesses | 0 | 10 | 0 |
| For putting a person in the stocks | 0 | 2 | 6 |
| For serving an execution or attachment returnable to the County Court against the estate of a debtor removing his effects out of the county | 0 | 7 | 6 |
| For whipping a slave by lawful authority, to be paid by the overseer, if no overseer, by the owner | 0 | 2 | 6 |

Fees not payable till an account of them be produced to the party chargeable.

LIX. None of the fees herein-before mentioned shall be payable by any person whatsoever, until there shall be produced or ready to be produced unto the person owing or chargeable with the same an account in writing, containing the particulars of such fees, signed by the clerk or officer to whom such fees shall be due, or by whom the same shall be chargeable respectively, in which said bill or account is and shall be expressed in words at length, and in the same manner as the fees aforesaid are allowed by this act, every fee for which any money is or shall be demanded.

LX. Every

* Altered to £7 10s. by A. A. 1786.

chasers are made secure in their titles, whereby the persons, to whom the care and custody of the estates of such lunatics may be committed, are prevented from collecting the purchase money, and the purchasers cannot obtain sufficient titles. For remedy whereof:

[Section I.]    (Section I, P. L.)    Be it therefore enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania, in General Assembly met, and it is hereby enacted by the authority of the same, That whenever any contract in writing has been made or shall be made for the sale of any lands and tenements within this commonwealth, by any person, who, after making the same, shall become lunatic or *non compos mentis,* it shall be lawful for the purchaser, or purchasers, under such contract to proceed to enforce the same against the person and persons, to whom the custody of the estate of such lunatic has been or shall be committed, in like form and with like effect, and the person or persons having such custody shall have like remedy to recover the purchase money under such contract, as in case of contracts for the sale of lands and tenements provided for in and by the act to which this is a supplement.

Passed April 14, 1794.  Recorded L. B. No. 5, p. 347, &c.

———————

## CHAPTER MDCCXLII.

———

AN ACT TO INCORPORATE THE DISTRICT OF SOUTHWARK.

Whereas the laws now in force have, in consequence of the improvements in the district of Southwark, become inadequate to the purposes for which they were originally intended. And whereas it is the duty of the legislature, not only to remedy defects which a change of circumstances has created, but also to make such further regulations as will tend to the advancement of public happiness and public order.

4—XV

[Section I.]    (Section I, P. L.)    Be it therefore enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania, in General Assembly met, and it is hereby enacted by the authority of the same, That the inhabitants of the district of Southwark, as the same is bounded and described in the act entitled "An act for erecting the southern suburbs of the city of Philadelphia into the district of Southwark, for making the streets and roads already laid out therein public roads and highways, and for regulating such other streets and roads as the inhabitants thereof may hereafter lay out, and for other uses and purposes therein mentioned"[1] be, and they, and their successors forever, are hereby constituted a corporation and body politic, in fact and in law, by the name and style of "The commissioners and inhabitants of the district of Southwark," and by the same name shall have perpetual succession, and they and their successors shall, at all times forever, be able and capable in law to have, purchase, take, receive, possess and enjoy lands, tenements and hereditaments, liberties, franchises and jurisdictions, goods, chattels and effects, to them and their successors forever, or for any other or less estate, and the same lands, tenements and hereditaments, goods, chattels and effects, to grant, bargain, sell, alien and convey, mortgage, pledge, charge and encumber, or demise and dispose of, at their will and pleasure.

Provided always, That no sale be made of any of the lands, tenements or hereditaments, except such as hereafter may be acquired, and that no part of the estate be mortgaged or encumbered for any sum, exceeding the amount of three years taxes, within the said district, nor for a longer term than three years.

[Section II.]    (Section II, P. L.)    And be it further enacted by the authority aforesaid, That a majority of the commissioners shall be a quorum for transacting all business, except for the purchase or sale of real estate, for the mortgaging or encumbering of the same, or for borrowing any money as aforesaid, for which purposes the concurrence of ten members shall be essential, and the said commissioners shall receive no pecuniary compensation for their services.

[1]Passed March 26, 1762, Chapter 481.

[Section III.]   (Section III, P. L.)   And be it further en-
acted by the authority aforesaid, That the said corporation, by
the name and style aforesaid, are, and forever shall be, able and
capable in law to sue and be sued, plead and be impleaded,
answer and be answered unto, defend and be defended, in all
courts of record, and elsewhere, in all actions, suits, complaints,
pleas, causes and matters whatsoever, and to do and execute all
things that to them, as a body politic and corporate, shall and
may appertain, and for that purpose shall have and use one com-
mon seal, and the same from time to time shall and may at their
will and pleasure change and make anew.

[Section IV.]   (Section IV, P. L.)   And be it further en-
acted by the authority aforesaid, That it shall and may be law-
ful for the freemen of the said district, who are or shall be quali-
fied, agreeably to the constitution and laws of this state, to vote
for members to serve in the general assembly, to meet together
at the house now occupied by Catherine Fritz, in the said dis-
trict, for the first election, and afterwards, at such other place
as shall be appointed by the commissioners, between the hours of
ten in the morning and ten in the evening, on the first Monday in
May next, and then and there to choose by ballot, out of such of
the inhabitants of the said district, who, according to the laws
and constitution of this state, may be members of the house of
representatives of this commonwealth, in the manner prescribed
for choosing members to serve in the said house of representa-
tives, fifteen suitable persons, to serve as commissioners in and
for the said district, and the five persons who shall have the
greatest number of votes shall be commissioners for three years
next following; and the five persons who shall have the next
greatest number of votes shall be commissioners for two years
next following; and the five persons who shall have the next or
third greatest number of votes shall be commissioners for one
year thence next following and that, on the first Monday in
May, which will be in the year one thousand seven hundred and
ninety-five, and so on the first Monday in May annually forever,
five persons shall be chosen as aforesaid, to serve as commission-
ers in the said district for the term of three years.

Provided always, That no person shall be excluded from the choice of the people, on account of his having before filled the office of commissioner.

And provided also, That in all cases wherein the number of votes shall be equal for two or more candidates, the preference shall be decided by lot to be drawn by the inspectors of the election.

[Section V.]  (Section V, P. L.)  And be it further enacted by the authority aforesaid, That all elections, to be held in pursuance of this act, shall be conducted by three inspectors, who shall be elected in the same manner, and at the same place, as the commissioners, on the Saturday preceding the election of the said commissioners, between the hours of ten in the morning and ten in the evening, and each of them shall take an oath or affirmation before entering on the duties in and by this act enjoined, well and faithfully to discharge the same, according to the best of his skill and abilities.

[Section VI.]  (Section VI, P. L.)  And be it further enacted by the authority aforesaid, That all elections to be held in pursuance of this act, shall be held and conducted, except as in and by this act is otherwise directed, in the same and like manner, as, in and by the laws of this commonwealth, is or shall be directed for holding of the general elections for persons to serve in the house of representatives, under and subject to the same rules and penalties.

[Section VII.]  (Section VII, P. L.)  And be it further enacted by the authority aforesaid, That when each election to be had and held in pursuance of this act shall be closed, and the number of votes for each person shall be ascertained, the judges of the election as aforesaid, or a majority of them, shall prepare and make, under their respective hands and seals, a return thereof, containing the names of the commissioners elect, with the number of votes in favor of each, and shall, within two days after the closing of each election, give notice in writing to each of the commissioners elect of their respective elections, and shall also deliver, or cause to be delivered, the said return, together with the tickets, lists of names, tally papers, and other documents, sealed up, to the said commissioners elect, for the first

election, and at each succeeding election to the commissioners in office, at the times and places in and by this act appointed for them to meet and receive the same.

[Section VIII.]    (Section VIII, P. L.)    And be it further enacted by the authority aforesaid, That the fifteen persons, who shall, at the next election to be held in pursuance of this act, have the highest number of votes for the office of commissioners, shall meet together at the house now occupied by Catherine Fritz, between the hours of nine and eleven of the clock in the forenoon of the fourth day next following the said election; and that the five persons who shall, at every subsequent election, have the highest number of votes for the said office of commissioners, together with the ten commissioners whose time shall not have expired, shall meet together, at such place as may be legally appointed, between the hours of nine and eleven in the forenoon, on the fourth day next following each and every election to be held in pursuance of this act, and shall then and there receive the said returns of commissioners elect, and shall forthwith proceed to examine the same, and to judge and determine thereon. And for that purpose, the said commissioners so met, or a majority of them, shall be judges of the said elections, and shall have full power and authority to approve thereof, or to set aside the same, and to order new elections, as the law may require, to be held in the manner hereinbefore directed, and at such times as shall be by them appointed, of which they shall give at least six days previous notice, by handbills, posted up in at least ten of the most public places within the district.

[Section IX.]    (Section IX, P. L.)    And be it further enacted by the authority aforesaid, That each and every commissioner, who shall be elected and returned, and whose election shall be approved in manner aforesaid, shall, before he enters on the execution of his said office, take a solemn oath or affirmation, well and faithfully to execute the office of a commissioner of the said district. And shall thereupon, without any further or other commission enter upon the duties thereof, and shall hold and exercise the same for the term for which he shall have been elected as aforesaid.

[Section X.]    (Section X, P L.)    And be it further enacted by the authority aforesaid, That if any commissioner of the said

district shall misbehave in his said office, or shall fail or ne-
glect well and faithfully to discharge the duties thereof, it shall
and may be lawful for any number, not less than ten, of the said
commissioners, on the petition and complaint in writing of
thirty electors of the said district, fifteen of whom, at least,
shall be freeholders, to remove, in a summary way, any such
commissioner from his said office.

Provided nevertheless, That the said petition and complaint
in writing shall fully and minutely state all the causes assigned
for such removal, and no other cause whatever shall be assigned,
heard or inquired into.

And provided also, That a copy of the said petition and com-
plaint, with a notice of the time and place appointed for hearing
and inquiring into the same, shall be served on such commis-
sioner, at least ten days before any such hearing or inquiry shall
be made.

[Section XI.]   (Section XI, P. L.)   And be it further en-
acted by the authority aforesaid, That in case two or more
vacancies shall happen, by death, removal or otherwise, a major-
ity of the board of commissioners may appoint special elections
for supplying such vacancies, and for that purpose a writ, under
the hand of their president and seal of the corporation, shall
issue, directed to the proper officers, and every special election
shall be held and conducted, and the proper return thereof made,
in manner and form, as is hereinbefore directed for the general
election; and the persons so legally chosen shall be commis-
sioners for the remainder of the time that the commissioners,
in whose places they were elected, had been elected for.

[Section XII.]   (Section XII, P. L.)   And be it further en-
acted by the authority aforesaid, That the said commissioners,
when assembled together for that purpose, shall have full power
and authority to make, ordain, constitute and establish such
and so many laws, ordinances, regulations and constitutions,
not inconsistent with the constitution and laws of this common-
wealth, as shall be necessary and convenient for the purposes of
ascertaining the toll and rates of wharfage of all articles brought
to public landings in the said district, for directing the conduct
of all persons concerned in buying, selling or acting on any

Case 4:24-cv-00565-O    Document 28    Filed 11/27/24    Page 12 of 71    PageID 335

part of the estate belonging to the said district; for fixing the
compensations of the officers appointed by the said commis-
sioners, for their respective services; for lighting, watching,
watering, pitching, paving, repairing and cleaning the streets,
lanes, and alleys; and for preventing and removing nuisances
therein, on the wharves, in the docks or elsewhere, and directing,
appointing and regulating the time, order and manner of light-
ing, watching, watering, pitching, paving, repairing, and cleans-
ing the said streets, lanes and alleys; and the same to enforce,
put in use and execution, by the proper officers, under such
penalties as they may prescribe, and at their pleasure to revoke,
alter and make anew.

Provided always, That nothing herein contained shall vest in
the said commissioners an authority to regulate the prices of
property or labor.

[Section XIII.]    (Section XIII, P. L.)    And be it further
enacted by the authority aforesaid, That the court of general
quarter sessions of the peace for the county of Philadelphia shall
have, and they are hereby vested with, full power and authority
to inquire of, hear, try and determine all offenses which shall be
committed within the said district, contrary to this act, or
against any of the laws, ordinances, regulations or constitutions
that shall be made, ordained or established in pursuance of this
act, and to punish the offender or offenders, as by the said laws,
ordinances, regulations or constitutions shall be prescribed or
directed.

[Section XIV.]    (Section XIV, P. L.)    And be it further en-
acted by the authority aforesaid, That such and so many of the
said laws, ordinances, regulations and constitutions, as shall
not be published in two or more of the public newspapers pub-
lished in the said district, or in the city of Philadelphia, and in
handbills, within ten days from and after their being severally
passed, ordained and established, and also recorded in the office
of the master of the rolls, who shall be allowed and paid for re-
cording thereof at the same rate as is allowed for recording the
laws of this commonwealth, within thirty days from and after
their being so as aforesaid passed, ordained and established,
shall be null and void.

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)
Def. App'x 010

[Section XV.]    (Section XV, P. L.)  And be it further enacted by the authority aforesaid, That before any of the said laws, ordinances, regulations and constitutions, shall be so as aforesaid recorded, the publications thereof, respectively shall be proved by the oath or solemn affirmation of some credible person, which oath or affirmation shall be recorded therewith, and at all times be deemed and taken as sufficient evidence of the time of such publications.

[Section XVI.]    (Section XVI, P. L.)  And be it further enacted by the authority aforesaid, That the said commissioners shall have full power and authority to limit, direct and appoint the depth of all vaults, wells and sinks, hereafter to be dug in the said district, for privies or necessaries, which regulation, being so made as aforesaid, shall be published and recorded, and the publication proved, in the same manner and within the same period as is hereinbefore directed; and if any person or persons shall dig, or cause to be dug, any such vault, well or sink, for privies or necessary houses, of any greater depth than shall be limited or appointed as aforesaid, every such person or persons, so offending, and being thereof legally convicted in the court of quarter sessions of the peace for the county of Philadelphia, shall forfeit and pay the sum of fifty pounds, and the said vaults, wells and sinks shall be filled up at the expense of the owners.

[Section XVII.]    (Section XVII, P. L.)  And be it further enacted by the authority aforesaid, That no person or persons shall lay any foundation or party wall within the said district, before they shall have applied to the regulators appointed by the said commissioners, who are hereby required and empowered to appoint three or more discreet and skillful persons for that purpose.

[Section XVIII.]    (Section XVIII, P. L.)  And be it further enacted by the authority aforesaid, That the said regulators, upon application to them made, shall have full power and authority to enter upon the land of any person or persons, in order to set out the foundations and regulate the walls to be built between party and party, as to the breadth or thickness hereof, which foundation shall be laid equally upon the lands of the

persons between whom such party walls are to be made, and
the first builder shall be reimbursed one moiety of the charge
of such party wall, or for much thereof as the next builder
shall have occasion to make use of, before such next builder shall
use or break into said wall, the charge or value whereof to be
fixed by the said regulators, or by arbitrators mutually chosen.

[Section XIX.]    (Section XIX, P. L.)    And be it further
enacted by the authority aforesaid, That all appeals hereafter
made from the order, direction and award of the said regulators,
shall be taken and made, and shall lie to the next court of com-
mon pleas to be holden for the county of Philadelphia, within
one calendar month from the time of making the order, direc-
tion or award, appealed from, but not afterwards, nor otherwise;
whereupon the said court, upon security being entered by the
party appealing for the payment of all costs, in case he or she
should not prevail in his or her appeal, shall direct a venire to
the sheriff of the county, commanding him to summon a jury to
try the matter in dispute, and shall proceed therein according.
to the course of common law.

[Section XX.]    (Section XX, P. L.)    And be it further en-
acted by the authority aforesaid, That if any person shall lay the
foundation, or begin to lay the foundation, of any party wall,
or any wall adjoining, or upon the line of any public street, lane
or alley, within the said district, before the line and boundaries
of the lot, or piece of land, whereon the said foundation shall be
so laid, or began to be laid, shall be adjusted and marked out by
the said regulators, or two of them, every such person, as well
employer as master builder, shall forfeit the sum of thirty
pounds, one half part thereof to the said commissioners, to be
laid out in making or amending the public streets in the said dis-
trict, and the other half to the use of the informer, together with
costs, provided the prosecution be commenced within twelve cal-
endar months from the time the offense shall be committed.

[Section XXI.]    (Section XXI, P. L.)    And be it further
enacted by the authority aforesaid, That the regulators, so to
be appointed, shall enter in a book all directions, orders and
awards, by them made in pursuance of this act, and every such
order and award, if made with reasonable notice to the parties

interested, shall be conclusive, unless the same be set aside upon appeal as aforesaid, which book shall be provided by the said commissioners and shall be under their direction.

Provided always, That no person under age, *non compos mentis, feme covert,* imprisoned, or beyond sea, or who shall not have notice as aforesaid, shall be injured or affected by any proceeding, order, direction, or award, until the expiration of three years after their coming to full age, return from beyond sea, discovered, being at large, of sound memory, or if within the United States, until the expiration of one year after notice in writing, within which periods his, her or their appeal may be entered and prosecuted as aforesaid.

[Section XXII.]    (Section XXII, P. L.)    And be it further enacted by the authority aforesaid, That the said commissioners shall have full power and authority to contribute towards defraying the expense of making a common sewer under South Street, to erect and cause to be erected on the public estate now belonging to the said district, or which may hereafter belong to the same, market houses, school houses and other public buildings, and to make, and cause to be made, any other improvements on such estate, which they may judge necessary.

[Section XXIII.]    (Section XXIII, P. L.)    And be it further enacted by the authority aforesaid, That the said commissioners shall have full power and authority, for the purpose of carrying this act into execution, to lay and assess all the taxes which could be laid or assessed by the assessors, supervisors or commissioners of the said district, or others, at the time of passing this act, and shall also have full power and authority, in like manner, to make and lay, yearly and every year, one additional rate or assessment, not exceeding five shillings in every hundred pounds, of the clear value of all the real and personal estate within the said district, to be applied to the purpose aforesaid, and to appoint collectors for the same, from whom adequate security shall be taken, which rate or assessment, being fairly made, shall be transcribed in a book, to be kept by the said commissioners, and a duplicate thereof shall be delivered to the said collectors, by them to be appointed from among the inhabitants of the said district, who are hereby authorized, enjoined and

required to receive, collect, levy and recover the rates and assessments, in the same manner and form, and by the same legal remedies, which are by law appointed for recovering and collecting the county taxes in the said district; and having received or collected the same, or any part thereof, shall, at the end of every month from the time of appointment, or when thereunto required, account with and pay to the person whom the said commissioners shall appoint their treasurer, all such sums of money which they shall have so collected during the preceding month, deducting therefrom such sums as shall have been agreed upon at the time of their entering security.

[Section XXIV.]    (Section XXIV, P. L.)    And be it further enacted by the authority aforesaid, That the treasurer of the said commissioners, before he undertakes his office, shall give a bond, with two sufficient sureties, to the commisisoners, in such penalty as they, from time to time, shall judge proper, conditioned that he will well and faithfully execute his office, keep regular accounts of his receipts and disbursements, pay all the orders drawn on him by the said commissioners, or a majority of their board, as soon as sufficient moneys shall come to his hands from any of the funds under the direction of the commissioners, and that he will, once in every year, or oftener if thereunto required, settle and adjust with the said commissioners a full and just account, supported by proper vouchers, of all his receipts and payments during the preceding time, and that upon his death or the appointment of another treasurer in his room, which the said commissioners, or a majority of their board, are hereby authorized to do, whenever they see cause, he, his executors or administrators, shall and will settle and adjust all his accounts with the said commissioners, and pay the remaining balance in his hands to his successor in office, charging for his trouble no more than shall be allowed him by the commissioners.

[Section XXV.]    (Section XXV, P. L.)    And be it further enacted by the authority aforesaid, That so much of all and every act or acts, as directs, authorizes or requires any matters or things to be done and performed, by the surveyors or regulators, by the assessors and supervisors of the public highways, by supervisors of the public landings and highways, by trustees

or commissioners for the purchase of public landings within the said district, or by all or any of them, or by any other person or bodies politic or corporate authorized to lay taxes within said district, or to manage its concerns, shall, from and after the fourth day after the election of the commissioners, by this act constituted a body politic and corporate, be null and void, and the said officers shall no longer continue in office, nor shall any new appointment of such officers be made under any former law or act of assembly.

Provided nevertheless, That nothing herein contained shall bar, prevent, or in any manner impede, the recovery of any sum or sums of money, or of any other matter or thing, for the recovery whereof suits have been or may be instituted, but the same may be carried on by the said commissioners, hereby incorporated, to final judgment, execution and recovery.

And provided further, That all and every matter and thing that has been commenced, begun or entered upon, by the said surveyors, regulators, assessors, supervisors, trustees and commissioners, or either of them, in pursuance of the powers and authorities in them vested, shall be of the same force and effect, as if this act had not been passed, and may, from and after the time last mentioned, be proceeded in and carried into effect, agreeably to the directions of this act, as fully as the same might or could have been done by the said surveyors, regulators, assessors, supervisors, trustees, and commissioners, or either of them, had this act not been made; and for this purpose, all contracts and agreements made or entered into by the said surveyors, regulators, assessors, supervisors, trustees and commissioners, or either of them, in pursuance of the powers in them legally vested previously to the time last aforesaid, shall be equally binding upon the commissioners, and upon the person or persons with whom the same have been or shall be made, as if the same had been originally made and entered into by and between them.

[Section XXVI.]    (Section XXVI, P. L.)    And be it further enacted by the authority aforesaid, That from and after the fourth day following their first election, the commissioners hereby incorporated shall be, and they are hereby fully authorized and empowered, either by themselves or by proper persons to

be by them appointed for that purpose, to do, perform and execute all such matters and things not hereinbefore provided for, as the said surveyors, regulators, assessors, supervisors, trustees and commissioners were, at and immediately before the passing of this act, respectively authorized or enabled by law to do.

[Section XXVII.]    (Section XXVII, P. L.)    And be it further enacted by the authority aforesaid, That for the well governing of the said district, and the ordering of the affairs thereof, there shall be such other officers therein, and at such salaries or other compensations as the commissioners shall direct, each and every of which said officer and officers shall, nevertheless, before entering on the duties of his office, take a solemn oath or affirmation, well and faithfully to perform and execute the same.

[Section XXVIII.]    (Section XXVIII, P. L.)    And be it further enacted by the authority aforesaid, That all the rights of the supervisors of the public landings and highways, trustees and commissioners, within the said district, in and to all lands, tenements, hereditaments, ferries, wharves, markets, stalls, landings, and landing places, goods, chattels, moneys, and effects, whatsoever, and also all other lands, tenements and hereditaments, rights, franchises, liberties, privileges, goods, chattels, moneys, and effects, whereof any person or persons, or bodies politic or corporate, are seized or possessed, or which they, or any of them, hold or enjoy, in trust for or to and for the use of the inhabitants of the said district, to which the said inhabitants are in anywise entitled to, be, and they are hereby, severally and respectively vested in the said corporation or body politic of the district of Southwark, and their successors, in and by this act established, by the name, style and title aforesaid, to and for the use and benefit of the said inhabitants, and their successors, forever; saving nevertheless to all and every person and persons and bodies politic and corporate, his, her and their rights therein.

(Section XXIX, P. L.)    And to the end and intent that all and singular the estate and estates, rights, privileges and interests aforesaid, may be had and received by the said commissioners, and be by them and their successors faithfully applied to and for the use of the said inhabitants and their successors, forever.

[Section XXIX.] Be it further enacted by the authority aforesaid, That all and every person and persons, and bodies politic or corporate, who are or shall be seized or possessed of the same, or any part thereof, shall, on reasonable request, deliver the same to the said commissioners, together with all deeds, writings, evidences, books and papers, touching and concerning the same, with proper assignments, where the same shall be necessary, and just, true and fair accounts thereof; and whoever shall fail therein, shall be liable to be sued for the same, and shall moreover forfeit and pay to the said commissioners, any sum of money, not exceeding twelve hundred dollars, to be sued for and recovered in any court of record, and to be applied to the use of the inhabitants of said district.

[Section XXX.]    (Section XXX, P. L.)    And be it further enacted by the authority aforesaid, That the said commissioners shall cause all accounts of receipts and expenditures of money to be published, up to the thirty-first day of December, inclusive, in each and every year, within three months thereafter; and the vouchers in support of all charges may be viewed, at any seasonable hour, by any taxable inhabitant, who may demand the inspection thereof; and the said commissioners shall also keep regular minutes of their proceedings, which may be examined by like persons, and at like times, as the accounts aforesaid, provided that no inspection thereof shall be permitted until three months after making such minutes, respectively, unless ten commissioners, the names of whom shall be entered on the minutes, consent thereto.

[Section XXXI.]    (Section XXXI, P. L.)    And be it further enacted by the authority aforesaid, That no misnomer of the said corporation shall defeat or annul any gift, grant, devise, or bequest to or from the said corporation, provided the intent of the parties shall sufficiently appear on the face of the gift, grant, will or other writing, whereby any estate or interest was intended to pass to, or from the said corporation; nor shall any disuser or nonuser of the rights, liberties, privileges, jurisdictions and authorities, hereby granted to the said corporation, or any of them, create or cause a forfeiture therof.

[Section XXXII.]    (Section XXXII, P. L.)    And be it further enacted by the authority aforesaid, That as often as any doubts shall arise touching this act, the same shall in all courts of law and equity, and elsewhere, be construed and taken most favorably for the said corporation.

Passed April 18, 1794.  Recorded L. B. No. 5, p. 210, &c.

Supplement passed March 27, 1795, Chapter 1814.  See Act of March 3, 1800, Chapter 2117, as to enrolling of public ordinances.

---

## CHAPTER MDCCXLIII.

---

### AN ACT TO PREVENT THE DAMAGES WHICH MAY HAPPEN BY FIRING OF WOODS.

Whereas it hath been represented that numbers of persons are in the custom of setting fire to the woods for different purposes, thereby producing an extensive conflagration injurious to the soil, destructive to the timber and the infant improvements within this state.  Therefore:

[Section I.]    (Section I, P. L.)    Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania, in General Assembly met, and it is hereby enacted by the authority of the same, That whosoever shall at any time hereafter wilfully set on fire, or cause to be set on fire, any woods, lands, or marshes whatsoever within this commonwealth, so as thereby to occasion any loss, damage or injury to any other person or persons, every such person or persons so offending and being thereof legally convicted by the oath or affirmation of one or more witnesses in the county court of quarter sessions where the offence is committed, shall pay a fine not exceeding fifty dollars and not less than twenty dollars; the one-half of such fine to be paid to the informer and the other half to the overseer of the poor of the township where the offence is committed for the use of the poor in the said township.

[Section II.]    (Section II, P. L.)    And be it further enacted by the authority aforesaid, That where any person or persons so

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 018

49

ditaments shall be previously lodged with the said clerk, or recorded as aforesaid.

———

A supplement to the act entitled " An act respecting conveyances," passed June seventh, one thousand seven hundred and ninety-nine.

*Passed  February* 8, 1811.

Sec. 1. BE IT ENACTED *by the council and general assembly of this state, and it is hereby enacted by the authority of the same,* That if the party who shall execute or may have executed, any deed or conveyance of lands, tenements or hereditaments, lying and being in this state, or the witnesses thereto, reside not in this state, but in one of the territories of the United States, or in one of the cities of Philadelphia or New-York, then the acknowledgment or proof which may have been, or shall be made before, and certified by one of the judges of the supreme court of such territory, or the mayor of such city, shall be as good and effectual as if the same had been made before, and certified by one of the judges of the supreme court of this state.

———

AN ACT constituting courts for the trial of small causes.  [Rev. 313]

*Passed March* 15, 1798.

Sec. 1. BE IT ENACTED *by the council and general assembly of this state, and it is hereby enacted by the authority of the same,* That every suit of a civil nature at law, where

G

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)
Def. App'x 019

50

**What causes shall be cognizable before justices of the peace.**

**[Rev. 313]**

the debt, balance, or other matter in dispute, does not exceed, exclusive of costs, the sum or value of sixty* dollars, shall be, and hereby is made cognizable before any justice of the peace of any county in this state, who is hereby authorized to hold a court within such county to hear, try, and determine the same according to law, although the cause of action did not arise in the said county; and further, that the said court shall be a court of record, and vested, for the purposes aforesaid, with all such power as is usual in courts of record of this state. *Provided always*, That this act shall not extend to any action of replevin, slander, trespass for assault, battery, or imprisonment, or to any action, wherein the title of any lands, tenements, hereditaments, or other real estate, shall or may in any wise come in question.

**Territorial jurisdiction of justices to be coextensive with their counties.**

2. *And be it enacted*, That the territorial jurisdiction of every justice of the peace, under this act, shall be coextensive with the limits of the county, for which he is appointed and commissioned; that his writs, precepts and process shall run in and through such county, and that he may, in causes pending before him, award writs of subpœna ad testificandum into other counties of this state.

**Constables to be their ministerial officers.**

3. *And be it enacted*, That the constables of the several townships in such county shall be the ministerial officers of the said court, and that it shall be the duty of the said constables to execute and return all precepts, summons, warrants, writs and other process, issuing out of the said court, and to them or any of them

* *Extended to* 100 *dollars by act of* 29th *Nov.* 1801.

51

directed and delivered, and to perform all matters, acts, and things appertaining to their offices aforesaid.

4. *And be it enacted,* That all such precepts, summons, warrants, writs and other process, shall be tested the day on which they are respectively issued, and shall be signed and sealed by the justice, who issued the same. <span style="float:right">Process, how to be tested, signed and sealed.</span>

5. *And be it enacted,* That the first process, which shall be issued against any defendant by virtue of this act, shall be a summons, or a warrant, in nature of a capias ad respondendum, as the case may require; but the plaintiff may nothwithstanding in any case make use of the former. <span style="float:right">First process to be a summons or a warrant.</span>

6. *And be it enacted,* That the summons, to cite the defendant to appear before the said justice, shall specify a certain place and time, not less than five nor more than fifteen days from the date of such process, and shall be served at least five days before the time of appearance mentioned therein, by reading the same to the defendant, and delivering to him a copy thereof, when required, if he shall be found; and if not found, by leaving a copy thereof at his house or place of abode, in presence of some white person of the family of the age of fourteen years, who shall be informed of the contents thereof; and the constable, serving such summons, shall, on the oath of his office, endorse thereupon the time and manner he executed the same, and sign his name thereto. <span style="float:right">Summons, how to be served.</span>

7. *And be it enacted,* That if the defendant does not appear at the time and place expressed in such summons, and it shall appear by the return endorsed thereon, that the summons was duly served, and no sufficient reason be <span style="float:right">If the defendant does not appear according to the summons, the</span>

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)
Def. App'x 021

52

**justice may proceed in his absence.** assigned to the justice why the defendant does not appear, then the said justice shall proceed to hear and determine the cause in the absence of such defendant.

**Summons, in what cases to be used.** 8. *And be it enacted,* That the summons shall be used by virtue of this act, in cases where the defendants are freeholders and residents in the county where such process shall be issued, and in cases where by law the defendants cannot be held to bail.

**In what cases a warrant may be issued against a freeholder.** 9. *Provided always, and be it further enacted,* That if any plaintiff, his attorney or agent, shall prove, on oath or affirmation, to the satisfaction of the justice, that if the process be by summons against such freeholder, the plaintiff will be in danger of losing his debt or demand, or doth really believe that such freeholder will abscond or depart, or remove from the county wherein he resides, before the day of return of such summons, then it shall be the duty of the said justice to issue a warrant against such freeholder.

**Warrant, when to be issued.** 10. *And be it enacted,* That the warrant, commanding the defendant to be arrested, may, under this act, be used in all cases where the said defendant is not a freeholder residing in such county, and can by law be held to bail, and shall be returnable forthwith after service thereof, and the constable serving said warrant, shall, according to the tenor thereof, forthwith convey the said defendant before the justice who issued the same, who shall thereupon at his discretion, either cause the said defendant to enter into recognizance in the manner herein after mentioned, or, on neglect or refusal, shall command the said constable to convey the said defendant to the gaol of the county, to be there detained in custody, until time may be had for

53

the hearing or trial of the cause, not exceeding
three days from the time of the return of the
said warrant, or such justice may direct the
said constable to hold the said defendant in
custody, until the plaintiff shall be notified and
have time to appear and proceed to such hear-
ing or trial ; and the constable, who served the
said warrant as aforesaid, shall, on the oath of
his office, endorse thereon the execution of the
same, and sign his name thereto.

11. *And be it enacted*, That the said justice
shall endorse the debt, damages, or sum de- The sum
manded, with costs, on every summons or  due or de-
                                            manded to
warrant, which he shall issue by virtue of this  be endors-
act ; and if the defendant think proper to pay  ed on the
                                                 process.
such debt, damages or demand, with costs so
endorsed, without any further proceedings in
the cause, then it shall be lawful for the con-
stable to receive the same, and his receipt shall
be a full discharge to such defendant from
such debt, damages or demand, and costs,
aforesaid ; and if any constable shall not pay the
money so by him received for such debt, dam-
ages, or demand, to the justice issuing such
process, or to the plaintiff in the said process,
or his legal representative, within eight days
after he shall have received the same, then
such constable shall be liable to pay to such
plaintiff, or his legal representative, the amount
of the said debt, damages or demand, with in-
terest, to be recovered by action of trespass on
the case, with costs.

12. *And be it enacted*, That the recognizance,
directed in the tenth section of this act, shall be
entered into by the defendant, with at least one
surety, having sufficient freehold and residing
in the county, to the plaintiff in the said action,
in the amount of the demand specified in the

54

warrant, according to the effect and meaning of the following form ; that is to say,

<span style="float:left">**Form of recogniz- ance.**</span>                     county, to wit.   Whereas, A. B. hath been arrested and is now in custo- dy by virtue of a warrant issued by C. D. one of the justices of the peace in and for the said county, at the suit of E. F. in an action of          for the sum of          Now be it re- membered, that on the          day of          in the year of our Lord one thousand          the said A. B. and G. H. of the county aforesaid, personally appeared before me the said C. D. and jointly and severally acknowledged them- selves to owe to the said E. F. the sum of          to be made and levied of their several goods and chattels, and in want thereof, of their bodies, upon condition, that if the said A. B. shall not be and appear on the          day of          next before the said justice, or if he does appear, and is condemned in the said ac- tion, at the suit of the plaintiff, that he shall pay the costs and condemnation money, or sur- render himself up to the constable, on execu- tion to be thereafter issued against him, on the day judgment shall be obtained, and if he fail so to do, that he the said G. H. will pay the said costs and condemnation money for him, and suffer judgment to be entered up against him for the same.

Acknowledged the day and year
   last abovesaid, before me C. D.
   one of the justices of the peace
   in and for the said county of

<span style="float:left">**Which is to remain with the justice.**</span> And every justice of the peace is hereby em- powered and directed to take such recogniz- ance, which shall remain with such justice, for the benefit of the plaintiff in the suit.

13. *And be it enacted,* That if the defend-

55

ant does not appear at the time and place ex- *When justice may proceed in absence of defendant.*
pressed in such recognizance, and no sufficient
reason shall be assigned to the justice, why the
defendant does not appear, then the said jus-
tice shall proceed to hear and determine the
cause in the absence of such defendant.

14. *And be it enacted,* That the plaintiff in *Plaintiff to deliver a copy of his account, or state of his demand, or be non-suited.*
such suit shall, on or before the return day of
the said summons, or on the return of the war-
rant, or at the time of appearance specified in
the recognizance, deliver, or cause to be de-
livered to the justice, before whom the action
is to be tried, a copy of his account, or state of
his demand against the defendant, and in de-
fault thereof, the said plaintiff shall be non-
suited with costs.

15. *And be it enacted,* That when the par- *Justice to try the cause when the parties appear, unless he adjourns the same.*
ties in any suit to be instituted by virtue of
this act, shall appear at the place and time ex-
pressed in the summons, or at the return of the
warrant, or at the time of appearance men-
tioned in the recognizance, the said justice
shall proceed to hear and examine their respec-
tive allegations and proofs, unless he shall think
it proper to adjourn the trial.

[16. *Repealed by the* 12th *section of the act of* 29th
*November,* 1809—*and supplied by the* 1st *and* 2d *sec-
tions of said act.*]

17. *And be it enacted,* That if any defendant *Defendant neglecting to set off his account shall not recover the same, unless the balance exceed sixty dollars.*
neglect or refuse to plead and deliver as afore-
said, and give in evidence his account or de-
mand against such plaintiff, he shall forever
thereafter be precluded from having or main-
taining any action for such account or demand,
or from setting off the same in any future suit.
—*Provided always,* That where the balance
found to be due to such defendant exceeds
the sum of sixty dollars, then the said defend-
ant shall not be precluded from recovering his

56

account or demand against such plaintiff, in any other court of record having cognizance of the same.

[*See 1st section of act of 29th Nov.* 1809.]

18. *And be it enacted,* That any justice of the peace, before whom a suit is instituted, by virtue of this act, may, to prevent fraud or surprize on either side, or on reasonable cause being assigned by or in behalf of either party, adjourn the trial to any time not exceeding fifteen days from the return day of the summons, or, if the process be by warrant, from the time when the same was returned, or from the time of appearance mentioned in the recognizance; except where the applicant for such adjournment shall make oath or affirmation, that he cannot safely go to trial for want of a material witness, whom he shall name, being absent and out of this state, and then such justice may postpone the trial to any time not exceeding three calendar months.—*Provided,* That if the process is by warrant, the defendant shall, previous to such adjournment, enter into recognizance to the plaintiff as in and by this act is before directed.

*Justices may adjourn the trial.*

[*See 2d section of act of 29th Nov.* 1809.]

19. *And be it enacted,* That where parties agree to enter, without process, any action before a justice of the peace, to the decision of which he is competent, if process had been executed, such court shall proceed thereon to final judgment and execution, in the same manner as if a summons or warrant had been issued and duly served.

*If parties agree, cause may be tried without process.*

20. *And be it enacted,* That in every action which shall be brought before any justice of the peace by virtue of this act, it shall and may be lawful for either of the parties, after the de-

*Either party may demand a trial by ury.*

57

fendant has appeared to such action, and before the said justice has proceeded to enquire into the merits of the cause, to demand a trial by jury, which the said justice is hereby required to grant; that thereupon a venire shall be issued to summon a jury of six men and no more, if the debt or demand be of the sum or value of five dollars, and not exceeding sixteen dollars, or a jury of twelve men, and not less, if the debt or demand exceed the sum or value of sixteen dollars, being citizens of this state, above the age of twenty-one and under the age of sixty-five, and freeholders in the county where the said cause is to be tried, and in no wise of kin to the plaintiff or the defendant, nor interested in the suit, to be and appear before the said justice at such time and place as shall be expressed in the venire, to make a jury for the trial of the action between the parties mentioned therein; and the constable shall, at the return of the said venire, return, annexed thereto, a panel containing the names of the jurors, whom he shall have summoned by virtue thereof.

*A venire shall issue to summon six men, if the debt be from five to sixteen dollars, or 12 men, if above the latter sum.*

21. *And be it enacted,* That when either of the parties to a suit, before any justice of the peace, shall demand a jury of twelve men, and such jury shall find a sum in favor of such applicant above five and not exceeding sixteen dollars, then such applicant shall pay one half of the costs of such jury, and if the sum found by such jury in favor of such applicant be under five dollars, then he shall pay the whole costs of such jury, and when either party shall demand a jury of six men, and such jury shall find a sum in favor of such applicant under five dollars, then the said applicant shall pay the costs of such jury.

*Costs thereof how to be paid.*

H

58

22. *And be it enacted*, That to the jurors, and each of them, who shall be returned to try any cause as aforesaid, the said justice shall administer the following oath or affirmation :

**Juror's oath.**

You do swear, in the presence of Almighty God, (or do affirm, as the case may require) that you will well and truly try the matter in difference between          plaintiff, and defendant, and a true verdict give according to evidence.

That to every witness produced at the said trial, the said justice shall administer the following oath or affirmation :

**Oath of witness.**

You do swear, in the presence of Almighty God, (or do affirm, as the case may require) that the evidence you shall give to the court and jury in this matter in difference between          plaintiff, and          defendant, shall be the truth, the whole truth, and nothing but the truth.

And that to the constable, who shall be appointed to attend the jury, the said justice shall administer the following oath or affirmation :

**Constable's oath.**

You do swear, in the presence of Almighty God, (or do affirm, as the case may require) that you will, to the utmost of your ability, keep every person sworn (or affirmed) on this jury together in some private and convenient place, without meat or drink, water excepted ; that you will not suffer any person to speak to them, nor speak to them yourself, except by order of the court, unless it be to ask them, whether they have agreed on their verdict, until they have agreed on their verdict.

23. *And be it enacted*, That every person summoned as a juror, or subpœnaed as a witness, who shall not appear, or appearing, shall

59

refuse to serve, or to give evidence in any *Penalty on*
such action, shall forfeit and pay for every such *defaulting*
default or refusal, unless some reasonable *witnesses,*
cause be assigned, such fine, not exceeding
five dollars, nor less than one dollar, as the
said justice shall think proper to impose ; and
such justice is hereby authorized and required
to issue an execution, directed to any consta- *how to be*
ble in the said county, to levy the same of the *recovered*
goods and chattels of the offender ; which fine, *& applied.*
when recovered, shall be applied by the said
justice to the use of the said county.

24. *And be it enacted,* That if the plaintiff,
other than executors or administrators, in any
such action, shall be nonsuited, or shall dis- *Cost, in*
continue or withdraw his action, without the *to be a-*
consent of the defendant, then judgement shall *warded a-*
be given against such plaintiff for the costs, *plaintiff.*
which have accrued ; or if such plaintiff shall
appear to owe or be indebted to the defendant,
then judgment shall be given against him for
the debt, or damages, and costs, as the case
may require.

25. *And be it enacted,* That when judgment *Execution*
shall be given against the plaintiff or defendant, *to be a-*
by virtue of this act, the said justice shall grant *gainst the*
execution thereupon, commanding the con- *goods,*
stable to levy and make the debt or damages, *chattels,*
and costs, of the goods and chattels of the *the party.*
party, and for want of sufficient goods and
chattels, whereon to levy and make the same,
to take the body of such party, and to convey
him to the gaol of the county. *Provided al-*
*ways,* That when judgment shall be obtained
against executors or administrators, execution
shall issue thereon in the same manner as it is
issued against them in the other courts of law
of this state. *And provided also,* That when

60

**On judgments for certain sums against freeholders, execution not to issue till a given period be elapsed.** any judgment given against any freeholder, by virtue of this act, shall not be more than fifteen dollars, nor less than five dollars, execution shall not issue until after one month from the time of such judgment rendered, and when the judgment shall exceed fifteen dollars, no execution shall issue until after three months from the time of the render of such judgment, unless the party, in whose favor judgment may be given, shall make it appear to the satisfaction of the justice, on oath or affirmation, that he or she is in danger of losing his or her debt or damages, if such delay of execution be allowed; in which case the said justice shall issue execution immediately, as hereinbefore directed, unless the party against whom such judgment is given shall thereupon give security to the adverse party for the payment of the debt, or damages, and costs, within the month, or three months, (as the case may be) in this section limited. *And further*, It is the true intent and meaning of this act, that if any defendant shall appear at the return of the summons or warrant, or by consent without process, and procure a good and sufficient freeholder, resident in the county, to join with such defendant in a confession of judgment to the adverse party, with costs, then such defendant shall be entitled to all the privileges, which any freeholder is entitled to by virtue of this act.

**When and how the constable is to advertise & sell goods taken in execution.** 26. *And be it enacted*, That the constable, who, by virtue of such execution, levies on any goods and chattels, shall immediately give notice, by advertisements, signed by himself, and put up at three or more public places in the township, where they were taken, of the time and place they will be exposed to sale, at least five days before the time appointed for

61

selling them, and therein describe the goods and chattels so taken; and shall, at the time and place so appointed, expose them to sale by public vendue: and strike them off to the highest bidder, and pay the money thence arising agreeably to the directions of such execution.

27. *And be it enacted*, That for want of goods and chattels whereon to levy, the said constable shall, according to the tenor of the said execution, take the body of the person against whom the said execution is issued, and convey and deliver him to the keeper of the common gaol of the county, who is hereby commanded to keep such person in safe custody, in the common gaol aforesaid, until the debt, or damages, with costs, be fully paid, or until he be thence delivered by due course of law: And if the said keeper shall suffer such person so committed to his custody to go or be at large out of the said gaol, except by virtue of some writ of habeas corpus, before the said debt or damages, with costs, be paid, or he be thence delivered by due course of law, then every such going or being out of the said gaol shall be an escape, for which the sheriff shall be responsible to the plaintiff to the amount of the debt, or damages, and costs, for which such person shall be committed, to be recovered by the said plaintiff, with costs, by action of debt.

For want of goods the defendant to be committed to the common gaol;

And if suffered to escape therefrom, the sheriff to be responsible.

[28. *Repealed by a supplemental act of the* 16*th of February*, 1799.—*Sect.* 3. *Rev.* 369.]

29. *And be it enacted*, That if the constable, to whom any execution is delivered, shall not perform the duties or any of them prescribed by this act respecting such execution, such constable shall be liable to pay to the person,

Penalty on constables for neglect of duty.

62

in whose favor the said execution is issued, the debt, or damages, and costs, or any of them mentioned therein, to be recovered by action of debt, with costs, by the person so as aforesaid injured thereby; and if the constable, to whom any summons or warrant is delivered, shall neglect or refuse to serve the same, such constable shall be liable to pay damages to the party aggrieved, to be recovered, with costs, by an action of tresspass on the case.

Proceedings on a plea of title to real estate.

30. *And be it enacted*, That when, in any action to be brought by virtue of this act, the defendant shall as a justification, plead title to any real estate in himself or another, under whom he acted or entered, such defendant shall commit the said plea to writing, and, having signed the same, shall deliver such plea to the said justice, who shall countersign and deliver it to the plaintiff; and thereupon it shall and may be lawful to and for such plaintiff to commence and prosecute his action against such defendant, in the supreme court of the state; and if, in such action, the plaintiff recover any damages, he shall be entitled to and recover therewith all costs of suit.

Such plea to be conclusive evidence, that the defendant relied thereon.

31. *And be it enacted*, That on every trial so to be had in such action, where title is pleaded, the plea, so as aforesaid signed by the said defendant, shall be conclusive evidence, that such defendant relied on his title by way of justification.

Defendant to give bond before such plea be received.

32. *And be it enacted*, That the said justice, to whom a plea of justification is tendered as aforesaid, shall, before he receive such plea, require and obtain from the defendant a bond, with one good surety, being a freeholder in the said county, in the penalty of eighty

63

dollars, executed to the plaintiff, and condi-
tioned, that if the said plaintiff shall commence
such action before the next supreme court,
the said defendant shall appear thereto, and put
in special bail within twenty days after the first
day of the then next term of the said court,
and shall pay such costs as may be awarded
against him in the said action; and that in
every case, in which such plea is tendered,
and the defendant shall not forthwith enter into
such bond to the plaintiff, the said justice shall
proceed in the same manner, if such plea had
not been tendered.

33. *And be it enacted,* That from any judg-
ment, which may be obtained before any jus-
tice of the peace, except such as shall have
been given on a verdict, or on report of re-
ferees, or by default, or in the absence of the
defendant, or on a debt, balance, demand, or
other matter in dispute, not exceeding three
dollars, either party may appeal to the court of
common pleas of the county, to be holden
next after the rendering of such judgment;
which appeal the said justice is hereby directed
to grant on the following and no other terms,
that is to say, the party demanding such ap-
peal shall enter into bond to the other party
with at least one sufficient surety, being a free-
holder in the county, and in double the sum for
which such judgment was given, conditioned,
that the appellant shall appear and prosecute
the said appeal in the said court of common
pleas, shall stand to and abide the judgment of
the said court, and pay such further costs as
shall be taxed, if the judgment be affirmed.

*Appeals to the common pleas in what cases & on what terms to be granted.*

34. *And be it enacted,* That the several
courts of common pleas, in and for the respec-
tive counties of this state, shall have cogniz-

*Courts of common pleas to have cogn-*

64

izance of such appeals.

ance of, and hear and determine all such appeals, in a summary way, and give judgment and award execution thereon with costs, either on the affirmance or reversal of the judgment so appealed from. But the same and no other documents, proofs and witnessess shall be produced and examined in the said court of appeals, as had been previously produced and examined in the said court below; except where the justice shall have admitted illegal, or rejected legal evidence, and then such court of common pleas, on the hearing of the said appeal, shall reject such illegal evidence, so admitted, or admit such legal evidence, so rejected, by the said justice.

The justice who tried the cause, not to sit on the appeal.

35. *And be it enacted*, That no justice of the peace, who heard and determined the said cause, shall sit as a judge of any of the courts of common pleas, on the hearing and determining of the same cause on appeal, or give any opinion thereon.

On appeal, the bond, and copy of proceedings to be sent to the clerk of the court.

36. *And be it enacted*, That the justice, who grants an appeal as aforesaid, shall send a transcript of the proceedings and judgment in the said cause, under his hand and seal, together with the bond aforesaid, to the clerk of the court of common pleas, to which such appeal is made, on or before the first day of the court next ensuing such appeal.

Rules of reference may be entered by the justice, or by the common pleas, on appeal.

37. *And be it enacted*, That in every suit to be instituted before any justice of the peace by virtue of this act, and in every appeal to be made before any court of common pleas, it shall and may be lawful for such justice of the peace, or court of common pleas, as the case may be, with the assent and at the request of the parties, to enter rules of reference of the matters in difference, to such persons as shall

65

be nominated and agreed upon by and between the parties; and the reference, so made, shall and may be conducted in the same manner in all respects as directed in the case of references by rule of court, in and by the act, entitled, "An act for regulating references, and determining controversies by arbitration," and the report of the said referees, or the major part of **[Rev. 141]** them, whether in favor of the plaintiff or defendant, appellant or appellee, shall be final and conclusive to the parties, judgment shall be entered thereon, and execution issue accordingly.

38. *And be it enacted,* That it shall be the duty of every justice of the peace, before whom **Justice's docket,** any suit shall be instituted, to enter, in a book **how to be** to kept for the purpose, the names of the plain- **kept.** tiff and defendant, the style and nature of the action, the sum demanded, the time of issuing process and when returnable, the return made thereto by the constable, when the copy of the account, or state of the demand was delivered by the parties, or either of them, the time of taking the recognizance, the adjournment, the rule of reference and report of referees, the jury, when and by whom demanded, the venire, when issued and how returned, the time of trial, and names of the jurors and witnesses, the admission of evidence objected to, and the rejection of evidence offered, the verdict and judgment, and when given, the execution, when issued and its endorsement, and how returned by the constable, the appeal, when and by whom demanded, *and all the proceedings before him had touching* the said suit; and further, that it shall be the duty of such justice to grant to either party, when required, a certified copy of such proceedings.

39. *And be it enacted,* That the book, in

I

66

*To be left in the clerk's office, and when.* which such proceedings shall be entered by any justice of the peace, shall, within one year after the death of the said justice, be deposited in the office of the clerk of the county, wherein the said justice resided and held his commission, to be there kept as a public record ; and if the executors or administrators of such deceased justice shall neglect or refuse to deliver the said book, at the expiration of the said term of one year, to the said clerk as aforesaid, he, she or they, so refusing or neglecting, shall forfeit and pay the sum of sixty dollars, to be recovered by action of debt, with costs, in any court having cognizance of the same, and paid, when recovered, to the collector of the county for the use of the county.

*Penalty on persons suing otherwise than is directed by this act.* 40. *And be it enacted,* That if any person shall institute a suit for any debt or demand, made cognizable before a justice of the peace, in any other court than is hereby directed, and obtain judgment thereon for any sum, which, without costs, shall not exceed sixty dollars, then such person shall not recover or have any costs in the said suit ; unless, before the commencement of the suit, he shall have taken an oath or affirmation before a justice of the peace, and filed the same in the clerk's office of the court, in which such suit was instituted, stating, that he believes, that the sum due, or damages sustained, exceed sixty dollars, and then, if he recover any sum whatever, the defendant shall be liable to pay costs.

41. *And be it enacted,* That whenever any bond, bill, note or other contract in writing, *If the balance on bond, or note, exceed not* for the payment of any sum of money above sixty dollars, shall, by a bona fide payment of part of the consideration money, the receipt whereof shall be endorsed thereon, or by set

67

off, be reduced to the sum of sixty dollars or $60 it may be recovered before a justice of the peace. under, then the balance, due on such deed or contract, shall be considered as the real debt, (without regard to any kind of penalty expressed therein) and shall be recoverable before a justice of the peace, in the same manner as any other debt or demand of sixty dollars or under is made recoverable by virtue of this act.

42. *And be it enacted,* That every sum of money, or penalty, not exceeding sixty dollars, to be sued for and recovered by virtue of any law of this state, in any court of record, or in any court having cognizance thereof, shall be and hereby is made cognizable before any justice of the peace in manner aforesaid. Penalties, not exceeding $60 cognizable before a justice of the peace.

43. *And be it enacted,* That no judgment, order, or proceeding, to be had or made by virtue of this act, shall be removed by writ of error, but by certiorari only. Causes to be removed by certiorari only.

44. *And be it enacted,* That no justice of the supreme court shall grant or allow any certiorari to remove any judgment, order or proceeding, to be had by virtue of this act, unless the party, applying for such certiorari, shall present to the said justice the reasons therefor, drawn up in writing, and subscribed by some attorney at law, and the same be deemed by the said justice to contain a probable cause for allowing such certiorari; and also, unless such applicant shall enter into bond to the other party in the sum of one hundred dollars, with one or more good surety or sureties, conditioned, that such applicant shall prosecute the said certiorari in the supreme court, shall pay the sum recovered in the court below, with interest and costs, if the judgment be affirmed, and Writs of certiorari how obtained.

68

shall in all things stand to and abide the judgment of the said supreme court respecting the judgment, order, or proceeding given or made by the court below; which said bond shall likewise be tendered to the justice granting such certiorari, to be by him filed with the clerk of the supreme court, for the benefit of the obligor therein named, and on failure thereof, no certiorari shall be allowed.

45. *And be it enacted,* That such certiorari shall be determined and adjudicated upon by the supreme court, at the first term at the furthest after due return thereof shall be made, or be dismissed, with costs; unless the said court shall think proper to adjourn the same till the next term for further argument or advisement.

And when to be determined.

46. *And be it enacted,* That if any judgment, to be given by virtue of this act, shall, on removal by certiorari, be affirmed by the supreme court, the plaintiff in certiorari shall pay to the defendant all costs arising on such suit in the said supreme court; for which the party, entitled to such costs, may have execution, to be issued out of the supreme court, against the body, or goods and chattels of the adverse party; but if such judgment be reversed, then the plaintiff in certiorari shall not be entitled to any costs.

Costs allowed on reaffirmance, but not on reversal of judgment.

47. *And be it enacted,* That all attornies at law within this state shall, for any debt, demand or damages, be liable to be sued before any justice of the peace, by virtue of this act, in like manner and form of action, as other citizens of this state, not being attornies, are liable to be sued before such justice; any plea of privilege or exemption to the contrary notwithstanding.

Attornies at law to be sued under this act as others.

48. *And be it enacted,* That in all actions,

.

69

which may be brought by virtue of this act, the following and no other fees shall be allowed :

## JUSTICES.

Summons,  .  .  .  13 cents.
Warrant,  .  .  .  .  13 cents.  Table of
Recognizance,  .  .  .  13 cents.  fees before
Entering every nonsuit or discon-  a justice of
    tinuance,  .  .  .  4 cents.  the peace.
Venire facias,  .  .  .  13 cents.
Administering every oath or affirm-
    ation,  .  .  .  .  5 cents.
Subpœna for every witness,  .  7 cents.
Swearing the jury,  .  .  20 cents.
Entry of every verdict,  .  4 cents.
Entry of every rule of reference,  13 cents.
Every copy thereof,  .  .  13 cents.
Entry of every judgment,  .  10 cents.
Every execution,  .  .  13 cents.
Drawing, signing and sealing return
    to certiorari,  .  .  .  20 cents.
Copy of proceedings when demand-
    ed by the party,  .  .  13 cents.

## CONSTABLES.

Serving every summons,  .  30 cents.
Serving every warrant,  .  45 cents.
Serving every subpœna,  .  25 cents.
Summoning every jury of six men,  30 cents.
Summoning every jury of twelve
    men,  .  .  .  .  60 cents.
Attending jury till agreed of their
    verdict,  .  .  .  25 cents.  .  .
Serving every execution,  .  30 cents.
Advertising and selling property,  50 cents.
And for all sums on execution  } 2 cents on
    above the value of fifteen  } each dollar.
    dollars,

## JURORS.

For all causes tried,  .  12 cents a man.

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)
Def. App'x 039

# DOCTOR FRANKLIN

## Postmaster General

BY

R U T H   L A P H A M   B U T L E R

UNIV. OF
CALIFORNIA



1928

DOUBLEDAY, DORAN & COMPANY, INC.

Garden City, New York

Digitized by Google

48    Dr. Franklin, Postmaster General

Although New York City had been designated by the British Government as the administrative center of the continental colonies neither of the Postmasters General removed their offices to that city: Hunter continued to work in Williamsburg while Franklin maintained his establishment in Philadelphia.  Thus the latter city was the actual center for postal affairs from 1753 to nearly the end of the colonial period, for this was the headquarters for both Franklin himself and for his son William as long as he remained Comptroller.

As far as the housing of the American Post Office was concerned the British Government was still unprepared to furnish separate buildings; the location of Post Offices moved with any change of the Postmasters in charge.  In 1753 Franklin transferred the postal headquarters of Philadelphia from the printing establishment of Franklin and Hall to "a house in 3rd Street" and in 1757 to his house in Market Street.  For all practical purposes this may be considered the central Post Office of continental North America.

As soon as Franklin had taken over the higher office of Postmaster General he had appointed his son, William, as his successor in the Postmastership of Philadelphia.  A year later William left this office to become Comptroller of the American system and another member of the family, a relative of Mrs. Franklin, succeeded to the vacancy.  Because of this family patronage and other appointments like that of his brother John to the Post Office at Boston, in 1754, Franklin has sometimes been accused of nepotism.



48                    *Post Office Department.*

propounded unto us this day, *wee shall surely perishe out of
the good land whither wee passe over this vast sea to pos-
sesse it ;*

Therefore lett us choose life
that wee, and our seede
may liue, by obeyeing His
voyce and cleaveing to Him,
for Hee is our life and
our prosperity.

---

## POST OFFICE DEPARTMENT.

[It is well known, that little has been systematically published on the
past history of the Post Office department in our country.—Such a sub-
ject might be individually and interestingly handled from its small be-
ginnings to its present expanded and important relations.—To aid in
preserving materials for the accomplishment of this subject,—the pub-
lishing Committee have prepared the ensuing article.—Most of the
extracts and documents, which they here quote, are derived from the
Massachusetts Archives.]

### I.

*Under General Court Records.* 5th, 9 mo. 1639.

"For preventing the miscarriage of letters,—It is order-
ed that notice bee given, that Richard Fairbanks his house
in Boston is the place appointed for all letters, which are
brought from beyond the seas, or are to be sent thither;—
are to bee brought unto him and he is to take care, that
they bee delivered, or sent according to their directions,
and hee is alowed for every such letter 1d. and must
answer all miscarriages through his owne neglect in this
kind ; provided that no man shall bee compelled to bring
his letters thither except hee please."

Generated on 2024-05-30 13:55 GMT / https://hdl.handle.net/2027/njp.32101076467495
Public Domain in the United States, Google-digitized / http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google

Original from
PRINCETON UNIVERSITY

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)
Def. App'x 042

# Great American Post Offices



J A M E S   H .   B R U N S

HE6422  .B78  1998 c.4

Bruns, James H.

Great American
 post offices.



Preservation Press



## John Wiley & Sons, Inc.

NEW YORK  CHICHESTER  WEINHEIM  BRISBANE  SINGAPORE  TORONTO

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)
Def. App'x 043

INTRODUCTION

.................................................

## American Post Offices



HIS BOOK BEGAN AS A SERIES OF anecdotal accounts, odd "would you believe" kinds of stories about post offices and postmasters. When it came time to look at actual buildings though, to see if they were still standing, I was dumbfounded by the void. Far too many of these buildings were gone: They'd been razed in the name of progress, fallen victim to tornadoes or floods, or been casualties of arson or of accidental fires.

Hopefully, though, enough of the original manuscript's story-telling quality remains to give this book about buildings a human side. I believe that this is an essential ingredient for a book about post offices, because they are principally human places.

In this respect, it should come as no surprise that many of the structures depicted in this book are less than "great" by architectural standards. This stems in part from the fact that before the mid-1800s the government did not really own many post office buildings—outside of the capital in Washington, D.C. The first marble building in Washington, was the General Post Office, designed by Robert Mills and constructed in the late 1830s.

There were few "great" federal buildings before the 1850s. By the late 19th century, however, the government began constructing post offices, usually as part of a building that housed various

*PRECEDING PAGE, BOTTOM:*

*A rendering of Robert Mills's General Post Office, a building that housed the Washington, D.C., post office, as well as Post Office Department headquarters. This building until recently was still in use, although it no longer is associated with the postal system.*

xi

federal agencies. These buildings were restricted to larger communities, and these mixed-use offices were often grander than was necessary, but such an appearance was part of the nation's emerging image.

Smaller post offices, on the other hand, mirrored the growth of the communities they served. Hanover, New Jersey, is typical of countless other small towns; a series of buildings have housed its postal facilities. Its first post office was opened in the late 1700s in a private home. It moved into a general store in the mid-1800s. The community did not finally receive its own separate federally-owned post office building there until 1950.

Something else should also be kept in mind. This book is not only about buildings, it's also about the customers and communities served by the postal system. In this respect, the "greatness" of the buildings depicted here is derived from a combination of form and function.

MAIL HAS HELPED SHAPE THE CHARACTER AND WILL OF this nation's people. Perhaps Postmaster General John Wanamaker said it best in 1889: "The Post Office is the visible form of the Federal Government to every community and to every citizen. Its hand is the only one that touches the local life, the social interests, and business concern of every neighborhood." Because Americans from all walks of life, from all corners of the country, and from diverse ancestry receive mail, they share a common experience. We do not, however, all share the same-style post office. This book portrays post offices, not merely as a pictorial guide to architectural styles, but also as intrinsically social centers of the community.

The nation's postal system is the largest civilian employer of Native Americans, African-Americans, Hispanic-Americans, and Asian-Americans, as it has been for generations. For the elderly, it delivers loving missives from scattered friends and family, along with well-earned Social Security and retirement checks. For those raised on farms or in the country's rural hamlets, it brings merchandise from around the nation and the world directly to their doorstep.

Indeed, it does not matter where one lives, whether in an affluent suburb or the "inner city," whether in northern Alaska or at



Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)
Def. App'x 045

the bottom of the Grand Canyon, everyone receives mail!

Since the 1850s, the postal service has also provided a variety of public services that have little to do with mail delivery. It has distributed over a million pounds of free vegetable and flower seeds at Congress's request, gathered hog surveys and weather forecasting information, distributed tax forms, assisted in draft and Selective Service registrations, distributed food stamps, sold savings bonds and federal duck stamps to waterfowl hunters, and furnished flags for the burial of veterans.

To fulfill all these missions, the postal service has always needed buildings. Article I of the Constitution vested the federal government with the power "to establish post offices...." This was an essential mandate, for, as George Washington predicted, the postal service would be the principal means by which the people of the United States would be bound together in loyalty to the government. But, to make that dream a reality, the government had to create post offices. With the exception, perhaps, of local places of worship and schools, the local post office has frequently been among the largest buildings and generally the most important cultural structure in a town.

*The general store and post office at College Hill, Mississippi, was the center of community life. Now undergoing restoration, this old post office is located across the street from the town's only place of worship, a Presbyterian Church where novelist William Faulkner was married.*



xiii

# Post Offices Across a Young Nation

 TAVERN AT THE END of Boston's Long Wharf served as America's first post office. This was a convenient point where ship masters could drop off and pick up overseas correspondence, which represented the bulk of colonial America's mail. The drop site was designated by the General Court of Massachusetts in 1639, which decreed:

> That Richard Fairbanks, his house in Boston, is the place appointed for all letters which are brought from beyond the seas, or are to be sent thither, to be left with him; and he is to take care that they are to be delivered or sent according to the directions; and he is allowed for every letter a penny, and he must answer all miscarriages through his own neglect in this kind.

Not much is known about the architectural details of Fairbank's Tavern. The only surviving description is from a deed of the property when it was sold in 1652. The property was described as a "dwelling house, garden and yard."

Similarly, New York City's first post office, opened in 1642, was in a coffeehouse. Coffeehouses were seen as a temperate alternative to taverns. New York's post office continued to be housed in a succession of coffeehouses, the last of which was the Merchant's Coffeehouse, located at Wall and Water Streets, from 1737 to 1804. These popular gathering places were ideal for letters to await the coming of their owners. They were described as "the headquarters of life and action, the pulsating heart of excitement, enterprise, and patriotism."

Postal business was relegated to a small portion of such places, if it was given any space at all. Architectural form was not the least bit important; and, judging from the comments of the time, function was not all that crucial either.

Over a century later, Charlestown, South Carolina, had much the same type of arrangement. Its post office was kept "in a room in the most frequented coffee-house in the most publick part of the town." The delivery system at this time in America's history was simple. Mail was either tossed onto a spare table, where it lay until claimed, or was dumped into a common basket or box that everyone could paw through whether they were expecting a letter or not. Another common practice was to tack a letter onto a board in a conspicuous space in the hope that

PRECEDING PAGE:

*The interior of the post office at New York City was depicted elsewhere in this book as a tidy and orderly place in 1845. Operations had become chaotic by 1855, however, as depicted in this illustration.*

3



*Merchant's Coffeehouse, New York City, the city's post office from 1737 to 1804.*

it would be noticed by the intended recipient, who had to pay the postage. The idea was for the addressee to collect his or her own letters, but more often than not, well-intentioned friends, family members, or strangers were willing to pay the postage in the expectation of being reimbursed later, and often carted off letters for the addressee.

Under these makeshift circumstances letters were frequently miscarried. Henry Callister, an exasperated Maryland resident, writing in 1761 to a friend, observed, "I know not by whom this will be handed you; it waits for the first traveler of good aspect." Callister had many bad experiences with the mails. The previous year he advised a friend:

I have been mortified these two days by notice given me of a letter being seen at Georgetown [about nine miles from his home] directed to me with the postage marked on it. I sent to enquire about it yesterday, and find it was delivered to someone to be left at a certain place for me; I sent thither; but no letter was to be found. So that it is not likely I shall hear from you till you write again.

Occasionally, acquaintances and well meaning strangers carried mail containing money or bills of exchange, but not everyone was so kindly disposed. As the *Maryland Gazette* reported in 1753, this practice had its darker side:

For want of due Care of such letters, in which the same are enclosed, no settled Post-Houses being appointed for the Reception of them, many times sundry evil-minded Persons find Occasion clandestinely to take such Letters out of the Public Houses, where they are generally left, and break open and conceal the same, to the great Detriment of sundry of the Inhabitants, Merchants, and Traders.

Jonas Green, the publisher of the *Gazette,* had first-hand experience of this type of theft, having lost about two hundred subscribers' payments.

4

POST OFFICES ACROSS A YOUNG NATION

One way around the thievery was to hire a private carrier. Colonial Americans frequently banded together to form cooperatives to employ mounted messengers, for which a fixed fee was charged. According to the summary of the 1764 *Moravian Diaries of Travels Through Virginia,* published in 1915, "Private messengers might always be sent, and were made much use of." Demand for this type of service was sufficient enough for riders to advertise. One Maryland rider was prepared to serve "as reasonably as any one" for those with an "occasion to send a Messenger to any Distant Part of this, or to any of the Neighboring Governments."

Architecturally, postal repositories had changed little by the 1790s. Joseph Habersham, who served as U.S. Postmaster General from 1795 to 1801, claimed that "There is scarcely a village ... of any consequence but is accommodated with the mail." The truth of the matter, however, was that there were only about 200 post offices nationwide. Post offices in the late 18th century continued to be located in taverns, coffeehouses, hotels, or other public places, with little space devoted to postal affairs. The post office at Woodbridge, New Jersey, for example, which opened on July 31, 1792, was known as Cross Keys Tavern. The proprietor, John Manning, hosted George Washington on the night of April 22, 1789, during his inaugural journey to New York. Years later, during the American Civil War, Samuel Moore's Tavern likewise served as Woodbridge's post office.

The postmasters' private homes also were used as post offices in some areas. The post office at Falmouth, Massachusetts, was run like one giant open house. "Every person who looks for a letter or a news paper freely enters [the postmaster's] home, be it post day or not: he cannot afford to set apart a room in his house as an office: he is continually disturb'd in his family," noted one passerby in 1791. The nuisance was so great that the postmaster freely admitted that he was more than willing to give up the job, if anyone else wanted it. The reason for this was far more than just personal, it was economic. Postal business was often conducted as an unprofitable sideline.



*Private messengers were often the surest way of ensuring delivery of mail.*

Early on, however, newspaper publishers realized how to make their association with the postal system pay. Many publishers were themselves postmasters, and for good reason. Being a postmaster was an ideal way of killing off the competition. Benjamin Franklin learned all about this firsthand. Franklin, the publisher of the *Pennsylvania Gazette,* and his rival, Andrew Bradford, publisher of the *Mercury,* went head-to-head over advertising in the 1730s. Bradford had the advantage, because as postmaster of Philadelphia he used his influence to exclude the *Gazette* from the mails. Bradford reasoned that the lack of visibility would prompt potential advertisers to conclude that Franklin's paper lacked the kind of circulation they desired, prompting them to advertise instead

5

exclude newspapers from the mail, nor prohibit their carriage or delivery on account of their character or tendency, real or supposed." But, Kendall wrote, "I am not prepared to direct you to forward or deliver the papers of which you speak." Instead, he left everything up to Huger.

The simple fact was that real news was not always easy to come by. Sometimes it had to be borrowed. Taking news from another paper was an acceptable practice that continued well into the 19th century. In 1851 a Baltimore paper noted "The Southern mail has arrived, but the papers contain no news of importance." A decade and a half later another newspaper observed, "The mails by the *Asia* ... arrived at a late hour last night. There is nothing striking in the news. It is too late to make our usual extracts."

Even when it was difficult to gather other forms of reliable intelligence, information continued to be extracted during the Civil War. The April 7, 1862 issue of the *New York World* announced, "We have received from our correspondent at Nashville late copies (of six) Southern papers." As usual, segments of articles were copied verbatim, however, publishers had to be selective in the information they used, avoiding articles that might be considered pro-Southern. Newspapers publishing questionable material, or those that were clearly sympathetic to the South, risked swift retribution, as the publishers of the *Missouri Standard* discovered. The publisher was convicted in 1862 in military court on charges of publishing information for the benefit of the enemy and inviting rebellion. The conviction carried a mandatory expulsion order from the state for the duration of the war. His printing equipment was also confiscated and ordered sold for the benefit of the government.

Despite such risks, some newspaper publishers continued to freely exchange the news from one newspaper to another by mail during the war years without penalty, and readership rose. By 1875, five million newspapers reportedly were distributed daily by mail, roughly equal to two a week for every literate American.

For all their reliance upon the mails, printer/postmasters typically were stingy about providing space for conducting post office business. That was true from the colonial period to the late 19th century. In colonial Providence, Rhode Island, the post office was in John Carter's printing office. In the journal of his inspection tour of the colonial post office made in 1773-1774, Hugh Finlay noted that Carter did not actually devote any floor space to the post office as such, but did pledge to keep incoming letters under lock and key until the recipients came to call.

Such early printer/postmasters also had to deal with another postal problem, that of collecting postage. Before the second half of the 19th century mail could be sent either prepaid or collect. This allowed countless fees to go uncollected when mail was simply refused. Not wishing to get stuck with unwanted mail, some postmasters tried to lay down the law. The publisher of the *Continent of the North-west Territory*, who was also the postmaster of Cincinnati from 1794 to 1795, advised his patrons, "those who have a right to calculate on receiving letters and papers at this office in the future, must come prepared with cash in hand, or no letters or papers."



# A Growing Need for Postal Facilities



IKE TAVERNS, COFFEEHOUSES, and print shops, churches also served as early post offices. New York City's Post Office was once a church. Although beloved as a place of worship, it was hated as a post office. One old-time postal patron described it as "the dingy and gloomy old post office."

Dedicated in 1732, the Middle Dutch Church on Nassau Street had a rich history. During the American Revolution, British troops stripped its interior to house captured American patriots. When it was no longer needed as a prison, it served as a riding stable for British cavalry. The congregation got the building back after the British evacuated the city. By the 1840s, the church was put up for sale. The original asking price was $350,000, far too much for the Post Office Department, which did not really want the property anyway. Under pressure to buy the building, the postal service reluctantly said it was willing to pay $300,000, but no more. To make up the difference, local merchants hastily passed the hat for the rest.

When the second-hand post office was opened local residents were invited "to view the interior arrangement of the establishment," but the inquisitive crowds were shocked to see that not much had changed. Despite $80,000 worth of renovations, the pulpit and religious ornamentations were still in place. Even worse, the original occupants were still there too! The vaults underneath and around the church were left as they had been for 112 years—occupied! The buried human remains were finally removed but, according to one account, "for a long time the spectacle was presented of coffins and mailbags, of carts and extemporized hearses, jostling each other while engaged in their allotted work."

The building received a steady stream of scorn, including this mid-century commentary: "There was nothing in the world so unsuited as [this] building for such a purpose.... The extravagance and folly of the federal government in buying property erected for a church, and attempting to alter it to accommodate a post office, finds an illustration, but not an exceptional one, in this

*New York City's post office occupied an old Dutch Reform Church in 1845. It was extremely impractical and a city-wide joke. This invitation was issued to prominent citizens to inspect the "new" post office.*



**POST OFFICE**
*NEW YORK, Jan'y 2[?], 18[?]*

*The Post Master has great pleasure in announcing to his fellow Citizens that the new Post Office Building in Nassau Street will be ready for occupation in a few days; he respectfully invites you and family*

*to view the interior arrangements of the establishment on Friday day the 28 inst. from 12 to 3 P.M.*

*John Lorimer Graham*
*P.M.*

13



*Local residents hated their second-hand post office, which never was as nice as shown here. It was always crowded and service was poor.*

'high old Dutch Church post office.'" It was also said of the building that its "inconvenience, the necessarily miserable arrangement, the total unfitness of the place—inherently so by the original design of the building—has been a source of constant discomfort." These conditions were tolerated for approximately three decades.

Others accused "the old Dutch church in Nassau-street" of being the black hole for the metropolis' mail, and they had conducted experiments to prove their assertions. One publication did test mailings to see how long it took for mail to get to its destination; 14 letters were mailed in various parts of the city, between Central Park and the Battery, to an address in Cortlandt Street, roughly five minutes' walk from the post office. The letters took about 16 hours to get there, which by modern standards is fast! The bottom line at the time was that "once [letters] lodged [in the post office], the possibility of further delays are ample and varied."

New York City residents were quick to compare their flawed service to that of England. Residents of London enjoyed a vast contrast, there, city delivery service worked. A transplanted New Yorker, John Oxenford, voiced his opinion in *The London Times*, saying the "Suffering the inconvenience of [New York's] system, or rather no system, two or three times, I execrated the internal postal arrangements of New York in no measured terms, and loudly extolled the frequent 'deliveries' of London. ... the merchants and bankers perfectly sympathized with my execration, and envied the Londoner with his complete postal system."

American magazines also hammered away at the way we were "barbarously behind other nations." "In contrast with [London's] perfect institution, is it needful to describe the derangements, the difficulties, the methods of incommoding the public, which annoy our [largest] metropolis?" asked one popular periodical. "In this vast, enormously increasing, double or triple city, one of the things which most strikes a stranger with surprise and disappointment, and a well-informed citizen with shame, is the miserable deficiency of its postal accommodation."

14



Thankfully, by the mid-1870s, New York City had a new post office, a Second Empire building designed by Alfred Mullett. In vacating the old Dutch Reform church, city postal clerks and letter carriers sang "Auld Lang Syne" previous to the last day of service, and then on August 28, 1875, the clerks left the building in a formal procession, led by fife, drums and flag bearers. The clerks each carried some of the old furnishing, such as chairs and stools, with them to the new building.

New York City's old post office was far from uncommon. Many of the nation's early postal facilities were mediocre. The post office in Salem, Massachusetts, was described as "a small mean-looking place" by a visitor in the early 1770s. Even after the Revolution, the postal system actually owned few buildings. Federal ownership would come much later and even then, those buildings were largely acquired secondhand. Postal service headquarters, for example, was housed in a converted hotel. During the nation's formative years, almost any building would do.

Between 1728 and 1882, the Philadelphia post office was located in about 10 different places, including, in the 1830s, the Merchant's Exchange. Such sites quickly fell in and out of favor. In 1863, Philadelphia's post office was considered "one of the most extensive and completely-appointed establishments of the kind in the country," but, by 1880, it was described as "wholly inadequate." In the cycle of fickle public opinion, its replacement was said to be "with the exception of the Chicago post-office ... the largest and most complete building of its kind in the Country," but that too would not last for very long!

Fires contributed greatly to the turnover in post offices. No city was immune. On December 16, 1835, a fire broke out in the rear of the New York post office, then housed in the Merchant's Exchange on Wall Street. The blaze raged for 15 hours, consuming about 50 acres of the city's business district. Luckily, no mail was lost. Postal workers, along with some conscripted soldiers from Governor's Island, hastily removed the mail before the building was consumed.

Similarly, the Chicago post office went up in smoke when fire swept through that city on October 8 and 9, 1871, forcing postal officials to temporarily set up shop in a Methodist church. The following year fire destroyed the Boston post office, then

*Philadelphia's Merchant's Exchange served as the city's main post office before the American Civil War.*



15



# Sources of Historical Information on Post Offices, Postal Employees, Mail Routes, and Mail Contractors

November 2022

United States Postal Service® | Publication 119

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)
Def. App'x 054

## Contents

Sources Chronologically ..................... 1

Sources by Subject ............................. 2

Sources Alphabetically ....................... 2

Record Locations ............................. 11

Further Sources ................................ 12

Incomplete Sources .......................... 14

The United States Postal Service® traces its origin to July 26, 1775, when the Second Continental Congress appointed Benjamin Franklin the postmaster general of the United Colonies, predecessor to the United States. Originally called the Post Office or General Post Office, it became known as the Post Office Department by the 1830s, and in 1872, Congress specifically established it as an executive department. *The Postal Reorganization Act of 1970* transformed the Post Office Department into the United States Postal Service, an independent establishment of the executive branch. The Postal Service™ officially began operations as an independent agency on July 1, 1971.

Historians, postmasters, genealogists, and others who want to learn more about the history of their communities will discover valuable sources of historical information on Post Office™ facilities, postal employees, mail routes, and mail contractors in this publication. This publication lists sources chronologically, then discusses them by subject, and then describes them in alphabetical order. Links to digital copies of sources (if available) are provided in the descriptions. Record locations, further sources of information, and common questions for which there are no comprehensive sources of information are discussed on the final pages.

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 055

## *Sources Chronologically*

| | |
|---|---|
| 1700s–present | Newspapers |
| 1700s–1960 | City directories |
| 1700s–1960s | Post route maps |
| 1775–1778 | Benjamin Franklin's ledger |
| 1782–1799 | *Ledgers of the General Post Office* |
| 1789–1818 | *Record of First Returns Received from Postmasters* |
| 1789–1952 | *Letters Sent by the Postmaster General* |
| 1789–present | *Annual Report of the Postmaster General* |
| 1789–1970 | U.S. Congressional Serial Set |
| 1789–1883 | U.S. Statutes at Large |
| 1790–1950 | Census records |
| 1793–1800 | *Letters Sent by the First Assistant Postmaster General* |
| 1803–2004 | Lists, tables, and directories of Post Offices |
| 1814–1960 | Contract route registers |
| 1814–1971 | *Record of Appointment of Postmasters* |
| 1816–1911 | *Official Register of the United States* |
| 1835–1953 | *Orders of the Postmaster General ("Journals")* |
| 1837–1950 | Site location reports of Post Offices |
| 1861–1865 | Confederate Post Office Department records |
| 1863–ca. 1900 | *Record Cards of Letter Carriers Separated from the Postal Service* |
| 1874–1954 | *United States Official Postal Guide* |
| 1880–present | *Postal Bulletin* (*Daily Bulletin* prior to 1919) |
| 1890s–1986 | Record cards of postmaster appointments |
| 1896–1970s | Rural delivery route cards |
| 1900–1938 | Rural delivery route maps |
| 1901–1934 | Rural delivery records |
| ca. 1901–present | Pay and personnel records |
| 1986–present | Postmaster Finder |

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 056

## Sources by Subject

### Post Offices and Employees

Post Offices operated in all fifty states before statehood — see "First U.S. Post Offices by State" at *https://about.usps.com/who/profile/history/pdf/first-post-offices.pdf*. For an overview of sources of information on Post Offices in the American colonies before July 1775, see "First U.S. Post Offices: Research Challenges and Sources of Information" at *https://about.usps.com/who/profile/history/pdf/first-post-offices-sources.pdf*.

For information on Post Offices and postmasters from 1775 to 1814, major sources include the following:

- *Record of First Returns Received from Postmasters.*
- *Letters Sent by the Postmaster General.*
- *Letters Sent by the First Assistant Postmaster General.*
- Benjamin Franklin's ledger.
- Newspapers.

After 1814, the primary source of information on Post Offices and postmasters is the *Record of Appointment of Postmasters.*

For concise listings of Post Offices by state and alphabetically, see the lists, tables, and directories of Post Offices, as well as the *United States Official Postal Guide* and *Official Register of the United States.*

For postmaster salary information and lists of other Post Office employees, refer to the *Official Register of the United States.*

Pay and personnel records may be available for employees whose service ended after about 1901.

Site location reports of Post Offices provide geographic and other information on specific Post Offices.

### Mail Routes, Contractors, and Letter Carriers

For information on mail transportation contracts and contractors before 1814, sources include the following:

- *Letters Sent by the Postmaster General.*
- *Letters Sent by the First Assistant Postmaster General.*
- Newspapers.

Contract route registers are available beginning in 1814.

The biennial *Official Register of the United States* lists names and compensation of mail transportation contractors from 1816 to 1911.

Rural delivery route cards provide rural route establishment dates, as well as the names, dates of service, and salaries of rural carriers from 1896 to the 1970s.

The historian of the United States Postal Service has compiled tables showing first rural delivery routes established, by state and Post Office, through 1904. These tables are available at *https://about.usps.com/who/profile/history/first-rural-routes.htm*.

Names and salaries of rural and city letter carriers are listed in the biennial *Official Register of the United States* through 1911.

Dates of service of city letter carriers whose service ended before about 1900 are available in *Record Cards of Letter Carriers Separated from the Postal Service, 1863–1899.*

Pay and personnel records may be available for rural and city letter carriers whose service ended after about 1901.

## Sources Alphabetically

### Annual Report of the Postmaster General, 1789–present

Early editions of the *Annual Report* (title varies slightly) offer only brief summaries of a few pages each on mail service nationwide, but by the 1840s the report begins to include statistical tables on everything from missent mail (by state) to international money orders issued (by state). Also featured are the following:

- The lengths of mail routes and modes of conveyance, by state (1836–1913).
- Railroad and steamboat contracts (beginning in 1843 and 1845, respectively).
- The number of Post Offices by state (1847–1970).
- Receipts/expenses by state (1851–1970).
- Statistics on city delivery (1873–1971).

- Establishment dates of rural free delivery, by Post Office (1897–1901).

More detailed financial statistics are often available on the largest U.S. Post Offices — for example, receipts, expenses, and money allowed for clerk hire and rent, light, and fuel. The 1970 *Annual Report* has a statistical overview of the history of the Post Office Department from 1789 to 1970. In 1971, the report reverts to a limited format, with statistics available for the most part on only a national basis.

Digital copies of many editions of the *Annual Report* are available online through HathiTrust at *https://babel.hathitrust.org*, Google Books at *https://books.google.com*, and the Internet Archive at *https://archive.org*. Mike Ludeman's "Portal to the Annual Reports of the Postmaster General," hosted by the Stamp Smarter website at *https://stampsmarter.org/learning/PostalPortal.html*, provides links to many online editions.

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 057

## Benjamin Franklin's Ledger, 1775–1778

Benjamin Franklin received the appointment as the first postmaster general under the Continental Congress on July 26, 1775. He and his successor, Richard Bache, kept a ledger of the quarterly accounts of the General Post Office from 1775 to 1778. This ledger includes sums paid to and received from Post Offices — serving as a useful list of early Post Offices — with postmaster names sometimes noted.

A copy of the ledger, titled *The Ledger of Doctor Benjamin Franklin, Postmaster General, 1776*, is available online through HathiTrust at *https://babel.hathitrust.org*, Google Books at *https://books.google.com*, and the Internet Archive at *https://archive.org*.

## Census Records, 1790–1950

Federal census records are available for every 10 years from 1790 through 1950, though most of the 1890 records were destroyed by fire. Records before 1850 contain little information beyond the name of the head of household. Beginning in 1850, the records list every household member by name, along with their age, occupation, and other information. The records are arranged by state and county, then by township or enumeration district, and then by household in the order visited by census takers. For more information, see *https://www.archives.gov/research/census*.

Census records have been digitized by Ancestry.com and FamilySearch.org, making it possible to search for individuals by name only. Access to Ancestry.com is available by subscription, and is free-of-charge at National Archives facilities and many public libraries; FamilySearch.org is a free site.

## City Directories, 1700s–1960

City directories were printed in several of the largest U.S. cities by the end of the 1700s. By 1861, directories were printed in more than 80 cities. These directories often contain detailed city maps and list businesses, public and private institutions, and residents and their addresses. Occupation and race of residents are often noted in 19th-century directories. City directories sometimes contain a separate section on the Post Office, listing the address and the name of the postmaster, other employees, office hours, the schedule of mail arrival and departure, and other information.

Directories from 1861 to 1960 have been reproduced by Primary Source Microfilm as *City Directories of the United States* and may be available from your local library through inter-library loan. Digital copies of many U.S. city directories are also available online through Ancestry.com by subscription, and many public libraries offer them free-of-charge. Copies of some directories are

---

### POSTOFFICE.

**Federal Building**, K ne. cor. 7th. Hours: 8 a. m. to 5 p. m., and general delivery, 8 a. m. to 7 p. m. Sundays, 12 to 1 p. m. Money Order department, 9 a. m. to 5 p. m., and from 6 to 9 p. m. for issuing and registration. Registering department, 8 a. m. to 6 p. m.

**Official Roster.**

Postmaster R. M. Richardson, Asst. Postmaster G. M. Treichler, Superintendent of Delivery Wm. Rider, Mailing Clerk J. P. Bascom, Registry Clerks, James Longshore, Jr., Henry O. Tubbs and C. W. Stewart; General Delivery Clerk, Charles S. Pepper; Stamp and Box Clerk, Edgar H. Rivett; Money Order Clerks, Mrs. Alice Campbell, Victor A. Fuchs and A. F. Webb; Distributors, W. F. Brown, J. A. Considine, J. E. Steward and C. A. Lambert; Postoffice Inspector, J. I. Driscoll, Federal Bldg.; Carriers: T. W. White, G. B. Eldred, C. A. Dufour, C. E. Hill, L. T. Miller, C. F. J. Pearson, J. W. Toomey, F. H. Toomey, M. Butler, E. F. Gibson, M. J. Troy, P. B. McIntyre, R.

**Office Hours.**

The general postoffice is open for the reception of mail from 5 o'clock a. m. to 11 o'clock p. m., and for general business from 8 a. m. to 7 p. m., except Sundays. Cashier's office from 8:30 a. m. to 5 p. m. For the transaction of registry business from 8 a. m. to 9 p. m., and for money order business from 9 a. m. to 9 p. m., except Sundays.

The carrier stations are open for general business from 7:30 a. m. to 7 p. m.

The numbered stations in drug stores, etc., are open for business at all hours of the day and evening, including Sundays.

On Sundays and holidays the main office and stations are open for general business one hour—from 12 m. to 1 p. m.—during which the carriers are in waiting to pass out any mail called for by their patrons.

Collections of mail from street boxes are made from one to twelve times daily, according to location of the boxes.

Outgoing mails close one hour before departure of train from the railroad station.

*A 1908 city directory for Sacramento, California, includes nearly five pages of information relating to the city's Post Office, including the excerpts shown above of a roster of employees and the office's operating hours.*

---

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 058

available through HathiTrust at *https://babel.hathitrust.org*, Google Books at *https://books.google.com*, and the Internet Archive at *https://archive.org*. Libraries, historical societies and state archives also may have copies of local city directories. A list of directories beginning with 1861 is available at *https://guides.loc.gov/united-states-city-telephone-directories/city-directories*.

### Confederate Post Office Department Records, 1861–1865

Surviving records of the Confederate Post Office Department are located at the National Archives and at the Library of Congress.

Confederate records at the National Archives are part of the War Department Collection of Confederate Records, Record Group 109. The Post Office material in this collection has been digitized and is online at *https://catalog.archives.gov*. It includes the following information:

- A list of Post Office establishments, discontinuances, and name changes in the Confederate states beginning in 1861 (undated).

- A register of accounts, 1864 to 1865, for Arkansas, Louisiana, and Texas, listing name of Post Office, county/state, and receipts.

- Confederate records on mail contracts and routes in Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Texas, and Virginia.

Records at the Library of Congress include the following:

- An Appointment Bureau list of Post Offices in Arkansas, Louisiana, and Texas, 1861 to 1865, noting establishments, discontinuances, and name changes, along with names of postmasters and appointment dates.

- A register of accounts for the quarter ending March 31, 1862, for Arkansas, Florida, Tennessee, and Texas (includes Post Office and postmaster name and financial information on the office — sometimes incomplete).

- An Appointment Bureau list, 1861 to 1865, of postmasters appointed in Arkansas, Indian Territory, Louisiana, and Texas (provides dates of appointment, bond and commission of the postmaster, the name and reason for leaving of the previous postmaster, the county of location, sureties' names, and miscellaneous remarks).

- Journal and Orders of the postmaster general (contains lists of hundreds of postmaster appointments in the summer of 1861).

- Appointment Bureau letters sent, 1861 to 1865, partially indexed through November 4, 1863.

- Letters sent by the Contract Bureau, 1861 to 1864, mainly to contractors and postmasters, which are indexed by recipient or Post Office name and provide details on mail service.

- Confederate records on mail contracts and routes in the states of Mississippi and Virginia.

Confederate postal records at the Library of Congress are in the Manuscript Division as part of the Records of the Confederate States of America. Many of these records are accessible at *https://findingaids.loc.gov*: search for "Confederate States," and select "Confederate States of America Records" > "Contents List" > "Post Office Department, 1861–1865." Mike Ludeman's "Portals to Confederate Post Office Publications," hosted by the Stamp Smarter website at *https://stampsmarter.org/learning/PostalPortal.html*, provide links to many of the records in both these collections.

### Contract Route Registers, 1814–1960

Registers of contract routes (also called "star routes") from 1814 to 1817, in 1824, from 1828 to 1870 (or circa 1882, for particular states), and from circa 1914 to 1960 (years vary by state) usually list names of stops along routes, names of bidders for the contracts, frequency of service, distances involved, and modes of transportation. They generally do not show the names of subcontractors or carriers employed by the contractors. In some time periods, there are indexes to mail routes by Post Office.

Contract route registers are located at the National Archives as part of the Records of the Post Office Department, Record Group 28.



*Contract route registers contain details about routes, schedules, and the names of contractors. This record from 1918 describes Route 65112, Snyder to Stoneham, Colorado.*

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 059

## Ledgers of the General Post Office, 1782–1799

The *Ledgers of the General Post Office* contain the quarterly accounts of the General Post Office. These accounts include mail contractor names, their routes, and sums paid, and an alphabetical listing of Post Offices, including the postmaster's name, letter and newspaper postage collected and the postmaster's commissions on the same, and sums paid for ship letters.

The *Ledgers of the General Post Office* are located at the National Archives as part of the Records of the Post Office Department, Record Group 28.

## Letters Sent by the First Assistant Postmaster General, 1793–1800

The letters sent by the first assistant postmaster general from October 27, 1793, to March 27, 1800, are arranged chronologically in three volumes with an index of names of addressees. The letters primarily relate to the financial accounts of postmasters and mail contractors, but they also concern mail transportation, postmaster appointments, and other matters.

The *Letters Sent by the First Assistant Postmaster General* are located at the National Archives as part of the Records of the Post Office Department, Record Group 28. These volumes have been digitized by the U.S. Philatelic Classics Society and are accessible through its website at *https:// www.uspcs.org/resource-center/government-documents/1st- asst-postmaster-general-letter-books-1793-1800*. Digital editions of these volumes indexed by Mike Ludeman are available on the Stamp Smarter website at *https:// stampsmarter.org/learning/PMGLedgers.html*.

## Letters Sent by the Postmaster General, 1789–1952

The earliest letters sent by the postmaster general — between October 3, 1789, and December 31, 1836 — are arranged chronologically in 50 volumes with an index of names of addressees. The letters reference specific Post Offices, postmasters, and mail contracts, and discuss mail transportation, postal laws and regulations, and budgetary matters, among other things.

The *Letters Sent by the Postmaster General* are located at the National Archives as part of the Records of the Post Office Department, Record Group 28. These volumes have been reproduced as National Archives Microfilm Publication M601, *Letters Sent by the Postmaster General, 1789–1836*, which is available for purchase from the National Archives and may be available from your local library through inter-library loan. The microfilm has been digitized by the U.S. Philatelic Classics Society and is accessible through its website at *https://www.uspcs.org/resource-center/government-documents/postmaster-general-letter-books-1789-1836*.

Links on that page also provide access to copies of letters sent by the postmaster general from 1837 to March 2, 1869. Digital editions of the earliest letters sent, indexed by Mike Ludeman, are available on the Stamp Smarter website at *https://stampsmarter.org/learning/PMGLedgers.html*.

## Lists, Tables, and Directories of Post Offices, 1803–2004

Lists, tables, and directories of Post Offices are available for nearly half of the years from 1803 to 1870, and then annually from 1955 to 2004. (For the intervening period, see the *United States Official Postal Guide*.) Although there is some variation by year, the earliest lists typically provide an alphabetical listing of Post Office names, along with the name of the postmaster, county, and state. The distances from the Post Office to the state and national capitals are also sometimes noted. The 1831 *Table of Post Offices in the United States* provides the first listing of Post Offices by county, which is regularly featured beginning in 1859. Directories of Post Offices from 1955 to 2004 list Post Offices, as well as stations and branches, alphabetically and by state and county, and they also provide the class of the Post Office (before 1975) as well as names of postal units discontinued in the preceding year. They do not show names of postmasters. Beginning in 1957, numbers of boxes served by Post Offices are listed. City delivery statistics are available beginning in 1979, when the *Directory of Post Offices* combined with the *National ZIP Code Directory* to form a new title, the *National ZIP Code and Post Office Directory*. This was last issued in 2004 as the *National Five-Digit ZIP Code and Post Office Directory*.

Copies of these publications are available through HathiTrust at *https://babel.hathitrust.org*, Google Books at *https://books.google.com*, and the Internet Archive at *https://archive.org*. Mike Ludeman's "Portal to the Early Postal Guides," hosted by the Stamp Smarter website at *https://stampsmarter.org/learning/PostalPortal.html*, provides links to many of the online editions. Select editions may also be available from your local library through inter-library loan.

## Newspapers, 1700s–present

Newspapers often contain announcements of changes to mail service, Post Offices, and postmasters. Sometimes, newspapers also contain descriptions of mail routes.

Thousands of historic newspapers have been reproduced in searchable electronic databases such as Newspapers.com™, ProQuest Historical Newspapers™, and Readex's Early American Newspapers, and the databases are available online by subscription and at many research libraries. The Library of Congress' Chronicling America website at *https://chroniclingamerica.loc.gov* provides free online access to more than 3,500 titles from 1777 to 1963. Many useful lists of digitized newspaper collections are available online, including at *https://www.loc.gov/rr/news/oltitles.html* and *https://guides.lib.purdue.edu/digitalUSnewspapers*.

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 060

## Official Register of the United States, 1816–1911

The *Official Register of the United States* lists Post Offices and postal employees and their financial compensation in 1816, and in odd-numbered years from 1817 to 1911. (Before 1879, the title was *Register of Officers and Agents, Civil, Military, and Naval in the Service of the United States*.) The earliest editions of the *Official Register* list Headquarters employees, postmasters, Post Office clerks, and mail contractors. Route agents and mail messengers are first listed in 1855. Railway Mail Service employees and city letter carriers are listed beginning in 1867, and rural carriers beginning in 1899. From 1877 to 1905, the *Official Register* is indexed by employee name. From 1879 to 1911, this title was published in a 2-volume set with postal employees listed in volume 2. Starting in 1913, the *Official Register* lists only top staff, primarily at postal Headquarters.

Digital copies of many editions of the *Official Register* are available online through HathiTrust at *https://babel.hathitrust.org*, Google Books at *https://books.google.com*, and the Internet Archive at *https://archive.org*. Mike Ludeman's "Portal to the Official Registers," hosted by the Stamp Smarter website at *https://stampsmarter.org/learning/PostalPortal.html*, provides links to many online editions. Most of the 1863–1911 volumes have also been digitized by Ancestry.com, making it possible to search for individuals by name only. Access to Ancestry.com is available by subscription, and many public libraries offer it free-of-charge.

## Orders of the Postmaster General ("Journals"), 1835–1953

The *Orders of the Postmaster General*, also referred to as the *Journals*, are arranged chronologically in bound volumes covering the period from July 7, 1835, to March 5, 1953. Noted in these volumes are Post Office establishments, discontinuances, and name and site changes, as well as information on mail routes, contractors, and carriers. Also noted, upon their dates of appointment, are the names of postmasters appointed to Post Offices, as well as the names and reasons for leaving of the previously appointed postmasters ("moved away," "resigned," "declined position," etc.). Although these volumes are not indexed, they can help verify pre-1880 information found in the *Record of Appointment of Postmasters*. (To verify post-1880 information, the *Postal Bulletin* is easier to access and use.) The *Journals* are also helpful in identifying individuals who were appointed to the position of postmaster but did not take office.

The *Journals* are located at the National Archives as part of the Records of the Post Office Department, Record Group 28. Copies of the *Journals* from October 19, 1848, to March 8, 1853, have been digitized by the U.S. Philatelic Classics Society and are accessible through its website at *https://www.uspcs.org/resource-center/government-documents/postmaster-general-order-books*.

## Pay and Personnel Records, circa 1901–present

Although personnel files — called "Official Personnel Folders" (OPFs) — were not created for postal employees until 1948 or later, information on the service of some employees before 1948 is available from other sources, such as Post Office payroll records. Note: Historically, most employees at smaller Post Offices were employed directly by the postmaster, so federal personnel records were not kept for them. Also, personnel records were not kept for individuals who carried mail on a contractual basis.

Pay and personnel records of former postal employees are located at the National Personnel Records Center.

## Postal Bulletin, March 1880–present

The *Postal Bulletin* (titled *Daily Bulletin of Orders Affecting the Postal Service* before 1919) lists postmaster names and dates of commission until 1942. Acting postmasters are listed from 1884 to 1942. Star (contract) route establishments, discontinuances, and schedule changes are listed from 1880 to 1942, and rural route establishments, discontinuances, and changes are listed from 1898 to about 1934. The *Postal Bulletin* also gives Post Office establishment and discontinuance dates, as well as information on Post Office name and site changes. Beginning in 1907, the *Postal Bulletin* also begins establishment and discontinuance dates of Post Office stations and branches.



The *Postal Bulletin, called the* Daily Bulletin of Orders Affecting the Postal Service *before 1919, lists Post Office establishments and changes, postmaster appointments, and other changes to mail service.*

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)
Def. App'x 061

Issues from 1880 to 2016 have been digitized by the U.S. Postal Bulletin Consortium and are accessible and searchable through its website at *http://www.uspostalbulletins.com*. Issues since 2001 are available on the Postal Service's website at *https://about.usps.com/resources/postal-bulletin.htm*.

### Postmaster Finder, 1986–present

Postmaster Finder is a database maintained by the historian of the United States Postal Service. It provides the establishment and discontinuance dates of Post Offices and the names and appointment dates of postmasters, acting postmasters, and officers-in-charge who served in between two different postmasters. Post Office name and county changes are also recorded. Since its creation in 1986, Postmaster Finder has been the sole national repository of postmaster names and appointment dates by Post Office. Names of earlier postmasters are gradually being added to the database; complete lists of postmasters are currently available for about 30 percent of active Post Offices.

Postmaster Finder is available on the Postal Service's website at *https://about.usps.com/who/profile/history/postmaster-finder.htm*.

### Post Route Maps, 1700s–1960s

Post route maps of counties, states, or regions show the mail transportation routes that connected Post Offices. The frequency of service and the distance between offices are also sometimes noted.

Some post route maps are located in the Cartographic and Architectural Section of the National Archives at College Park, Maryland, and also in the Geography and Map Division of the Library of Congress. Select digitized versions are available through their respective online catalogs, *https://catalog.archives.gov* and *https://www.loc.gov*. The library of the Smithsonian's National Postal Museum has post route maps for every U.S. state for 1933 and 1934, and the USPS historian has route maps for most states from the 1940s and 1950s. Some post route maps are also located in local collections — for example, in state or university archives/libraries and at local historical societies. Mike Ludeman's "Portal to Postal Route Maps," hosted by the Stamp Smarter website at *https://stampsmarter.org/learning/PostalPortal.html*, provides links to some online editions.

### Record Cards of Letter Carriers Separated from the Postal Service, 1863–ca. 1900

The record cards of letter carriers whose service ended by about 1900 are index cards filed alphabetically by state, Post Office, and the name of the letter carrier. The cards give the carrier's appointment date and the date and reason for his separation from service, such as "resigned," "transferred," "died," or "removed." Causes for removal

are sometimes noted. Although the cards generally are from before 1900, some cards through 1902 and even later are available.

The record cards are located at the National Archives as part of the Records of the Post Office Department, Record Group 28. The cards have been reproduced as National Archives Microfilm Publication M1846, *Record Cards of Letter Carriers Separated from the Postal Service, 1863-1899* (3 rolls). They are available for purchase from the National Archives and might be available from your local library through inter-library loan.

### Record Cards of Postmaster Appointments, 1890s–1986

The record cards of postmaster appointments (PS Forms 1094, 1095, and 1084) are index cards of postmaster and acting postmaster appointments and officer-in-charge installations at Post Offices from the late 1890s through 1986, filed alphabetically by state and Post Office. Post Office establishment and discontinuance information is also provided, along with dates when a Post Office was advanced to or relegated from the presidential class. (The president appointed postmasters at the largest offices from 1836 to 1970.) These records are often the sole source of information on postmaster appointments at Post Offices from 1971 to 1986, although before 1971 they largely duplicate information found in the *Record of Appointment of Postmasters*.

The record cards before about 1971 are located at the National Archives as part of the Records of the Post Office Department, Record Group 28. Cards after 1971 are located in the office of the historian of United States Postal Service.



*Record cards of postmaster appointments, like this one for Oro Grande, California, provide names and dates of appointees and other information on Post Offices.*

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 062

## Record of Appointment of Postmasters, 1814–1971

The *Record of Appointment of Postmasters* consists of ledgers of postmaster appointments by Post Office from 1814 to September 30, 1971. The records before 1832 are arranged alphabetically on a national basis, by Post Office name and state. County names are listed beginning in 1824. After 1832, the records are arranged by state or territory, then by county, and then alphabetically by Post Office. The records show the names of Post Offices, the dates of their establishment and discontinuance, any name changes, and the names and appointment dates of postmasters. Surety information is sometimes provided before 1844. Beginning in the 1840s, presidential appointments are noted. Money order offices are noted beginning in the 1860s. After about 1870, the records show the names of Post Offices to which mail from discontinued offices was sent. Names of acting postmasters are listed beginning in the 1910s. See also the description of this record at *https://www.archives.gov/research/post-offices*.

The postmaster appointment ledgers are located at the National Archives as part of the Records of the Post Office Department, Record Group 28. They have been reproduced as National Archives Microfilm Publication M1131, *Record of Appointment of Postmasters, October 1789–1832* (Rolls 2, 3, and 4), and M841, *Record of Appointment of Postmasters, 1832–September 30, 1971* (145 rolls). They are available for purchase from the National Archives and might be available from your local library through inter-library loan. The microfilm has also been digitized; records from 1814 to 1832 are accessible through the National Archives' website at *https://www.archives.gov/research/post-offices*. The records from 1832 to 1971 have been digitized by Ancestry.com, which is accessible by subscription and is free-of-charge at National Archives facilities and at many public libraries.



*An excerpt from* Record of Appointment of Postmasters *shows postmasters appointed in Sangamon County, Illinois, in the early 1800s — including Abraham Lincoln at New Salem on May 7, 1833* .

## Record of First Returns Received from Postmasters, 1789–1818

The *Record of First Returns Received from Postmasters* is a volume containing names of postmasters at Post Offices from October 1789 to July 1818, along with the dates of their first financial returns. Since postmasters were required to submit quarterly financial statements, their first financial returns generally postdated their appointment by several months, although delays in submitting accounts were not uncommon. This volume is especially useful since records of postmaster appointments before 1814 were destroyed by a fire at postal Headquarters in 1836. (It is sometimes possible to find pre-1814 appointment dates for postmasters by searching for them in the index to the *Letters Sent by the Postmaster General* in the months preceding their first return date.)

This record is located at the National Archives as part of the Records of the Post Office Department, Record Group 28. It has been reproduced as Roll 1 of National Archives Microfilm Publication M1131, *Record of Appointment of Postmasters, October 1789–1832*, which has been digitized by the National Archives and is accessible through its website at *https://catalog.archives.gov/id/75493318*.

## Rural Delivery Records, 1901–1934

Among the records of the Division of Rural Mails from 1901 to 1917 and from 1930 to 1934 are correspondence, reports, and supporting documents (sometimes including maps and petitions) regarding proposed rural route establishments and changes, filed by state and county. The Division records also include correspondence, filed by state and Post Office, from 1909 to 1929 and from 1930 to 1932. Inspection reports, referenced in the above files and arranged by state and report number, contain further details on proposed route changes, such as discussions of local topography, existing mail service, and customers served.

The records of the Division of Rural Mails are located at the National Archives as part of the Records of the Post Office Department, Record Group 28.

## Rural Delivery Route Cards, 1896–1970s

Rural delivery route cards, filed by Post Office, list route lengths, establishment dates, and the names, dates of service, and salaries of rural carriers.

Rural delivery route cards are located at the National Personnel Records Center in St. Louis, Missouri.

## Rural Delivery Route Maps, 1900–1938

Rural delivery route maps generally show the route of travel of rural delivery routes in a particular county or Post Office delivery area. These maps often show the locations of houses, schools, churches, and roads. Mailbox numbers are not listed, although patron names are sometimes noted.

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 063

Some rural delivery route maps are located in the Cartographic and Architectural Section of the National Archives at College Park, Maryland, and also in the Geography and Map Division of the Library of Congress. A few digitized versions are available through their respective online catalogs, at *https://catalog.archives.gov* and *https://www.loc.gov*. Some maps are also located in local collections — for example, in state or university archives/libraries and at local historical societies. Mike Ludeman's "Portal to Postal Route Maps," hosted by the Stamp Smarter website at *https://stampsmarter.org/learning/PostalPortal.html*, provides links to some online editions.



*A portion of a 1911 rural delivery route map of Carroll County, Maryland, shows local rural routes, including lines and directions of travel and rural route numbers, but not box numbers. Small dots represent houses.*

### Site Location Reports of Post Offices, 1837–1950

The reports of site locations are forms completed and submitted by postmasters, mostly from 1845 until 1945, giving the location of their Post Office and other geographical information. The reports typically show locations in relation to nearby Post Offices and mail transportation routes, and some reports include hand-drawn maps of the vicinity of the office — see the example on page 10. Reports submitted for proposed Post Offices, referred to as "applications" to establish a Post Office, also list the number of patrons the Post Office would serve. See also the description of this record at *https://www.archives.gov/research/post-offices*.

These reports are located at the National Archives as part of the Records of the Post Office Department, Record Group 28. They have been reproduced as National Archives Microfilm Publication M1126, *Post Office Department Reports of Site Locations, 1837–1950* (683 rolls), which has been digitized by the National Archives and is accessible through its website at *https://catalog.archives.gov/id/608210*; click on Search within this series.

### United States Official Postal Guide, 1874–1954

The *United States Official Postal Guide* provides alphabetical lists of Post Offices nationwide, by state, and by state and county. Monthly supplements to the Guide show the latest Post Office establishments, discontinuances, and name and county changes.

The *United States Official Postal Guide* has been digitized and is available on the Stamp Smarter website at *https://stampsmarter.org/learning/Home_USPOD.html*. Some editions are also available online through HathiTrust at *https://babel.hathitrust.org*, Google Books at *https://books.google.com*, and the Internet Archive at *https://archive.org*.

### U.S. Congressional Serial Set, 1789–1970

From about 1817 to 1890, the *Serial Set* contains records of mail contract routes (also called "star routes"). Reports show the termini of the routes, the names of the contractors selected, and other information. General indexes to the *Serial Set* provide the years and volume numbers of mail route records, but few references to specific mail routes. Later volumes of the *Serial Set* provide information on other aspects of the Postal Service.

The *Serial Set* has been digitized, and the 19th-century volumes are available online free-of-charge through HathiTrust at *https://babel.hathitrust.org*. Subscription databases like LexisNexis®, ProQuest, and Readex offer both access and multiple search options. Mike Ludeman's Portal and index to Post Office records in the *Serial Set* are available on the Stamp Smarter website at *https://stampsmarter.org/learning/PostalPortal.html* and are useful finding aids.

### U.S. Statutes at Large, 1789–1883

From 1792 through 1883, the *Statutes* list post roads established and discontinued by Congress, and note stops on the routes. While there is a general index by subject ("post roads"), there is no index by Post Office.

The *U.S. Statutes at Large* are available online free-of-charge through the Library of Congress at *https://www.loc.gov/collections/united-states-statutes-at-large/about-this-collection/index.php* and HathiTrust at *https://babel.hathitrust.org*. The *Statutes* are also available online through the subscription database HeinOnline at *https://heinonline.org*, which offers multiple search options.

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 064

*A site location report typically shows a Post Office location in relation to nearby Post Offices. Some reports include hand-drawn maps of the vicinity of the office.*





*Site location reports describe Post Office locations in relation to neighboring offices and transportation routes. This report from Berkeley Springs, West Virginia, includes a hand-drawn map submitted by Postmaster Ann Mead in 1868.*

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 065

## Record Locations

### Historian

United States Postal Service
475 L'Enfant Plaza SW
Washington, DC 20260-0012
*https://about.usps.com/who/profile/history/*

Copies of many of the publications described in this booklet are available in the Postal Service's Library, which is managed by the historian and is open to the public by appointment. The historian can also provide guidance in researching specific aspects of postal history. Upon request, the historian's staff can provide information on Post Offices and former postal employees. For further information, write to the above address or email *phistory@usps.gov*.

### Library of Congress

101 Independence Avenue SE
Washington, DC 20540-0002
*https://www.loc.gov*

The Library's Manuscript Division houses some records of the Confederate Post Office Department. The Geography and Map Division has early post route maps. For further information, write to the Library of Congress or visit its website.

### National Archives and Records Administration

National Archives at Washington, DC
700 Pennsylvania Avenue NW
Washington, DC 20408-0001

National Archives at College Park, MD
8601 Adelphi Road
College Park, MD 20740-6001
*https://www.archives.gov*

The Records of the Post Office Department, Record Group 28, and the War Department Collection of Confederate Records, Record Group 109, are located at the National Archives at Washington, DC. Cartographic and architectural records are housed at the National Archives at College Park, Maryland. Many of the records most useful to researchers have been reproduced on microfilm and are available from the National Archives and its regional branches, and they may be available from your local library through inter-library loan. For further information, write to the National Archives or visit its website.

### National Personnel Records Center

National Archives and Records Administration
ATTN: Archival Programs
Post Office Box 38757
St. Louis, MO 63138-0757
*https://www.archives.gov/st-louis/opf*

The National Personnel Records Center has personnel records for many postal employees whose service ended after 1910. Information on the service of employees before that time may be available from other records at the center, such as payroll records and roster cards. Researchers should provide as much identifying information as possible about the former employee and his or her place and dates of employment. The center also houses rural route cards, filed by Post Office, which provide details on rural routes and carriers before 1971. Note: To request the personnel records of an employee whose service ended after 1951, write to the National Personnel Records Center, Annex; 1411 Boulder Boulevard; Valmeyer, IL 62295-2603. For more information, visit *https://www.archives.gov/personnel-records-center/civilian-non-archival*.

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 066

## Further Sources

Detailed descriptions of many of the postal records in the collection of the National Archives and Records Administration are available in Preliminary Inventory Number 168: *Records of the Post Office Department*, prepared by the National Archives and available online through HathiTrust at *https://babel.hathitrust.org*. Additional descriptions are available on the National Archives' website at *https://www.archives.gov/*

The Stamp Smarter website provides access to many digitized historic postal publications, including the *United States Official Postal Guide*, at *https://stampsmarter.org/learning/Home_USPOD.html*.

For lists of Post Offices and postmasters by state before 1811, see Robert J. Stets' *Postmasters & Postoffices of the United States, 1782–1811* (Lake Oswego, Oregon: La Posta Publications, 1994).

Many private researchers have compiled books on Post Offices by state, including the books listed below. Your local library might be able to help locate additional information on local postal history. Lists of postal history resources by state and locality are also available on the Stamp Smarter website at *https://stampsmarter.org/learning/linksportal.html*. Jim Forte's Postal History website offers bibliographies by state at *https://www.postalhistory.com/State/index.htm* and a Post Office look-up tool at *https://www.postalhistory.com/Post_Offices/index.htm*.

**Alabama** Helbock, Richard W. *United States Post Offices, Volume VIII — The Southeast*. Scappoose, Oregon: La Posta Publications, 2007.

**Alaska** Helbock, Richard W. *United States Post Offices, Volume I — The West*. Lake Oswego, Oregon: La Posta Publications, 1998.

**Arizona** Theobald, John, and Lillian Theobald. *Arizona Territory: Post Offices and Postmasters*. Phoenix, Arizona: Arizona Historical Foundation, 1961.

**Arkansas** Patera, Alan H., and John S. Gallagher. *Checklist of Arkansas Post Offices*. Burtonsville, Maryland: The Depot, 1983.

**California** Salley, Harold E. *History of California Post Offices, 1849–1976*. La Mesa, California: Postal History Associates, Inc., 1977.

**Colorado** Bauer, William H., James L. Ozment, and John H. Willard. *Colorado Postal History: the post offices*. Crete, Nebraska: J-B Publishing Co., 1971.

**Connecticut** Warmsley, Arthur J. *Connecticut Post Offices and Postmarks*. Portland, Connecticut: self-published, 1977.

**Delaware** Smith, Chester M. Jr., and John L. Kay. *The Postal History of Maryland, the Delmarva Peninsula, and the District of Columbia: The Post Offices and First Postmasters from 1775 to 1984*. Burtonsville, Maryland: The Depot, 1984.

**District of Columbia** Smith, Chester M. Jr., and John L. Kay. *The Postal History of Maryland, the Delmarva Peninsula, and the District of Columbia: The Post Offices and First Postmasters from 1775 to 1984*. Burtonsville, Maryland: The Depot, 1984.

**Florida** Bradbury, Alford G., and E. Story Hallock. *A Chronology of Florida Post Offices*. [Vero Beach, Florida]: The Florida Federation of Stamp Clubs, 1962.

**Georgia** Helbock, Richard W. *United States Post Offices, Volume VIII — The Southeast*. Scappoose, Oregon: La Posta Publications, 2007.

**Idaho** Patera, Alan H., and John S. Gallagher. *A Checklist Of Idaho Post Offices*. Burtonsville, Maryland: The Depot, 1984.

**Illinois** Helbock, Richard W. *United States Post Offices, Volume III — The Upper Midwest*. Lake Oswego, Oregon: La Posta Publications, 1999.

**Indiana** Baker, J. David. *The Postal History of Indiana*. Louisville, Kentucky: Philatelic Bibliopole, 1976.

**Iowa** Patera, Alan H., and John S. Gallagher. *Iowa Post Offices, 1833–1986*. Lake Oswego, Oregon: The Depot, 1986.

**Kansas** Baughman, Robert W. *Kansas Post Offices, May 29, 1828–August 3, 1961*. Topeka, Kansas: Kansas Postal History Society, 1961. Information from this book is available at *www.kshs.org*; search for post offices.

**Kentucky** Patera, Alan H., and John S. Gallagher. *A Checklist of Kentucky Post Offices*. Lake Grove, Oregon: The Depot, 1989.

**Louisiana** Germann, John J. *Louisiana Post Offices*. Lake Grove, Oregon: The Depot, 1990.

**Maine** Dow, Sterling T. *Maine Postal History and Postmarks*. Portland, Maine: Severn- Wylie-Jewett Co., 1943.

**Maryland** Smith, Chester M. Jr., and John L. Kay. *The Postal History of Maryland, the Delmarva Peninsula, and the District of Columbia: The Post Offices and First Postmasters from 1775 to 1984*. Burtonsville, Maryland: The Depot, 1984.

**Massachusetts** Merolla, Lawrence M., and Frank M. Crowther. *The Post Offices of Massachusetts*. North Abington, Massachusetts: Massachusetts Postal Research Society, 1981.

**Michigan** Ellis, David M. *Michigan Postal History: The Post Offices, 1805–1986*. Lake Grove, Oregon: The Depot, 1993.

**Minnesota** Patera, Alan H., and John S. Gallagher. *The Post Offices of Minnesota*. Burtonsville, Maryland: The Depot, 1978.

**Missouri** Schultz, Robert G. *Missouri Post Offices, 1804–1981*. St. Louis, Missouri: American Philatelic Society, 1982.

**Montana** Lutz, Dennis J. *Montana Post Offices & Postmasters*. Minot, North Dakota: publisher unknown, 1986.

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 067

**Nevada** Frickstad, Walter N., and Edward W. Thrall. *A Century of Nevada Post Offices 1852–1957*. Oakland, California: Philatelic Research Society, 1958.

**New Hampshire** Smith, Chester M. Jr., and John L. Kay. *The Postal History of New Hampshire: The Post Offices and First Postmasters from 1775 to 1985*. Lake Grove, Oregon: The Depot, 1986.

**New Jersey** Kay, John L., and Chester M. Smith Jr. *New Jersey Postal History*. Lawrence, Massachusetts: Quarterman Publications Inc., 1977.

**New Mexico** Helbock, Richard W. *A Checklist of New Mexico Post Offices, 1849–1988*. Lake Oswego, Oregon: La Posta Publications, 1989.

**New York** Kay, John L., and Chester M. Smith Jr. *New York Postal History: The Post Offices and First Postmasters from 1775 to 1980*. State College, Pennsylvania: American Philatelic Society, 1982.

**North Carolina** Stroupe, Vernon S., et al. *Post Offices and Postmasters of North Carolina, Colonial to USPS* (four volumes). Charlotte, North Carolina: North Carolina Postal History Society, 1996. Updates to this book are available at *http://www.ncpostalhistory.com/resources/north-carolina-postmark-catalog-update/*.

**North Dakota** Patera, Alan H., and John S. Gallagher. *North Dakota Post Offices, 1850–1982*. Burtonsville, Maryland: The Depot, 1982.

**Ohio** Gallagher, John S., and Alan H. Patera. *The Post Offices of Ohio*. Burtonsville, Maryland: The Depot, 1979.

**Oklahoma/Indian Territory** Helbock, Richard W. *Oklahoma Post Offices*. Lake Oswego, Oregon: La Posta Publications, 1987.

**Oregon** Helbock, Richard W. *Oregon Post Offices, 1847–1982*. Lake Oswego, Oregon: Raven Press, 1985.

**Pennsylvania** Kay, John L., and Chester M. Smith Jr. *Pennsylvania Postal History*. Lawrence, Massachusetts: Quarterman Publications, Inc., 1976.

**Rhode Island** Merolla, Lawrence M., Frank M. Crowther, and Arthur B. Jackson. *Rhode Island Postal History: the post offices*. Providence, Rhode Island: Rhode Island Postal History Society, 1977.

**South Carolina** Helbock, Richard W. *United States Post Offices, Volume VIII — The Southeast*. Scappoose, Oregon: La Posta Publications, 2007.

**South Dakota** Patera, Alan H., John S. Gallagher, and Kenneth W. Stach. *South Dakota Post Offices*. Lake Grove, Oregon: The Depot, 1990.

**Tennessee** Frazier, D. R. *Tennessee Post Offices and Postmaster Appointments 1789–1984*. Dover, Tennessee: self-published, 1984.

**Texas** Wheat, Jim. *Postmasters and Post Offices of Texas, 1846–1930*. [Garland, Texas]: self-published, ca. 1974. Information from this book is available at *www.rootsweb.com/~txpost/postmasters.html*. See also *Texas Post Offices by County*, by John J. Germann and Myron R. Janzen. CD-ROM [2010].

**Utah** Gallagher, John S. *The Post Offices of Utah*. Burtonsville, Maryland: The Depot, 1977.

**Vermont** Slawson, George C., Arthur W. Bingham, and Sprague W. Drenan. *The Postal History of Vermont*. New York, New York: Collectors Club, 1969.

**Virginia** Helbock, Richard W. *United States Post Offices, Volume VI — The Mid-Atlantic*. Scappoose, Oregon: La Posta Publications, 2004.

**Washington** Boardman, Tim, and Richard W. Helbock. *Washington Post Offices*. Lake Oswego, Oregon: La Posta Publications, 1986.

**West Virginia** Helbock, Richard W. *United States Post Offices, Volume VI — The Mid-Atlantic*. Scappoose, Oregon: La Posta Publications, 2004.

**Wisconsin** Hale, James B. *Wisconsin Post Office Handbook*. Madison, Wisconsin: Wisconsin Postal History Society, 1988.

**Wyoming** Helbock, Richard W. *A Checklist of Wyoming Post Offices, 1850–1988*. Lake Oswego, Oregon: La Posta Publications, 1989.

## Incomplete Sources

### What's the origin of my Post Office's name?

Post Office names were typically suggested by prospective patrons; there are no postal records that explain their origin. If available, the site location report submitted for a proposed Post Office, sometimes called the "application" to establish the Office, may show names that were rejected (see "Site Location Reports of Post Offices"). For further information, see "What's in a (Post Office) Name?" at *https://about.usps.com/who/profile/history/pdf/post-office-names.pdf*.

### Are there records on the buildings previously occupied by Post Offices?

There are no federal records on the buildings occupied by most early Post Offices. Until the early 1900s, most Post Office quarters were provided by the postmaster at no charge to the Post Office Department. Often, the Post Office was located in the postmaster's home or other place of business, such as a general store. It might be possible to research the property of former postmasters by looking through tax or real estate records at the local county courthouse. Local contemporary newspapers might also discuss Post Office locations. In towns and cities, city directories and telephone directories might list street addresses of postal facilities. Sanborn maps might also help determine locations in select years (see *https://www.loc.gov/collections/sanborn-maps*). A small percentage of Post Offices — fewer than 1 percent before 1910 — were located in government-owned buildings. Construction records and early photographs of federal buildings may be available in the Cartographic and Architectural Section of the National Archives and Records Administration in College Park, Maryland. (See *https://catalog.archives.gov/id/450* or email *carto@nara.gov*.)

### What is the current location of my ancestor's rural address?

The Post Office Department did not preserve records of the locations of particular rural route addresses. Rural delivery route maps, if available, show routes of travel and sometimes patron locations (see "Rural Delivery Route Maps"). It is sometimes possible to locate property previously owned by individuals by searching through tax and real estate records at the local county courthouse.

### What are the names of the mail carriers who transported mail between Post Offices?

Mail carriers typically worked for contractors or sub-contractors who held 4-year "star route" contracts. Although names of contractors are recorded in federal records (see "Contract Route Registers" and *Official Register of the United States*), the names of contractors' employees are not recorded. Names of mail carriers may appear in local newspapers, perhaps in connection with mail delays or hazards encountered. Local historical societies or libraries may be able to suggest other possible sources of information.

### Is there a record of all Post Office employees?

Although there are records on many types of postal employees — including postmasters, city letter carriers, rural carriers, and clerks at large Post Offices — records on all employees are not available. Until 1942, clerks who worked at third- and fourth-class offices (nearly 90 percent of all offices in 1940) were considered employees of the postmaster, not the Post Office Department; there are no federal records on their service.



**1901**    **1904**

*Buildings occupied by Post Offices are noted on Sanborn Map Company fire insurance maps in the collection of the Library of Congress. Sanborn maps are available for thousands of towns and cities, mostly from the 1880s to the 1950s. Shown above are details of maps for Bisbee, Arizona, noting the Post Office located next to the library on Main Street in 1901 (left, the building designated as 36), and on Brewery Avenue above a meat market in 1904 (right, the building designated as 42).*

Publication 119 | Sources of Historical Information    14

Firearms Policy Coalition v. Garland, No. 4:24-cv-565 (N.D. Tex.)

Def. App'x 069