IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **FIREARMS POLICY COALITION, INC., SECOND AMENDMENT FOUNDATION, GAVIN PATE, and GEORGE MANDRY,** | |
| *Plaintiffs*, | |
| **v.** | **CIVIL ACTION NO. 4:24-cv-565** |
| **MERRICK GARLAND,** in his official capacity as Attorney General of the United States**,** | |
| *Defendant*. | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND RESPONSE
IN OPPOSITION TO THE GOVERNMENT'S CROSS-MOTION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.      The Carry Ban is presumptively unconstitutional. ................................................ 2

        A.     *Heller*'s dicta cannot overcome *Bruen*'s holding. ................................... 2

        B.     The Government's "presumption of constitutionality" is not supported by the Property Clause or the Post Office Clause. ........................................ 6

II.     History does not support the constitutionality of the Carry Ban. ........................... 9

        A.     The Government has failed to prove that there is a historical tradition of banning firearms in places where government business is conducted. ............... 9

        B.     The correct historical principle to derive from *Bruen*'s examples is that the Government must secure a building to ban bearing arms there. ............... 15

               1.     Legislative assemblies. ....................................................................... 18

               2.     Courthouses. ....................................................................................... 21

               3.     Polling places. .................................................................................... 24

III.    This Court can issue injunctive relief that is not overbroad to ameliorate Plaintiffs' injuries. ............................................................................................. 26

CONCLUSION .................................................................................................................. 27

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Antonyuk v. James,*
   120 F.4th 941 (2d Cir. 2024) ...................................................................................5

*Bonidy v. U.S. Postal Serv.,*
   790 F.3d 1121 (10th Cir. 2015) ...........................................................................8, 9

*Dep't of Homeland Sec'y v. New York,*
   140 S. Ct. 599 (2020) ...........................................................................................27

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ...................................................................................1, 3, 11

*Ex parte Jackson,*
   96 U.S. 727 (1877) .................................................................................................8

*Koons v. Platkin,*
   673 F. Supp. 3d 515 (D.N.J. 2023) ........................................................................8

*McRorey v. Garland,*
   99 F.4th 831 (5th 2024) .......................................................................................5, 6

*MSI v. Moore,*
   116 F.4th 211 (4th Cir. 2024) ................................................................................5

*New York State Rifle & Pistol Association. v. Bruen,*
   597 U.S. 1 (2024) .............................................................1, 2, 4, 5, 8, 10, 17

*New York v. United States,*
   505 U.S. 144 (1992) ...............................................................................................7

*Ramos v. Louisiana,*
   590 U.S. 83 (2020) .................................................................................................6

*Rocky Mountain Gun Owners v. Polis,*
   121 F.4th 96 (10th Cir. 2024) ................................................................................5

*Shuttlesworth v. Birmingham,*
   394 U.S. 147 (1969) .............................................................................................16

*United States v. City & Cnty. of San Francisco,*
   310 U.S. 16 (1940) .............................................................................................6, 7

*United States v. Comstock,*
   560 U.S. 126 (2010) ...............................................................................................7

*United States v. Dorosan,*
   350 F. App'x 874 (5th Cir. 2009) ..........................................................................7

*United States v. Gailes,*
   118 F.4th 822 (6th Cir. 2024) ................................................................................5

*United States v. Gliatta,*
   580 F.2d 156 (5th Cir. 1978) ..............................................................................6, 7

*United States v. Rahimi,*
    61 F.4th 443 (5th Cir. 2023) ..................................................................5

*United States v. Rahimi,*
    602 U.S. 680 (2024) ........................................................2, 9, 10, 12, 14, 15

*United States v. Williams,*
    113 F.4th 637 (6th Cir. 2024) ................................................................3

*Wolford v. Lopez,*
    116 F.4th 959 (9th Cir. 2024) ................................................................5

**Constitutional Provisions, Statutes, and Legislative Materials**

U.S. Const.

    art. I, § 8, cl. 7 .........................................................................................6

    art. IV, § 3, cl. 2 ......................................................................................6

1786 Va. Acts 35 (1786) ...............................................................................26

1 LAWS OF NEW YORK 176
    (Webster & Skinner 2d ed. 1802) ....................................................21, 24

1 LAWS OF NEW YORK 534
    (Websters & Skinner 2d ed. 1807) (Twenty-Fourth Session, ch. CLXXIII. IV: "An Act for the
    Support of Government," passed April 7, 1801) .................................21

An Act for fixing the compensation of the Doorkeepers of the Senate
    and House of Representatives in Congress, 1 Stat. 252 (Apr. 12, 1792) ....................19, 20, 25

7 Edw. 2 (1313) ......................................................................................10, 11

An Act establishing the Court of Appeals, Ch. CCLXXVII 1 William Littell,
    THE STATUTE LAW OF KENTUCKY  (1809) .......................................22, 23

An Act for reducing into one Act, the several Acts concerning the Courts of Appeals and the
    special Court of Appeals, Ch. XI, Laws of Virginia, Oct. Sess. 1792 (1792)..........................22

THE CHARTER AND ORDINANCES OF THE CITY OF PROVIDENCE, WITH THE ACTS OF THE GENERAL
    ASSEMBLY RELATING TO THE CITY (1845) .............................................11

H.R. Rep. No. 750 (1838) ...........................................................................20

**Other Authorities**

5 JOURNAL OF THE HOUSE OF LORDS (1642) https://bit.ly/4gEh0Xh .......................................10, 11

*About the Sergeant at Arms – Historical Overview*, U.S. SENATE, https://bit.ly/3DiUrcx (last
    visited Dec. 17, 2024) .........................................................................19

CESARE BECCARIA, AN ESSAY ON CRIMES AND PUNISHMENTS
    Ch. XL  (Albany: W.C. Little & Co.,  1872) (1764), https://bit.ly/3VMKCdb ........................14

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine:
    Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 204 (2018).........12, 26

Hugh F. Rankin, *The General Court of Colonial Virginia*, COLONIAL WILLIAMSBURG DIGIT. LIBR. (Aug. 1958) https://bit.ly/3OWKO5M ......................................................................23

Jacob R. Straus, "Sergeant at Arms and Doorkeeper of the Senate: Legislative and Administrative Duties," CONG. RSCH. SERV. (Aug. 20, 2008), https://bit.ly/49K2R8A ..................................20

Taylor Ardrey, *Shooting at Texas USPS facility leaves 1 dead; suspect and victim were reportedly co-workers*, USA TODAY (Dec. 10, 2024), https://bit.ly/4gin7kf .........................14

R. Sheardown, THE DUTY OF CONSTABLES (1790), https://bit.ly/4iJ8Izs .....................................22

*Saturday, December 20, 1783*, JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA; BEGUN AND HELD IN THE TOWN OF RICHMOND, IN THE COUNTRY OF HENRICO, ON MONDAY, THE SEVENTH DAY OF MAY, IN THE YEAR OF OUR LORD ONE THOUSAND SEVEN HUNDRED AND EIGHTY-ONE (Thomas W. Whyte 1828) .........................................................21

THOMAS JEFFERSON, A MANUAL OF PARLIAMENTARY PRACTICE. FOR USE OF THE SENATE OF THE UNTIED STATES, Sec. XVIII (1801), https://bit.ly/4giHzSc ....................................19, 20

William Hakewell, *MODUS TENENDI PARLIAMENTUM*: OR, THE OLD MANNER OF HOLDING PARLIAMENTS IN ENGLAND (1671), https://bit.ly/49K1ff5 ......................................................19

## INTRODUCTION

Under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2024), courts apply a text-informed-by-history analysis to every Second Amendment case, no matter the specific subject matter. *Bruen* was unequivocal in this regard. It was similarly unequivocal that once it is established that the text of the Second Amendment is implicated by a plaintiff's challenge, the burden falls on the Government to prove, with reference to relevant history, that its law is constitutional. The Government misses these critical points from *Bruen*, because it assumes that language from *District of Columbia v. Heller*, 554 U.S. 570 (2008), carved out an exception to the mode of analysis that *Heller* itself applied and that *Bruen* made explicit. As such, the Government argues that in this case roles are reversed and the burden falls on Plaintiffs to prove the Carry Ban is unconstitutional. But because that argument cannot be squared with *Bruen*'s categorical language about the application of its methodology, this Court is bound to reject it.

This Court is bound to reject, too, the Government's alternative argument that the Property Clause and the Postal Clause of the Constitution shifts the burden of proof to Plaintiffs in this case. It is black letter law that, whatever the grant of authority, the Government must regulate in accordance with the rights enumerated in the Bill of Rights, so there can be no exception to *Bruen*'s analytical framework for Second Amendment cases involving property the Government controls.

The history the Government does discuss fails to support the Ban. The Government argues that history permits banning firearms at any location where the Government does business, but the theory does not fit the facts. As Plaintiffs have argued, and as the Government has failed to disprove, the unifying feature of the few places where the right to keep and bear arms has historically been limited consistent with the Second Amendment was that the Government secured

1

those places itself. The Government does not secure post offices today and the Carry Ban is therefore unconstitutional.

## ARGUMENT

### I.     The Carry Ban is presumptively unconstitutional.

#### A.  *Heller*'s dicta cannot overcome *Bruen*'s holding.

The Government gets this case wrong right out of the gate when it attempts to place the burden of proving that history shows the Carry Ban is unconstitutional on Plaintiffs. *See, e.g.*, Gov't Mot. For Summ. J., Doc. 27 at 5 (Nov. 27, 2024) ("Gov't Br."). Indeed, the Government's arguments throughout its brief are predicated upon this analytical maneuver. *See, e.g.*, Gov't Mot. at 14–15. This gets things backwards and is directly contrary to binding Supreme Court precedent. *Bruen* could not have been clearer that every Second Amendment case must be resolved by applying its text-then-history methodology. *See* 597 U.S. at 17 ("*Only if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' ") (emphasis added). Where the plain text covers Plaintiffs' desired course of conduct—as the Government does not dispute is the case here—then the burden is on the Government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," not on Plaintiffs to prove the reverse. *Bruen*, 597 U.S. at 24; *see also id.* at 33–34, 38 (similar). And in *United States v. Rahimi*, the Court reiterated "that when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.' " 602 U.S. 680, 691 (2024) (quoting *Bruen*, 597 U.S. at 24).

The Government refuses to accept that the *Bruen* mode of analysis applies here and insists that this case is exempted from the ordinary rules because of dicta in *Heller*, decided 14 years

2

earlier. *See* Gov't Br. at 5. It is true that *Heller* referred to "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" as "presumptively lawful." *Heller*, 554 U.S. at 626 & n.26. But in suggesting that this statement flips the burden that *Bruen* so clearly places on the Government, the Government overreads it. For one thing, as already explained, *Bruen* was categorical and never suggested that regulations that arguably fell within *Heller*'s language should be subject to an alternative legal framework. The correct way to understand this language is not to create "exception" to the *Bruen* analytical method for any of the enumerated "presumptively lawful" regulations listed by the Court, but merely as the Court putting a marker down that it expected  that, *when properly analyzed*, such a law would turn out to be lawful to some extent. *See* Pls.' Br. in Supp. of MSJ, Doc. 23 at 18 (Oct. 21, 2024) ("Pls. Br."). As the Sixth Circuit recently explained, those "presumptively lawful regulations" "weren't before the Court in *Heller* or *McDonald*. And while *Bruen* didn't overrule any aspect of *Heller*, it set forth a new analytical framework for courts to address Second Amendment challenges," such that even the "longstanding" prohibitions mentioned in *Heller* have to be analyzed under the *Bruen* framework. *United States v. Williams*, 113 F.4th 637, 648 (6th Cir. 2024). Thus, whatever might have been the case before *Bruen*, it is clear now that *Heller*'s dicta does not "place[] a thumb on the scale" in favor of *any* regulation, Gov't Br. at 8 (quoting *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1136 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part)), and that in fact, there is a thumb on the other side of the scale for laws implicating the Second Amendment's text. *See Bruen*, 597 U.S. at 17. To be clear, Plaintiffs are not arguing that *Heller*'s language should be ignored, or that *Bruen* overruled it, but rather that it must be interpreted in light of *Bruen*. And when that is done, it is clear that it is not the get-out-of-*Bruen*-free-card that the Government thinks it is.

The Government responds that in refusing to join in its overreading of *Heller*'s dicta, Plaintiffs "trivialize [the Supreme Court's] most important pronouncements." Gov't Br. at 7. But this gets things backwards. It is the Government's reading that would "hamstring the Court," *id.*, as it would render *Bruen*'s clear statement that every Second Amendment case should be analyzed according to the same framework a nullity merely because it did not explicitly state that every case included those raised obliquely in dicta in *Heller*. In fact, the Government gets the legal rule right, even if it gets the application wrong, when it points out that "[b]y their very nature, doctrinal frameworks sweep far beyond the facts at hand to address other situations not concurrently before the court." *Id.* at 7 (quoting Randy J. Kozel, *The Scope of Precedent*, 113 MICH. L. REV. 179, 193 (2014)). That is precisely why *Bruen*'s framework demands application even here, in a case that *Bruen* itself did not confront. And it refutes the Government's attempt to read silent exceptions into the *Bruen* framework.

Furthermore, *Bruen* itself acknowledged the "longstanding" laws referenced by *Heller*, but rather than suggesting that they were subject to a different analysis, it used them as an example of the framework it was prescribing. Referencing the specific dicta at issue here about "schools and government buildings," *Bruen* instructed that courts should use as a starting point the "longstanding" laws in the historical record (citing historical regulations at "legislative assemblies, polling places, and courthouses") and "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." 597 U.S. at 30. In performing that analysis, which is precisely how Plaintiffs structured their opening brief, the Government bears the burden. *See id.* at 31 (rejecting the respondents' argument that there was a "historical basis for New York

to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department").

The Government cites several cases for the proposition that restrictions on "government buildings" writ large are presumptively constitutional. Of these, the majority merely quote the same portion of *Heller*'s dicta on which the Government builds its argument, but they do not read it, as the Government does, to supersede *Bruen*'s clear instruction that the Government bears the burden of proof at the historical stage of the Second Amendment analysis. *See Antonyuk v. James*, 120 F.4th 941, 962 (2d Cir. 2024); *United States v. Gailes*, 118 F.4th 822, 824–25 (6th Cir. 2024); *Wolford v. Lopez*, 116 F.4th 959, 970 (9th Cir. 2024); *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023). One case actually treats *Heller*'s dicta as a "safe harbor" entirely shielding a regulation from Second Amendment scrutiny. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 119–20 (10th Cir. 2024). That is further than even the Government is willing to go here, and for good reason: that reading is untenable in light of *Bruen*'s plain statement that *any* law regulating conduct falling within the Amendment's plain text must be analyzed according to its methodology. In the end, just one of the post-*Bruen* cases the Government cites did shift the burden of proof onto plaintiffs, but it did not do so for the reasons the Government urges here. Rather, in *MSI v. Moore*, 116 F.4th 211, 222–23 (4th Cir. 2024), the Fourth Circuit addressed a challenge to a licensing scheme and it concluded that Footnote 9 of *Bruen* itself, which stated that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall issue' licensing regimes," shifted the burden on that issue, *Bruen*, 597 U.S. at 38 n.9. While Plaintiffs disagree that even *MSI*'s deviation from the *Bruen* framework was warranted, it at least had going for it the fact that it was rooted in *Bruen* and did not purport to find an unacknowledged exception to the *Bruen* framework in an earlier case. Indeed, the Fifth Circuit has previously acknowledged that "if

5

anything, *Bruen* displaced *Heller*'s statement about the presumptive lawfulness of sensitive-place restrictions but not its statement about background checks." *McRorey v. Garland*, 99 F.4th 831, 838 & n.16. The Government acknowledges this language, but attempts to dismiss it as "dicta," a somewhat untenable position, given that "even supposing (without granting) that [the Government] is right," its own argument is "dicta all the way down," *Ramos v. Louisiana*, 590 U.S. 83, 97 (2020), and there is every reason for this Court to accord the Fifth Circuit's gloss on *Heller* as much respect as the Government would accord *Heller* itself.

### B.  The Government's "presumption of constitutionality" is not supported by the Property Clause or the Post Office Clause.

The Government also argues that the ordinary *Bruen* analysis should not apply in this case because "the constitutional dimensions are different here than in the Supreme Court's recent cases" because this case implicates both the Property Clause and the Postal Clause of the Constitution as well as the Government's role as proprietor in Post Offices. Gov't Br. at 10. The Property Clause states that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST. art. IV, § 3, cl. 2. And the Postal Clause states that Congress has the authority "[t]o establish Post Offices and post Roads." U.S. CONST. art. I, § 8, cl. 7. Neither of these provisions permit the Government to ignore the Second Amendment's restrictions on postal property.

The Government claims that "the power over the public land thus entrusted to Congress is without limitations," Gov't Br. at 10 (quoting *United States v. City & Cnty. of San Francisco*, 310 U.S. 16, 29 (1940)), and as such, the Government has a free hand to enact and enforce rules "which, like those at issue in this case, are designed to maintain safety and order on government property." *Id.* (quoting *United States v. Gliatta*, 580 F.2d 156, 160 (5th Cir. 1978)). It takes these principles much too far, however, when it asserts that they excuse the Government from complying with the

Second Amendment on property it owns and operates according to these grants of regulatory authority. As the Supreme Court has explained, "Congress exercises its conferred powers subject to the limitations contained in the Constitution. Thus, for example, under the Commerce Clause Congress may regulate publishers engaged in interstate commerce, but Congress is constrained in the exercise of that power by the First Amendment." *New York v. United States*, 505 U.S. 144, 156 (1992); *see also United States v. Comstock*, 560 U.S. 126, 133 (2010) (noting that even if federal statute is permissible exercise of an enumerated power, it would be unconstitutional if it violated "other provisions of the Constitution—such as the Due Process Clause"). The cases the Government cites on this point are consistent with this rule. They merely stand for the uncontroversial proposition that the Government has the authority to regulate on property it owns in the first instance (as opposed to the state in which the governmental property is located). *See City & Cnty. of San Francisco*, 310 U.S. at 30. In *Gliatta*, for instance, that meant that the postal service had authority to regulate the operation of motor vehicles on postal property and could appropriately punish violations "on property that blended into Miami property, [but] turned out to be, not Florida, but Federal offenses." 580 F.2d at 160.

The Government cites one case which could be read to suggest that the Property Clause excuses firearm regulations under the Second Amendment. *See United States v. Dorosan*, 350 F. App'x 874, 875 (5th Cir. 2009). But *Dorosan* was an unpublished, pre-*Bruen* decision that was ultimately decided on interest-balancing grounds. In it, the Property Clause was just one of three bases (the others being that a postal service employee could have parked with a firearm offsite, and that *Heller*'s dicta about "government property" constituted an "exception" to the scope of the Second Amendment) from which the Court concluded that the Carry Ban would pass muster under "any applicable level of scrutiny." *Id.* at 876. Nothing in *Dorosan* suggests that the Property Clause

7

"demonstrates a historical understanding of the government's authority to restrict firearms in its own buildings, without exception." Gov't Br. at 12.

The Government's argument has no firmer a footing in the Postal Clause, or in the fact that it is acting as both sovereign and proprietor in operating Post Offices. As for the Postal Clause, the Government cites *Ex parte Jackson*, 96 U.S. 727 (1877), for the proposition that Constitution gives Congress the power to "authorize … all measures necessary to secure [the mail's] safe and speedy transit, and the prompt delivery of its contents." *Id.* at 728; *see also* Gov't Br. at 10–11. But *Jackson* itself refutes the notion that Congress can ignore the Second Amendment when passing any such measures, as it cautions that postal regulations so enacted must be "enforc[ed] … consistently with rights reserved to the people, of far greater importance than the transportation of the mail." *Jackson*, 96 U.S. at 732. Specifically, in *Jackson*, that meant the Fourth Amendment prohibition on unreasonable searches and seizures protected sealed packages and letters sent through the mail, which "are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles." *Id* at 733. The Second Amendment "is not 'a second-class right,' " *Bruen*, 597 U.S. at 70, and there is no way to read *Jackson* except as saying that the Bill of Rights acts as a limit, as it does wherever the Government acts, on regulations of postal property.

Finally, Courts reviewing Second Amendment cases in the wake of *Bruen* have rejected the idea that the government, as proprietor, is subject to any different legal framework than the one laid out in *Bruen*. *See Koons v. Platkin*, 673 F. Supp. 3d 515, 603 (D.N.J. 2023) ("[W]here the government is acting as a[] … 'proprietor' or 'market participant', allegations of government infringement are nevertheless resolved according to the applicable analytic framework."); *see also* Pls.' Br. at 18  (collecting cases). The Government does not address these cases, but instead cites

*Bonidy v. United States Postal Service*, 790 F.3d 1121 (10th Cir. 2015), which like *Dorosan*, applied the invalid interest-balancing framework to uphold the Carry Ban pre-*Bruen*. But *Bonidy* merely held that the government, as proprietor, had greater discretion in making regulations impacting the Second Amendment right than it would as a sovereign. *See id.* at 1126. That conclusion is irrelevant to the post-*Bruen* analysis of the Carry Ban.

## II.    History does not support the constitutionality of the Carry Ban.

Correctly understood then, this case calls for the straightforward application of the methodology the Supreme Court has twice now explained in detail in *Bruen* and *Rahimi*. As long as the conduct Plaintiffs wish to engage in—here, carrying firearms for lawful purposes such as self-defense on property operated by the United States Postal Service—is covered by the plain text of the Second Amendment, then the Government bears the burden of showing that "the challenged regulation is consistent with the principles that underpin our regulatory tradition," because it is "relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Rahimi*, 602 U.S. at 681 (quotations and citations omitted). The Government does not dispute that carrying firearms at Post Offices is an activity within the plain text of the Second Amendment. Therefore, the only question for this court is whether the Government has shown it is consistent with the history of firearms regulation in this country. It has not.

### A. The Government has failed to prove that there is a historical tradition of banning firearms in places where government business is conducted.

Because it wrongly assigns the burden to Plaintiffs, the Government devotes relatively little of its brief to developing its own historical thesis to excuse the Carry Ban, and what it does develop is unconvincing. The Government claims, broadly, that there is a tradition of banning firearms in "places where government business was conducted." Gov't Br. at 23. In support of this rule, the

Government points all the way back to a 14th century English law requiring that "every Man shall come [to Parliament] without all Force and Armour." 7 Edw. 2, 170 (1313) (Suppl. App.5); Gov't Br. at 23, and to the 1328 Statute of Northampton. Neither of these historical statutes supports the rule that lawful possession of firearms can be banned anywhere the government operates. Taking them in reverse order, *Bruen* unequivocally held that "the Statute of Northampton … has little bearing on the Second Amendment adopted in 1791" and that statement certainly holds true here. 597 U.S. at 41. First, the Statute of Northampton is too old to inform the meaning of the Second Amendment at the Founding. *See id.* Second, its prohibition on going or riding armed centered on large weapons used in combat because handguns had not yet been invented. *See id.* at 41–42. Third, as the Supreme Court has now twice explained, the Statute of Northampton codified the common law prohibition on "affrays," or going armed *with malicious intent* to terrify others. *Id.* at 40; *see also Rahimi*, 602 U.S. at 697. By the Founding at least, the Statute and American law modeled on it were understood not to regulate ordinary lawful carry for self-defense, but only to bar carriage of weapons with the intent to terrify others. *Bruen*, 597 U.S. at 49–51. It therefore cannot support the Carry Ban.

The Government's 1313 royal proclamation forbidding men from coming with "Force and Armour" to Parliament is of no more help. First, as with the Statute of Northampton, the statute is simply too remote from the Founding of the United States and the adoption of the Second Amendment to be informative about its scope—it is more remote in time from adoption of the English Declaration of Right and its protection of the right to have arms than adoption of the Second Amendment is to today. Second, much like the Statute of Northampton, the statute was not focused on the peaceable carry of self-defense arms but was rather intended "for the Restraint of armed Men from coming to the Parliament, *to disturb the Peace of it*." *See* 5 JOURNAL OF THE

HOUSE OF LORDS at 112 (1642), https://bit.ly/4gEh0Xh (emphasis added). In fact, the statute rather supports Plaintiffs' historical argument, described in detail below, that bans on arms are acceptable only where the government secures a location against those who would use arms for evil. After forbidding any man from coming to Parliament "without all Force and Armour," the statute (a royal proclamation from King Edward II) gave as a justification, "that to Us it belongeth, and our part is, through our Royal Segniory, straightly to defend Force of Armour, and all other Force against our Peace." Suppl. App.5. In other words, the King forbade the wearing of armor to Parliament precisely because he recognized his *own* duty, as the supreme feudal lord, to protect Parliament from breaches of the peace. This reading gains force when it is understood that the House of Lords, in the lead up to the English Civil War in 1642, concluded that *it* also had the authority, when "the King shall refuse to discharge that Duty and Trust" to take steps to safeguard Parliament itself. JOURNAL OF THE HOUSE OF LORDS, *supra, at 112*.

As for its American support, the Government cites an 1835 Providence, Rhode Island ordinance forbidding the firing of firearms "on [any] public lands within [the] city." THE CHARTER AND ORDINANCES OF THE CITY OF PROVIDENCE; WITH THE ACTS OF THE GENERAL ASSEMBLY RELATING TO THE CITY at 113 (1845) (Suppl. App.8); *see also* Gov't Br. at 24. But this law cannot support the Carry Ban, since it did not restrict carry in any way, but rather merely prevented discharge of a firearm on public lands within the city limits. (And as *Heller* remarked with respect to historical discharge restrictions, it is implausible that they "would have been enforced against a citizen acting in self-defense." 554 U.S. at 633. If the laws the Government cites did bar defensive use of arms, they are outliers and not part of the American tradition with respect to the regulation of arms.) Other than that inapposite comparison, the Government points exclusively to the laws "the Supreme Court noted in *Bruen*," that barred carriage at polling places, legislatures, and

courthouses. Gov't Br. at 23–24. But as Plaintiffs have explained already and discuss in further detail below those locations were defined not by the fact that they were performing a government function but that the Government took it upon itself to secure those places. Pls.' Br. at 13–18.

Compared with the principle offered by Plaintiffs to explain these laws, the Government's reading of these historical examples is vastly overbroad. There is historical evidence that at some places where government business was conducted, like some public meetings, firearm carriage was affirmatively *required* as a means of safeguarding the operation of the government. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 204, 232 – 34 & n. 108, 244 (2018). And at others, there were notably *no* restrictions. For instance, in contrast with polling places, legislatures, and courthouses the Government has presented no evidence that firearms were banned at customs houses or, as directly relevant to this case, post offices at the Founding. Taking relatively few restrictions centered upon particular (and distinct) government functions, and concluding from their existence that *any* government building could ban firearms on its premises, would be tantamount to accepting that because the Government had the power, historically, to require sureties for violent behavior and to punish affrays, that they can, today, disarm anyone who is not "responsible." But the Supreme Court has rejected that such overbroad reasoning is acceptable under *Bruen. See Rahimi*, 602 U.S. at 701. It is undoubtedly true that neither Mr. Rahimi, nor an affrayer in the 14th century, could be called "responsible," but as the Supreme Court cautioned, when drawing lessons from history, the principle underpinning historical laws still "must comport with the principles underlying the Second Amendment." *Id.* at 692. Accepting that any "irresponsible" person could be disarmed would have violated that central teaching of *Bruen*, and in this case, accepting that firearms can be banned, at all times, at post offices today because

12

colonial Maryland banned them in the legislature while it was in session, despite the fact that individuals who visit post offices, unlike those who visit heavily secured legislatures, have "ordinary self-defense needs," would contravene this teaching.

The Government argues that Plaintiffs have erred on the other side of *Rahimi* in requiring too close of a fit, claiming that a "myopic focus on post offices" is "[t]he fundamental flaw in Plaintiffs' historical analysis." Gov't Br. at 26. It would be unfair, the Government argues, to require the Founders to have banned firearms at post offices at the Founding to support a similar ban today, because (1) most post offices at the Founding were not operated out of government buildings but shared space with other existing commercial establishments, and that (2) the "materially different means" the Founders used to prevent violence from befalling postal workers was occasioned by the different nature of the threats against them. *Id.* at 25–26. As an initial matter, Plaintiffs have never argued that a lack of regulation at post offices is dispositive, but it is probative. Following *Bruen*'s lead, Plaintiffs have focused on the proper way to understand what made historical bans at legislatures, courthouses, and polling places acceptable. That there were no bans at post offices at the Founding hurts the Government's broad argument and provides further support to Plaintiffs'. Further, the fact that "post offices" at the Founding were often located within inns or the homes of postmasters does not explain the lack of regulation of these places from the Government's point of view. As the Government claims repeatedly, its position is that firearms can be banned in "places where government business was being conducted." *Id.* at 24. That such business was conducted in a place that might have also served other purposes does not suggest, under the Government's own framework, that similar legislation would have been impossible.

13

The Government's argument that materially different means were required at earlier periods of history affirmatively supports Plaintiffs. For example, the Government accepts that mail-carrying stagecoaches and trains were protected by Congress "putting bounties on robbers and arming mail carriers—not by banning firearms," because "it is not clear how Congress could have banned firearm carriage by 'robbers or Indians' riding horseback alongside stagecoaches or trains." *Id.* at 26. That is *exactly* Plaintiffs' point; Congress in fact could not have banned firearms near stagecoaches carrying mail—or rather, it *could* have passed such a law, but it would not have been worth the paper it was written on. It is obvious to the Government, as it is to Plaintiffs, that "robbers or Indians" riding horseback alongside stagecoaches and trains would not care one whit if in doing so they were crossing an invisible "no firearms" boundary. Why would they, if they are there to rob and kill anyway? *See* CESARE BECCARIA, AN ESSAY ON CRIMES AND PUNISHMENTS ch. XL (Albany: W.C. Little & Co., 1872) (1764), https://bit.ly/3VMKCdb (explaining that criminals intent on "violat[ing] the most sacred laws of humanity" can hardly be expected to "respect the less important and arbitrary" locational restrictions on firearms carriage). The Second Amendment is, as the Supreme Court recently explained, consistent with "common sense." *Rahimi*, 602 U.S. at 698. And common sense and experience both unfortunately teach that the Government cannot merely call a place "secure" and, by so stating, make it so. *See* Taylor Ardrey, *Shooting at Texas USPS facility leaves 1 dead; suspect and victim were reportedly co-workers*, USA TODAY (Dec. 10, 2024), https://bit.ly/4gin7kf. The only effect of such a ban is to prevent law-abiding citizens such as Plaintiffs, from whom the Post Office needs no securing, from being armed for their defense while visiting postal property, leaving them defenseless against violent criminals. The Government's proposed historical tradition is unsupported and is not consistent with the "principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692.

**B.  The correct historical principle to derive from *Bruen*'s examples is that the Government must secure a building to ban bearing arms there.**

As Plaintiffs have explained, the common factor uniting the three locations that *Bruen* acknowledged were sometimes treated as "sensitive" at the Founding—polling places, courthouses, and legislative assemblies—was that the Government took the burden upon itself to secure those places. Pls.' Br. at 17. Unlike the Government's proposed "government function" principle, this rule is both logical and comports with "the balance struck by the founding generation," *Rahimi*, 602 U.S. at 692, since Plaintiffs' need for personal self-defense is lessened in places that the Government itself secures against armed attack. Unfortunately for the Government, this principle has no application to the Carry Ban, because when the Government disarms law-abiding citizens who wish to visit a Post Office, it does nothing to secure those places against attack by those who would ignore those rules. *See* Pls.' Br. at 13–18.

The Government responds that Plaintiffs' argument is "contradictory" because it "would seem to concede that the government's intent determines whether or not a place is sensitive, yet (inexplicably) turns on whether that intent manifests by metal detectors and security guards or by regulations and legislation." Gov't Br. at 12. But this misunderstands Plaintiffs' position. The Government's "intent" is not dispositive at all. Its actions are. As Plaintiffs explained in their opening brief, historically the "sensitive nature" of a place was not "a matter of simple government fiat." Pls.' Br. at 17. If the Government wants to make a place sensitive, it is free to do so, but that requires more than "regulations and legislation"; the Government must actually take steps to keep that place free from firearms, which today will generally entail, as the Government notes, "metal detectors and security guards." Gov't Br. at 12.

The Government takes issue with the implications of this argument. It notes that a place could be sensitive, or not, depending on whether "the guards are absent for some reason" and that,

as a result, "the constitutionality of firearm regulations in a certain locale could ebb and flow with annual appropriations or the current force-protection posture—which, Plaintiffs elsewhere concede, cannot be correct." *Id.* Plaintiffs *do not* concede that this cannot be correct—indeed, it is precisely Plaintiffs' argument that a place can be sensitive only if and when the Government actually secures it. So, if the Government initially secures a location but then elects to fire the guards and defund the security measures, then yes, while the Second Amendment would have permitted the Government to prevent law-abiding citizens from carrying firearms in the location when security existed, it cannot insist on keeping an old "sensitive place" designation when the facts supporting that designation changed.

There is nothing odd about the constitutionality of a regulatory regime depending on details which, if changed, could alter the constitutional analysis of the regime. For example, in *Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969), the Supreme Court reviewed a parade permitting system which, as drafted, unconstitutionally conferred broad authority to grant permits to a commission based only on "their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience." *Id.* at 150. The Court acknowledged, however, that because the Alabama Supreme Court had construed the statute subsequently to require "[a] systematic, consistent and just order of treatment with reference to the convenience of public use of the streets and sidewalks" and that "[a]pplications for permits to parade must be granted if … the convenience of the public in the use of the streets or sidewalks would not thereby be unduly disturbed," it was currently constitutional. *Id.* at 154–55. If the Alabama Supreme Court rescinded that interpretation, or if Birmingham enacted a new permitting system that attempted to broaden the discretion of permitting officials, however, then the system would change materially, and what was previously constitutional would become unconstitutional.

16

*Bruen* engaged in a similar analysis itself when it noted that it was possible that colonial laws restricting the public carriage of handguns might have been acceptable *at the time* because of the possibility that "handguns were considered 'dangerous and unusual' during the colonial period." 597 U.S. at 47. But granting the possibility that such laws might have been consistent with the right to keep and bear arms *then* did not mean that similar restrictions were constitutional *now*, because, far from being "dangerous and unusual," handguns "are indisputably in 'common use' for self-defense today." *Id.* Indeed, it is baked into the *Bruen* and *Rahimi* analysis that a law may be consistent with the principles underpinning the Second Amendment at one time and, when the circumstances change, cease to be consistent with them. That is why *Bruen* requires modern and Founding-era restrictions must be both similar in "how" and "why" they burden the right to bear arms. In this case, Founding-era law that banned firearms in polling places while also requiring the sheriff to secure the polling place, is only similar to a modern ban on carrying firearms in a government building *if the government also secures that building*. And this comports with common sense. If the Government suddenly defunded the United States Marshals and removed them from courthouses, but insisted on acting as though courthouses remained secure because it was still illegal to bring a firearm onto the premises, acting like the courthouse was actually secure would be delusional. Everyone would be able to see that the people who previously made it secure were gone. This Court must, therefore, compare the details of the Carry Ban, as it actually exists, against the details of these historical regimes. And the details of the historical regimes show that the Government may only ban carriage of firearms and treat a place as "sensitive" if it takes it on itself to actually secure that location.

The Government claims that Plaintiffs have "fail[ed] to substantiate the premise of their arguments" because they "have not demonstrated that any of *Bruen*'s enumerated 'sensitive

17

places'" were, in fact, secured. Gov't Br. at 13. In making this argument, the Government leans heavily on its misconception of where the burden of proof lies in this case and narrowly reads the historical evidence with an eye toward drawing every inference against the Plaintiffs. This is inappropriate, as it is the Government's burden to show that these locations *were not* secured in the way that the statutes Plaintiffs have cited suggests they were. In any event, the historical record shows each of these types of places were typically secured.

### 1. Legislative assemblies.

Beginning with legislative assemblies, the Government criticizes Plaintiffs' submission because (1) "none of Plaintiffs' examples [of statutes compensating law enforcement for attending legislative proceedings] requires any sheriff, constable, etc. to be present for legislative assemblies" nor do they "describe 'comprehensive security' being provided at those assemblies," *Id.* at 14, (2) Plaintiffs' statutes appointing sergeants-at-arms or door-keepers do not "provide[] any security measures for legislative assemblies, let alone 'controlled entry points' or a requirement that visitors be 'screened by security,' which Plaintiffs elsewhere argue are the hallmarks of a 'sensitive place,' " *id.* and (3) none of the examples required government officials "to be armed" when they attended legislative sessions, *id.* It takes, as an illustrative example, Plaintiffs' citation of a Maryland law appointing both a doorkeeper and a sergeant-at-arms. It disputes that such roles involved a security function and suggests that instead the "doorkeeper" was primarily concerned with supplying fuel for the furnace and looking after furniture. *Id.* at 15.

The Government is mistaken. As discussed below, the reason why sheriffs or other officials with law-enforcement responsibility were the ones commanded to attend legislative proceedings is precisely because they had the responsibility of keeping the peace. As for the arguments about specific legislative security officials like "doorkeepers and "sergeants at arms," it is certainly true that they were given a wide range of administrative tasks at the Founding. The doorkeepers of both

the House of Representatives and the Senate were charged with "tak[ing] care of the apartments occupied by their respective houses, and provid[ing] fuel and other accommodations for their subsequent session." An Act for fixing the compensation of the Doorkeepers of the Senate and House of Representatives in Congress, 1 Stat. 252, ch. XX, (Apr. 12, 1792), https://bit.ly/49JAoQm. But the Government is wrong to think that because they were given these odd tasks, they did not also perform the roles, suggested by their names, of controlling entrances to the legislative chambers, thereby "securing" them from outside threats.

Both sergeant at arms and doorkeeper were positions in Parliament, which were adopted by the Americans when they were creating their own legislative institutions. Indeed, Vice President John Adams had suggested that the Senate give its sergeant at arms the title "Usher of the Black Rod" to mimic the title given by the House of Lords. *See About the Sergeant at Arms – Historical Overview*, U.S. SENATE, https://bit.ly/3DiUrcx (last visited Dec. 17, 2024). And in Parliament, both doorkeepers and the sergeant at arms had long been tasked with securing the legislative chambers against unauthorized visitors and threats. *See, e.g.*, William Hakewell, MODUS TENENDI PARLIAMENTUM: OR, THE OLD MANNER OF HOLDING PARLIAMENTS IN ENGLAND 22 (1671), https://bit.ly/49K1ff5 ("The principal Porter of the Parliament shall stand beneath the great Gate of the Monastery … where the Parliament is held, and must keep the door, so that none come into the Parliament but he which ought to come to the Parliament."); *see also id.* at 23 ("The King was wont to assign Sergeants at Arms, to stand a great while together without the door of the Parliament, to make the door, so that none should make thrusting or tumults about the door, by which the Parliament might be hindred, upon pain of taking of their bodies, because of right the door of the Parliament ought not to be shut, but to be kept by Porters, or Kings Sergeants at Arms."). These rules were adopted for American legislatures following the Revolution. *See*

THOMAS JEFFERSON, A MANUAL OF PARLIAMENTARY PRACTICE. FOR USE OF THE SENATE OF THE UNITED STATES, Sec. XVIII (1801), https://bit.ly/4giHzSc ("[T]he door of the house ought not to be shut, but to be kept by porters, or serjeants at arms, assigned for that purpose." (citing Hawkins, *supra*)).

In adopting these positions, Congress intended their titles to indicate that they inherited the traditional roles from Parliament. Referring to the sergeant at arms, the House of Representatives explained that "[h]is name *is significant of the nature of his duties*. In ancient times, when men were less under the government of law, reason, and rule, such an officer had much more to do in the line of his duties than at present." *See* H.R. Rep. No. 750 at 5 (1838) (Suppl. App.14) (emphasis added). And in the statute by which Congress created the position of "doorkeeper," in addition to listing out miscellaneous obligations like the duty to "take care of the apartments occupied by the respective houses, and provide fuel and other accommodations for their subsequent session," the statute prescribed that "it shall be the duty of the said doorkeepers to do *the usual services pertaining to their respective offices* during the session of Congress." 1 Stat. 252, ch. XX, (emphasis added). And history shows that there were, consistent with the creation of these roles, controlled entry and exit of the chambers for the safekeeping of the legislative process. *See* Suppl. App.4 (An assistant to the Doorkeeper kept the main door, while at the "other three, it was indispensably necessary to station an attendant. The Doorkeeper selected the larger boys for this service, in preference to employing men."); *see also* Jacob R. Straus, "Sergeant at Arms and Doorkeeper of the Senate: Legislative and Administrative Duties," at 1, CONG. RSCH. SERV. (Aug. 20, 2008), https://bit.ly/49K2R8A (explaining that the Seargeant of Arms and Doorkeeper of the Senate was responsible for ensuring "that a quorum of Senators was present and that other interested parties were kept out of the chamber" so as not to disturb the legislative process).

As noted above, the burden on this point does not appropriately lie with Plaintiffs, but irrespective of that issue, the historical record is clear. Just as with the House of Representative's "sergeant-at-arms," when states assigned sheriffs, constables, sergeants, or doorkeepers to legislative chambers, *see* Pls.' Br. at 15,[1] it is fair to deduce that the titles of those assigned were "significant of the nature of [their] duties" and those duties would have included maintaining order of the legislative chambers and controlling who could enter them and when—in essence, providing a security regime that would have greatly reduced the needs of those inside the chambers to defend themselves with firearms and rendered the places "sensitive" in a constitutionally relevant sense.

### 2.  Courthouses.

The Government's argument with respect to courthouses is much the same. It concedes, as it must, that Plaintiffs' South Carolina, Virginia, and Delaware[2] laws all "required sheriffs to 'attend' the 'courts.' " Gov't Br. at 18. But the Government complains that the statutes do not say more about "what it means for a sheriff to 'attend' a court," and it claims that without more, such measures could not amount to " 'comprehensive security' within Plaintiffs' meaning," and might connote nothing more than "ministerial and administrative duties." *Id*. In support, the Government

---

[1] The Government states that "[w]ithout a pin citation or direct quote, it is not clear what Plaintiffs rely on with respect to New York (Pls. App'x 128-29) or Virginia (Pls. App'x 55)." Gov't Br. at 14 n.7. Plaintiffs included the incorrect citations and pages for those two laws. The proper citations are: 1 LAWS OF NEW YORK 534 (Websters & Skinner 2d ed. 1807) (Twenty-Fourth Session, ch. CLXXIII. IV: "An Act for the Support of Government," passed April 7, 1801) (Suppl. App.24) (providing for payment of the sergeant-at-arms and door keepers of the state senate and assembly); *Saturday, December 20, 1783*, JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA; BEGUN AND HELD IN THE TOWN OF RICHMOND, IN THE COUNTRY OF HENRICO, ON MONDAY, THE SEVENTH DAY OF MAY, IN THE YEAR OF OUR LORD ONE THOUSAND SEVEN HUNDRED AND EIGHTY-ONE 77 (Thomas W. Whyte ed., 1828) (Suppl. App.28) (recording a resolution to pay sergeant-at-arms and door keepers for the Virginia House of Delegates and Senate).

[2] The Government omits New York from its list, although it too required "sheriffs and their officers" to "attend" court proceedings. *See* 1 LAWS OF NEW YORK 176 (Webster & Skinner 2d ed. 1802) (Pls. Appx 80–87); Pls.' Br. at 16.

cites the fact that Delaware gave sheriffs the duty of serving process at the direction of the courts and New York required them to bring jurors and prisoners to court and facilitate witness appearances. *Id.* at 18–19. But just as with the "doorkeepers" and "sergeants-at-arms" in the legislature, it makes sense that statutes would take more care to point out what *special* duties, that might not be obviously a part of a sheriff's ordinary job description, he would be expected to perform while attending court. But it does not follow at all that those duties would be to the exclusion of his ordinary peacekeeping function. Rather, it is far more sensible to assume that, when it is the *sheriff* (or constable, justice of the peace, or bailiff, as the case may be) that is required to attend court, the specific choice of a law-enforcement official implies that he will be responsible for enforcing the laws and maintain order while he is at the courthouse.

Again, history confirms that Plaintiffs' inference is correct. The English tradition inherited by the Founders was that law enforcement officials ordered to attend court were present for the purpose of protecting the orderly proceedings of the courts. *See* R. SHEARDOWN, THE DUTY OF CONSTABLES 16 (1790), https://bit.ly/4iJ8Izs ("It is a considerable part of your duty, under the directions of the high constable or bailiff of the hundred, to preserve quietness, order, and decency, in the Courts of Justice, where you are required to attend for that very purpose."). And some American laws were similarly direct, as they delegated the particular duty to control entrance to the courts and maintain order during proceedings to an official, serving under the sheriff, known as the "tipstaff," while others specified that the sheriff himself would perform those duties directly. *See* An Act for reducing into one Act, the several Acts concerning the Courts of Appeals and the special Court of Appeals, CH. XI, LAWS OF VIRGINIA, OCT. SESS. 1792 at 34 (1792) (Suppl. App.31) ("The Court of Appeals shall appoint a clerk, tipstaff, and cryer."); An Act establishing the Court of Appeals, Ch. CCLXXVII 1 William Littell, THE STATUTE LAW OF KENTUCKY 561 (1809),

https://bit.ly/41Z0b5x ("The sheriff of the county in which the court of appeals shall be had, shall be adjudged to be an officer of the said court, and shall attend the same with a sufficient number of deputies accordingly; and the said sheriff and his deputies shall be bound to perform the duties of sheriff, tipstaff, and crier."); *see also* Hugh F. Rankin, *The General Court of Colonial Virginia*, COLONIAL WILLIAMSBURG DIGIT. LIBR. at 14 (Aug. 1958), https://bit.ly/3OWKO5M ("The Tipstaff was another of these minor court functionaries. His duties were comparable to those of the bailiff of modern courts of law and included acting as usher, messenger, and doorkeeper for the General Court.").

These examples suffice to show that when law enforcement officers were ordered to be present at court proceedings, it would be normal and ordinary for them to perform both a protective function, as well as executing whatever specific duties were prescribed for them. Thus, to take the State's primary example, *see* Gov't Br. at 19–20, it is of no importance that New Jersey did not specifically state that constables provide a security function when they attended court and fulfilled myriad other assisting roles, because by appointing the *constable* to perform those functions in the first place, the security function was implied.

Finally, the Government objects that this Court cannot infer from laws setting forth payment schedules for law-enforcement attendance at Court that any such officials actually did attend court proceedings, taking, for example, a Connecticut law paying sheriffs and constables for " '[a]ttending a Justice's Court on Trial of each Action *when obliged to attend*,' " and concluding that "[a]pparently, these officers were not even required to attend every day of a trial." *Id.* at 20 (quoting Acts and Laws of the State of Connecticut, In America 63–65 (New London, Timothy Green ed.,1784) (emphasis added by Government). But that does not follow. That an official was paid for every day he was obliged to attend does not tell us anything about when he

was obliged to attend—it may well have been that he was obliged to attend every day when there was a trial but was not obliged only on days when the court had no public business to attend to. The Government's inference assumes that when sheriffs were or were not obliged to attend was essentially arbitrary, but there is no reason to think that would be the case, and it would not even be acceptable as the best reading of the evidence if Plaintiffs bore the burden of proof. It is particularly inappropriate here, where the burden lies unmistakably on the Government to refute the commonsense proposition, flowing from these schedules, that the Courts were given license by the legislature to command the sheriffs and constables to appear to secure the courthouse and did so whenever it was necessary.

### 3. Polling places.

The analysis is much the same as to polling places. Here, in fact, the Government concedes that not only did Georgia and Maryland both require sheriffs to attend elections, but the statutes explicitly state that the purpose of their attendance is to preserve the peace. *See id.* at 16. In a logical jump, it nevertheless suggests that the expression of the idea in Georgia and Maryland statutes should lead the reader to assume the role was not intended in Virginia, Delaware, and South Carolina where the statutes were not similarly explicit. *See id.* at 17. The Government offers no sound justification for this reading and a much more straightforward inference is each of these states, drawing as they were from the same historical institutions, required sheriffs, specifically, to attend these elections for the same reasons, even if only some bothered to state the obvious: they were charged with maintaining order and preserving the peace.

The Government takes particular issue with Plaintiffs' New Jersey law, which empowered election officers "to commit any person or persons who shall conduct in a riotous or disorderly manner … into the custody of a constable, or the keeper of the common gaol for any term not exceeding twenty-four hours," 1 LAWS OF NEW YORK 176 (Webster & Skinner 2d ed. 1802) (Pls.'

App.81), suggesting that the statute represents a "materially different means" of accomplishing the goal of securing an election, because it does not specifically require a constable to attend, and because it "upped the penalties for threatening elections—precisely what Plaintiffs say *does not* suffice with respect to post offices." Gov't Br. at 17. It is not clear what the Government's basis is for concluding that a twenty-four hour stay in jail was an "upped" penalty for breaching the peace, but in any event, it is not a materially different means of securing the location. Although it did not name the constable specifically, by designating all "election officers" as officials with the power to arrest and jail anyone who broke the peace, the statute effectively ensured there was security at every polling location.

Throughout all of these examples (regarding polling places, courthouses, and legislatures), the Government emphasizes that statutes ordering attendance of a constable or a sheriff or some other official did not require that the official be armed when they were performing their duties. *See, e.g.*, *id.* at 17, 20. This is a revealing error for a few reasons. First, again, the Government is placing a significant, and entirely inappropriate, burden on the Plaintiffs to prove from history what are the contours of the Second Amendment right, when *Bruen* explicitly and repeatedly said the opposite. Second, even if Plaintiffs bore the burden, the Government strains to avoid commonsense inferences from that history. None of the statutes Plaintiffs have cited require sheriffs or constables to wear appropriate attire when attending courts or appearing at polling places either, but it is safe to assume that they knew enough to do so. Similarly, it would be surprising if a statute *did* tell a sheriff performing his official duties that he had an obligation to carry with him whatever arms he needed to carry them out.

In any event, there is strong additional evidence that sheriffs and other security officers would have been armed when performing their duties. For instance, a Virginia statute modeled off

of the Statute of Northampton, which *Bruen* held "all but codified the existing common law" of the time, 597 U.S. at 49 n.14, specifically exempted from its ban on "com[ing] before the justices of any court, or either of their Ministers of Justice, doing their office, with force and arms," those "Ministers of Justice" who were "executing the precepts of the Courts of Justice, or in executing their office, and such as be in their company assisting them." An Act Forbidding and Punishing Affrays, 1786 Va. Acts 35 (1786) (Suppl. App.33). It is difficult to understand why the common law of the time would have bothered to exempt those who were executing their office on behalf of the court from such a prohibition, unless it was expected that they *would* be armed while doing so. The same inference can be drawn from the laws, mentioned above, requiring people to carry firearms to public assemblies where there was no security. *See* Kopel & Greenlee, *supra*. Both examples show that Founding generation understood that defensive arms to counter threats of disorder were necessary to the security of a free people—it is why they codified the Second Amendment in the first place.

## III.    This Court can issue injunctive relief that is not overbroad to ameliorate Plaintiffs' injuries.

Finally, the Government argues that, if this Court finds the ban on carrying firearms on postal property unconstitutional, it should nevertheless limit Plaintiffs' remedy in three respects, first, by limiting the injunction to "the Plaintiffs in this case," second, by tailoring relief "to those who enjoy a Second Amendment right to bear arms for self-defense—which is not (as Plaintiffs' proposed injunction might otherwise suggest) everyone," and third, by "exclud[ing] postal property that is comprehensively secured and is, therefore, a 'sensitive place' " under Plaintiffs' theory. Gov't Br. at 28. There is no need, as the Government suggests, to order additional briefing to address these issues regarding the scope of relief. *Id.* at 29. But, of course, if the Court disagrees Plaintiffs would welcome the opportunity to more expansively discuss these issues.

26

To clarify, if Plaintiffs succeed in showing the Carry Ban is unconstitutional, they seek a declaration that the 18 U.S.C. § 930(a) and 39 C.F.R. 232.1(1) cannot be enforced against Plaintiffs or their members. Plaintiffs do not seek a "nationwide injunction" in the sense that people other than the Plaintiffs and their members could claim the benefit of the injunction. *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch J., concurring in the grant of stay) (criticizing nationwide injunctions). They likewise do not seek to enjoin any laws or regulations except 18 U.S.C. § 930(a) and 39 C.F.R. 232.1(1). So, for instance, if a member of one of the Plaintiffs is ineligible to possess a firearm under some other federal law, the fact that Section 930(a) cannot be enforced against Plaintiffs' members would not, in the slightest, prevent the Government from enforcing any other non-challenged law against them. Those points resolve the Government's first two objections. Similarly, if a post office is located in a restricted area like a military base where unauthorized firearms are prohibited and where the Government actually secures the location against those who would violate that rule, Plaintiffs' suit would not prevent the government from enforcing any other regulation or law against carrying a firearm in that place, so the Government's concern is overstated. In any event, Plaintiffs would not object to an injunction that is tailored to prevent the enforcement of the Carry Ban for violations in post offices where the Government does not maintain comprehensive security.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and deny the Government's contrary motion.


Dated: December 18, 2024                    Respectfully submitted,

27

R. Brent Cooper
TX Bar No. 04783250
Brent.cooper@cooperscully.com
S. Hunter Walton
TX Bar No. 24106548
hunterwalton@cooperscully.com
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 74202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

/s/ David H. Thompson
David H. Thompson
DC Bar No. 450503
dthompson@cooperkirk.com
Peter A. Patterson
DC Bar No. 998558
ppatterson@cooperkirk.com
Megan M. Wold
DC Bar No. 198005
mwold@cooperkirk.com
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2024, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

<u>/s/ David H. Thompson</u>
David H. Thompson