IN THE UNITED STATES DISTRICT COURT
FOR THE NORHTERN DISTRICT OF TEXAS

| | |
|---|---|
| FIREARMS POLICY COALITION, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States,<br><br>Defendant. | Case No. 4:24-cv-565 |

**DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION
FOR SUMMARY JUDGMENT**

Defendant Merrick Garland, in his official capacity as the Attorney General of the United States, hereby files this reply in support of his motion for summary judgment.

## TABLE OF CONTENTS

I.     **Regulating Firearms In "Government Buildings" is "Presumptively Lawful," and Plaintiffs Should Bear the Burden To Prove Otherwise.** ............................................... 1

II.    **Plaintiffs Fail to Salvage Their Ahistorical Theory of "Sensitive Places."** ................... 3

III.   **If the Government Bore the Burden Here, Its Evidence Would Suffice** ....................... 8

IV.   **The Court Should Not Enter Plaintiffs' Proposed Injunction.** .................................... 10

Mindful of the 10-page limit on reply briefs in this district, Defendant emphasizes the following in response to Plaintiffs' combined opposition and reply, ECF No. 29 ("Pls. Opp'n"):

I. **REGULATING FIREARMS IN "GOVERNMENT BUILDINGS" IS "PRESUMPTIVELY LAWFUL," AND PLAINTIFFS SHOULD BEAR THE BURDEN TO PROVE OTHERWISE.**

Plaintiffs paint *Bruen* as imposing a uniform test on all Second Amendment cases. That cannot be squared with the opinion itself. For starters, the Court "assume[s]" that "disputes regarding the lawfulness of [sensitive-place] prohibitions" are "settled," which hardly connotes—and indeed, would seem antithetical to—a one-size-fits-all mode of analysis. *Bruen*, 597 U.S. at 30. Rather, *Bruen* is best read to reaffirm (as *McDonald* did before it) *Heller*'s admonition that those regulations are "presumptively lawful." *Heller*, 554 U.S. at 627 n.26.[1] If the Court wished to displace the "sensitive places" doctrine, it could have done so explicitly. Or it could simply have announced the "history and tradition" test and left it at that. The only plausible reason to call out "sensitive places" (for the third time) was to signal that they are subject to a different mode of analysis—namely, one that begins with the "presumpti[on]" that restrictions there are "lawful." *Heller*, 554 U.S. at 627 n.26.[2] *Bruen*'s variable approach to Second Amendment cases is further evident from its discussion of *non*-sensitive-place restrictions. The Court declared that in some of those cases, the "inquiry" would be "fairly straightforward," whereas others "may require a more

---

[1] At times, Plaintiffs argue that the word "presumptively" shifts the burden from one party to another. *E.g.*, Pls. Mot. 4 ("*Bruen* requires that Courts first assess whether the Second Amendment's text covers an individual's conduct, and if so, the Constitution presumptively protects that conduct." (citing *Bruen*, 597 U.S. at 22–24)); *id.* ("In other words, it is the Government's burden . . . ."). But when the word "presumptively" might require *Plaintiffs* to offer even modest support for their historical theory, they contend it "overreads" the word to infer any such burden-shifting. Pls. Opp'n 3. In such circumstances, Plaintiffs demote "presumptively lawful" to a mere "marker" that signals the Court's "expect[ation]" about future cases. *Id.*

[2] This is also a situation where concurring opinions are relevant. It took a majority of Justices to bring about the watershed change in *Bruen*, and three of the six Justices in that majority authored (or joined) concurring opinions that *expressly* preserved the viability of restrictions on firearms in sensitive places. *See Bruen*, 597 U.S. at 72 (Alito, J., concurring); *id.* at 81 (Kavanaugh, J., concurring, in which Roberts, C.J., joined).

1

nuanced approach." *Id.* at 26, 27. Then there is footnote nine, which endorsed 43 States' "shall-issue" licensing regimes, which were not at issue in *Bruen*. *See* 597 U.S. at 38 n.9. There is no way to read that footnote other than to suggest a different mode for analyzing challenges to such regimes. In sum, *Bruen* itself suggests different analyses for different kinds of cases.

And as Plaintiffs acknowledge, the *Bruen* opinion *has* resulted in different tests applied to different types of claims. At least one circuit has read *Heller*'s admonition as imposing a "safe harbor" where no Second Amendment scrutiny applies. Pls. Opp'n 5 (citing *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 118–19 (10th Cir. 2024)). Other courts, such as the Fourth Circuit, have applied exactly the sort of burden-shifting that Defendant urges here. *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222–23 (4th Cir. 2024) ("And if a plaintiff fails to rebut this presumption of constitutionality, the plaintiff's challenge to the 'shall-issue' licensing law fails at step one, with no requirement to conduct a historical analysis under step two.").

So has this Court, in *McRorey v. Garland*, No. 7:23-cv-47-O, 2023 WL 5200670, at *4 (N.D. Tex. 2023). Considering a post-*Bruen* challenge to national background checks, the Court observed that "[t]he *Bruen* majority therefore seems to acknowledge the *facial constitutionality* of regimes requiring background checks and attendant waiting periods . . . ." *McRorey*, (emphasis added). Given the "facial constitutionality" of such regulations, the government was not required to adduce the "history and tradition" necessary to fend off a typical Second Amendment challenge: "While the Government does not cite to specific founding era restrictions, the Supreme Court has already recognized the viability of certain regulations or limitations on Second Amendment rights." *Id.* at *3. The Court likewise should apply in this case what "the Supreme Court has already recognized." *Id.*

This Court was affirmed by the Fifth Circuit, in an opinion whose reach is disputed by the Parties. *See McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024); Def. Mot. 8 n.5; Pls Opp'n 6. Lest

there be any doubt: the Fifth Circuit's footnoted suggestion that *Bruen* overruled *Heller*'s sensitive-places language *is* dicta: the Fifth Circuit said so. *See McRorey*, 99 F.4th at 838 n.16 ("We make no holding in this regard."); *see also id.* at 836 n.11 ("It is quite possible that *Bruen* disturbed *no part* of *Heller*." (emphasis in original) (citing *Bruen*, 597 U.S. at 72 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* . . . ."))). As Defendant has explained, dicta from the Supreme Court are treated differently than those from lower courts. Def. Mot. 7–9. That is borne out by *McRorey* itself, in which the Fifth Circuit treated *Bruen*'s footnote nine—which prognosticated about licensing regimes *not* at issue in that case—as authoritative: "Read against the background provided by *Heller*, *Bruen*'s footnote 9 plainly forecloses plaintiffs' contention." 99 F.4th at 837. Rather than hold the government to the "history and tradition" test under *Bruen*, the Court of Appeals shifted the burden to the appellants to dispel the presumption that the background checks were permissible. *See id.* at 839 ("We turn to whether plaintiffs have shown that these presumptively lawful regulations have been put towards abusive ends or have otherwise rebutted that presumption." (cleaned up)). Again, that is all Defendant suggests here.

II.   **PLAINTIFFS FAIL TO SALVAGE THEIR AHISTORICAL THEORY OF "SENSITIVE PLACES."**

Plaintiffs stand by their argument that locations are only "sensitive" for Second Amendment purposes if the government provides comprehensive, armed security at that place. As the theory goes, "Plaintiffs' need for personal self-defense is lessened in places that the Government itself secures against armed attack." Pls. Opp'n 15.[3] Three responses bear emphasis.

---

[3] Plaintiffs have never tried to reconcile that theory with reality. There are myriad government buildings where a handful of armed guards man the entrance lobby but have no significant presence within the actual office spaces. That is, if a fight broke out in the 8th-floor break room of a typical government office building, or at a coffee shop within the Pentagon, one could hardly expect an armed security guard standing ready to intervene. To substitute truly for armed self-defense, the government would have to station armed guards on every floor, wing, and office of its many thousands of facilities. The Founders could not have envisioned, let alone desired, any such prerequisite to firearms prohibitions in government buildings. This reality underscores that the

First, Plaintiffs' theory is inherently illogical. On their view of the Second Amendment, the government can only ban firearms in federal facilities where it has *already* prevented firearms from entering. In other words, the government can only enact restrictions that have little to no restrictive effect. That makes no sense. Nor is it coherent, from a constitutional perspective, that the government could ban firearms from a given place by stationing armed guards there but not by passing a statute or regulation. Our Founders would be surprised to learn that what the federal government cannot prohibit by law, it can prevent by force. Finally, Plaintiffs never explain on what basis, absent a firearms prohibition, armed guards could even disarm visitors in the first place. For these reasons, it cannot be that the government must first secure a location forcibly before it can regulate firearms there.

Second, Plaintiffs' test turns entirely on the government's arbitrary approach to a given facility.[4] Plaintiffs have clarified that they do, in fact, believe that firearms could be prohibited in post offices today, but perhaps not tomorrow, depending on whether armed guards show up to work. *See* Pls. Opp'n 15–16. By the same token, the Second Amendment might allow carriage in some post offices but not others. Security decisions at each post office, such as "the posting of security personnel in the lobby or in the parking lot, the location and intensity of lighting, and the planting and maintenance of trees and shrubbery—are left to the discretion of the Security Control Officer for each post office in accordance with regulations established by the Chief Postal

---

government has historically provided security at its buildings, not to shoot assailants so that private visitors don't have to, but to protect the government business being conducted inside.

[4] Defendant understands the difference between "intent" and "actions." *Contra* Pls. Opp'n 15 ("But this misunderstands Plaintiff's' position."). That is why Defendant argued that Plaintiffs' theory turns arbitrarily "on whether [the government's] intent *manifests by* metal detectors and security guards or by regulations and legislation." Def. Mot. 12 (emphasis added).

Inspector." *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997).[5] Because that leaves "ample room for postal employees to exercise judgment and choice," *id.*, it would not be surprising to find different security postures at different post offices around the country.[6]

Plaintiffs offer *Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969), to support this ebb-and-flow theory of Second Amendment rights. *See* Pls. Opp'n 16–17. In that case, the Court considered whether a Birmingham ordinance, which had been radically reinterpreted by the Alabama Supreme Court in 1967 to pass constitutional muster, had been constitutional in 1963, when it was the predicate for a criminal conviction. *Shuttlesworth*, 394 U.S. at 941. The Court held that city officials had administered the ordinance differently than the Alabama Supreme Court later construed it, and thus unconstitutionally. *Id.* at 158–59. But the First Amendment right (to protest unconstrained by arbitrary licensing regimes) never changed from 1963 to 1967. The right did not depend, in other words, on the Alabama Supreme Court's (or the City of Birmingham's) interpretation or actions. Contrast that with Plaintiffs' position that their Second Amendment rights *do* change depending on how the government treats a given place, and *Shuttlesworth* is inapposite. Plaintiffs cite no case for the remarkable (and ominous) proposition that Congress can expand and contract constitutional rights through annual appropriations.[7]

---

[5] The Chief Postal Inspector is the security officer of the U.S. Postal Service. 39 C.F.R. § 231.1(b). In turn, each postmaster (or his designee) is "responsible for the general security of the post office, its stations and branches." 39 C.F.R. § 231.2.

[6] That leaves aside that, as Defendant pointed out, there are post offices in locations that even Plaintiffs would concede are "sensitive." Def. Mot. 28.

[7] Plaintiffs even suggest that one of *Bruen*'s enumerated examples, "courthouses," 597 U.S. at 30, could cease to be a "sensitive place" if armed guards fell away. *See* Pls. Opp'n (positing that, if Congress defunded the United States Marshals, it could no longer prohibit firearms in federal courthouses). Presumably, on that reasoning, courthouses would no longer be "sensitive" if the Marshals went on strike, or if there was an ammunition shortage such that they could no longer arm themselves. Second Amendment rights could even change without any conscious choice by the government, such as legislative gridlock that resulted in an appropriations lapse. Leaving the Second Amendments' scope up to such vicissitudes makes little sense.

The fluctuating nature of Plaintiffs' theory exacerbates the problem with their proposed injunction. In short, it would be impossible to enter a universal injunction predicated on Plaintiffs' theory of the Second Amendment. If the *ad hoc* presence of government security were to render a given post office "sensitive," and thus amenable to the "Carry Ban," then the Court would have to go post-office-by-post-office across the country to determine which are "sensitive" enough. And that sensitivity could change daily, leaving the Parties to litigate endlessly whether "the facts supporting that designation [had] changed." Pls. Mem. 16. This Court cannot become the *de facto* superintendent of firearms access at each post office across the country.

Third, Plaintiffs' theory still fails to account for "schools," which are "sensitive places" on par with "government buildings." *Bruen*, 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626). Plaintiffs could not possibly demonstrate—nor have they tried, despite Defendant's challenge (Def. Mot. 21)—that schools were historically secured by armed government security. Such security cannot, therefore, be the *sine qua non* of a "sensitive place."

Moving past the logical and legal defects in Plaintiffs' theory of "sensitive places," they have failed utterly to support that theory with historical evidence:

**Legislative Assemblies.** Plaintiffs failed to show that *any* Founding-Era legislative assembly was required to be secured by armed, government-provided security. *See* Def. Mot. 13–16. Instead of acknowledging that failure, Plaintiffs (1) disclaim that they ever bore the burden to adduce such evidence; and (2) offer *new* evidence in an attempt to resuscitate their theory. The first point is rebutted above and the second falls short.

Plaintiffs devote most of their effort to expounding the roles of "doorkeepers" and "sergeants-at-arms." Pls. Opp'n 18–21. But that does not cure the primary defect in Plaintiffs' historical evidence: almost none of it *required* such officers to secure legislative assemblies by armed force. Def. Mot. 13–16 (examining Plaintiffs' evidence). The fee schedules merely

reimbursed such officers *if* they attended. Turning to the roles of the above-named officers, it is telling that Plaintiffs can quote a 1792 statute for the proposition that doorkeepers "[took] care of the apartments occupied by their respective houses, and provid[ed] fuel and other accommodations for their subsequent session," Pls. Opp'n 19 (quoting An Act for fixing the compensation of the Doorkeepers of the Senate and House of Representatives in Congress, 1 Stat. 252, ch. XX, (Apr. 12, 1792)), but Plaintiffs *cannot* find comparable evidence of doorkeepers' "controlling entrances to the legislative chambers, thereby 'securing' them from outside threats," *id.* (citing no authority).

The best Plaintiffs can do is cite a book from 1671—more than a century before Congress ordained doorkeepers or sergeants at arms—offering one account of how British Parliament was conducted. Pls. Opp'n 19. But according to Mr. Hakewell's description of "Porters," their principal qualification was to "have knowledge of the persons which should come in, so that none at all be denied entrance which is bound to be present at the Parliament."[8] In other words, "porters" seem more oriented toward enforcing the guest list than providing armed security. Plaintiffs' citation to Mr. Jefferson's *Manual of Parliamentary Practice* is more puzzling still. Their point seems to be that "porters, or serjeants at arms," would be assigned to keep the doors of the House open. But Mr. Jefferson goes on to describe a process by which the Senate could order the doors shut to discuss business in private.[9] It is not clear what this open-door, closed-door process has to say about securing the "legislative assembly" against armed attack.

Finally, Plaintiffs offer two citations for the proposition that "history shows that there were . . . controlled entry and exits of the chambers for the safekeeping of the legislative process." Pls. Opp'n 20. Neither citation bears that out—and in fact, both seem to contradict Plaintiffs' thesis.

---

[8] Hakewell, *Modus Tenendi Parliamentum: or, The Old Manner of Holding Parliaments in England* 22 (1671).

[9] Jefferson, *A Manual of Parliamentary Practice for Use Of the Senate of the United States* § XVIII (1801).

One shows that doorkeepers preferred "larger boys" over "men" when hiring assistants—which would make no sense, if security were the aim—and the other suggests that "interested parties" were kept outside the chamber(s), *id.*, which reinforces the notion that these officers were meant to manage putative attendees, not guard the place.

As with their opening motion, Plaintiffs fail to prove that any of these officers had to be *armed*—which, according to Plaintiffs, is a necessary ingredient of any "sensitive place." *See* Def. Mot. 14–15; Pls. Opp'n 25–26. Instead, Plaintiffs ask the Court to infer from a single exception in one Virginia statute that all sheriffs, constables, doorkeepers, and sergeants-at-arms were always armed whenever they attended legislative assemblies, polling places, and courthouses. Suffice it to say, that argument rests on an unsupported logical leap: that because "Ministers of Justice" and "such as be in their company assisting them" were allowed to appear before government officials armed, that they were *otherwise* armed whenever (and wherever) they performed their duties.

**Courthouses and Polling Places.** The Parties seem to agree that their arguments overlap, at least to some degree, with respect to the three examples of "sensitive places" discussed in *Bruen*. *Cf.* Pls. Opp'n 21, 24. Therefore, and given the page limitations on this brief, Defendant will forego responding at length to Plaintiffs' arguments on these fronts. *See* Pls. Opp'n 21–26.[10] Suffice it to say, Defendant stands by its criticisms of Plaintiffs' evidence. *See* Def. Mot. 16–20.

### III.     IF THE GOVERNMENT BORE THE BURDEN HERE, ITS EVIDENCE WOULD SUFFICE.

Plaintiffs' arguments in response to the government's historical evidence, Def. Mot. 22–24, are unpersuasive.

Plaintiffs deny that the 1328 Statute of Northampton can inform the meaning of the Second Amendment, even as they argue that a Virginia statute "modeled off the Statute of Northampton" *is* expositive of such meaning. *Compare* Pls. Opp'n 10 *with id.* at 25–26. That Virginia statute—

---

[10] Defendant is more than willing to file a supplemental brief if the Court prefers.

8

part of Defendant's evidence (Def. Mot. 23)—forbade everyone but government officials from "com[ing] before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms." 1786 Va. Acts 33, ch.21. And that statute "all but codified the common law" with respect to these going-armed prohibitions. *Bruen*, 597 U.S. at 49 & n.14 (citing Webb, *The Office and Authority of a Justice of Peace* 92 (1736)).

Plaintiffs insist that Defendant present "evidence that firearms were banned at . . . post offices at the Founding." Pls. Opp'n 12. But there were no post offices as such, which is why Plaintiffs are always careful to say "[t]he *postal system* dates to the Founding." Pls. Mot. 2 (emphasis added); *see also id.* at 10, 11. Plaintiffs seem to acknowledge that Founding Era "post offices" were in fact run out of private businesses or dwellings, but then ask rhetorically why Congress didn't prohibit firearms in those places. Pls. Opp'n 13. But Defendant's theory is not that the government historically prohibited firearms everywhere that government business was conducted; rather, Defendant explains longstanding prohibitions in "government buildings" as meant to protect such business. A postmaster's house is obviously not a government building.

Plaintiffs' "materially different means" argument (Pls. Opp'n 14) proceeds as follows: there were threats to the postal system in the mid-19th century; Congress did not ban firearms in response to those threats; ergo, there is no analogous tradition on which the modern prohibition can rest. That syllogism fails at the major premise: threats to stagecoaches and trains are not the same as threats to "government buildings."[11] If today's "Carry Ban" barred firearms in cars driving alongside postal-delivery vehicles, then these 19th century statutes might be relevant under *Bruen*. But neither 32 C.F.R. § 232.1(l) nor 18 U.S.C. § 930(a) is addressed to mail being transported from one facility to another. Even if it were, Congress would be hard pressed—as Plaintiffs

---

[11] It is not that the "nature of the threats against them" is different. Pls. Opp'n 13. It is that a different thing—a federal facility, instead of a vehicle traveling outside federal property—is being threatened. While they face the same threat, it is Congress' impotence to address the latter through a firearms prohibition that matters here.

9

concede—to erect a gun-free bubble to surround a moving postal vehicle, no more than it could have respecting stagecoaches or trains. The import of choosing "materially different means" under *Bruen* is that, where Congress *could have* chosen firearms prohibition but did not, that suggests the absence of a historical tradition. But where Congress could not have prohibited firearms in the first place, its failure to do so is irrelevant.

*   *   *

Plaintiffs' failure to articulate a coherent or historical theory of "sensitive places" is not only a failure to overcome the presumptive lawfulness of "sensitive place" regulations under *Bruen*. It also goes to the second step of *Bruen*'s test for non-sensitive places: the "why" of a challenged regulation. Plaintiffs argue that the "Carry Ban" impinges on firearms carriage for a different reason (safeguarding government business) than such bans did historically (taking the place of private self-defense in those locations). But they have wholly failed to substantiate that thesis as a matter of historical fact. Rather, the only plausible explanation for such historical bans is, as Defendant has suggested, to safeguard the conduct of government business on government property. That is what the challenged regulations do, and they should be upheld.

## IV.   THE COURT SHOULD NOT ENTER PLAINTIFFS' PROPOSED INJUNCTION.

Plaintiffs proposed injunction, even as narrowed by their opposition brief (Pls. Opp'n 26–27), still portends serious problems of scope and administrability. Even if the Court found a Second Amendment violation, Defendant would respectfully urge the Court (for reasons previously stated, *see* Def. Mot. 27–29) to order supplemental briefing on the appropriate remedy before entering an injunction on behalf of more than 700,000 putative plaintiffs that could affect postal employees and private visitors at more than 30,000 post offices nationwide.

Dated: January 17, 2025

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Deputy Branch Director

/s/ *Jason C. Lynch*
JASON LYNCH (D.C. Bar No. 1016319)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 514-1359
Email: Jason.Lynch@usdoj.gov

*Counsel for Defendant*