IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **FIREARMS POLICY COALITION INC, ET AL.,** § § § | |
| Plaintiffs, § § | |
| v. § | Civil Action No. 4:24-CV-00565-O |
| § | |
| **PAMELA BONDI** § § | |
| Defendant. § | |

## MEMORANDUM OPINION & ORDER

Before the Court are Plaintiffs' Motion for Summary Judgment (ECF No. 22), Brief in Support (ECF No. 23) and supporting Appendix (ECF No. 24); Defendant's Combined Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment (ECF No. 27) and supporting Appendix (ECF No. 28); Plaintiffs' Reply (ECF No. 29) and Supplemental Appendix (ECF No. 30); and Defendant's Reply (ECF No. 31). After consideration of the briefing and the relevant case law, Plaintiffs' Motion for Summary Judgment is **GRANTED**, and Defendant's Motion for Summary Judgement is **DENIED**.

**I.   BACKGROUND[1]**

"Post offices are a fixture in the routine lives of many Texans who rely on the Postal Service to, among other things, receive mail, process money orders, and apply for passports."[2] Despite this, individuals are barred from carrying firearms for self-defense in post offices and on postal property by two provisions of federal law.

---

[1] Unless otherwise cited, the Court's recitation of the facts is taken from Plaintiffs' Brief in Support of their Motion for Summary Judgment.
[2] Pls.' Br. Supp. Mot. Summ. J. 2, ECF No. 23.

The first is 39 C.F.R. § 232.1(1), a regulation enacted by the United States Postal Service on November 16, 1972. It reads: "Notwithstanding the provisions of other law, rule, or regulation, no person while on postal property may carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, or store the same on postal property, except for official purposes." Violations of this regulation are "punishable by a fine, a term of imprisonment less than 30 days, or both." 39 C.F.R. § 232.1(p)(2).

The second is 18 U.S.C. § 930(a). It reads: "Except as provided in subsection (d), whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility (other than a Federal court facility), or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both." "Federal facility" is defined as "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." 18 U.S.C. § 930(g). The Parties do not dispute that this definition includes post offices.

Plaintiffs are two Texas citizens—Gavin Pate and George Mandry—and two non-profit membership associations—Firearms Policy Coalition, Inc. ("FPC") and Second Amendment Foundation, Inc. ("SAF"). Both individual Plaintiffs and members of FPC and SAF are licensed to carry firearms in Texas and desire to carry their firearms for self-defense while visiting the post office. They refrain from doing so out of fear of violating the aforementioned provisions of federal law. In turn, Plaintiffs assert that this infringes on their Second Amendment rights.

Plaintiffs brought this suit on June 18, 2024, against Pamela Bondi in her official capacity as Attorney General of the United States[3] ("Defendant" or the "Government") asking the Court to

---

[3] Plaintiffs originally complained of Defendant Merrick Garland in his official capacity as Attorney General of the United States. Pls.' Compl. for Declaratory and Injunctive Relief 1, ECF No. 1. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Merrick Garland's successor as Attorney General of the United States, Pamela Bondi, has been substituted as Defendant. FED. R. CIV. P. 25(d).

2

enjoin enforcement of 18 U.S.C. § 930(a) and 39 C.F.R. § 232.1(1) "to the extent they bar the possession and carriage of firearms in Post Offices and on postal property."[4] Plaintiffs filed their Motion for Summary Judgment on October 21, 2024, and the Government filed its combined Motion for Summary Judgement and Opposition to Plaintiffs' Motion for Summary Judgment on November 27, 2024. Plaintiffs then filed their Combined Reply and Response in Opposition on December 18, 2024, and the Government filed its Reply on January 17, 2025. The Motions are ripe for the Court's consideration.

## II. LEGAL STANDARD

A movant is entitled to summary judgment if by the pleadings and evidence it can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[S]ummary judgment is appropriate where the only issue before the court is a pure question of law." *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

## III. ANALYSIS

### A. Facial versus As-Applied

A second amendment challenge can be facial or as-applied. *United States v. Morgan*, 147 F.4th 522, 526 (5th Cir. 2025). A facial challenge is the "most difficult challenge to mount successfully," because it requires a challenger to "establish that no set of circumstances exists under which the [challenged regulation] would be valid." *United States v. Rahimi*, 602 U.S. 680, 693, (2024). "An as-applied challenge asks whether a law—though constitutional in some circumstances—is nonetheless unconstitutional as applied to [specific] activity." *Morgan*, 147 F.4th 526.

---

[4] Pls.' Br. Supp. Mot. Summ. J. 2, ECF No. 23.

Plaintiffs do not specify whether they are bringing a facial or as-applied challenge; they only ask the Court to find unconstitutional and enjoin 18 U.S.C. § 930(a) and 39 C.F.R. § 232.1(l) "to the extent they bar the possession and carriage of firearms in Post Offices and on postal property."[5] Because the regulations at issue cover more than just firearms, including explosives and other dangerous weapons, the Court will evaluate § 930(a) and § 232.1(l) as-applied to Plaintiffs carrying firearms in an ordinary post office. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 47 (2022) (reaffirming "that the Second Amendment protects only the carrying of weapons that are those in common use at the time, as opposed to those that are highly unusual in society at large").

### B. *Bruen* and *Rahimi* Standard

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. CONST. amend. II. When evaluating Second Amendment claims, courts must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If so, the "Constitution presumptively protects that conduct . . . [and] the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*

When determining whether a regulation is consistent with our Nation's historical tradition, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. While a modern regulation "need not be a 'dead ringer' or a 'historical twin'" for regulations at the founding, they

---

[5] *Id*.

must be "analogous enough to pass constitutional muster." *Id.* This involves asking both "why" and "how" a regulation burdens an individual's Second Amendment rights. *See id.* "If laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons" are permissible. *Id.* However, the law may fail to pass constitutional muster if it regulates arms-bearing "to an extent beyond what was done at the founding." *Id.*

The Court determines that both 18 U.S.C. § 930(a) and 39 C.F.R. § 232.1(1) are inconsistent with the principles that underpin this Nation's regulatory tradition. Thus, they are unconstitutional as-applied to carrying firearms inside a an ordinary post office or on post office property.

      i.   <u>Sensitive Place Restrictions Targeting the Keeping and Bearing of Arms are Subject to a *Bruen* Analysis</u>

Generally, "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to "justify its regulation." *Id*. at 691 (quoting *Bruen*, 597 U.S., at 24). Here, the Government asserts that under *Bruen* Plaintiffs bear the burden of rebutting the presumption that banning firearms in all government buildings is constitutional.[6] The Government misreads the law.

In *District of Columbia v. Heller*, the Supreme Court made clear that longstanding "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are valid restrictions on bearing arms. 554 U.S 570, 626–27 (2008). In *McDonald v. City of Chicago*, the Court reiterated that "[their] holding did not cast doubt on such longstanding regulatory measures… [including] laws forbidding the carrying of firearms in sensitive places such

---

[6] Def.'s Combined Mot. Supp. J and Resp. Pls.' Mot. for Summ. J. 7–9, ECF No. 27.

as schools and government buildings." 561 U.S. 742, 786 (2010) (citation modified). The Government argues that *Bruen* reaffirmed "sensitive place" restrictions and that "there is a presumption that federal buildings are sensitive places."[7] Accordingly, the Government contends that the burden should fall on Plaintiffs to rebut this presumption of constitutionality and show "that post offices and postal property are non-sensitive."[8]

The Government cites to this Court's opinion in *McRorey v. Garland* to support its position. No. 7:23-CV-00047-O, 2023 WL 5200670, 4 (N.D. Tex. Aug. 14, 2023), aff'd, 99 F.4th 831 (5th Cir. 2024). In *McRorey*, the Court indeed observed that "nothing in the *Bruen* majority [disturbs *Heller* or *McDonald*]" and that "the *Bruen* majority therefore seems to acknowledge the facial constitutionality of regimes requiring background checks and attendant waiting periods." *Id*. at 4 (citation modified).

When the Fifth Circuit affirmed, it noted that *Bruen* "continued to distinguish the treatment of prohibitions on keeping and bearing . . . and other ancillary firearm regulations such as background checks preceding sale." *Id.* at 836–37. It emphasized that *Bruen* requires a historical showing by the government "[w]hen the Second Amendment's *plain text* covers an individual's conduct" and that "[t]he plain text covers plaintiffs' right to keep and bear arms." *Id.* at 838. And, it explicitly said that "sensitive-place laws are likely captured by the plain text of the Second Amendment —they directly impact the right to bear. Therefore, they are likely subject to *Bruen*'s historical analysis." *Id.* at 838.

Both § 930(a) and § 232.1(l) prohibit the carrying of firearms in post offices and on post office property. This is clearly the type of regulation covered by the "plain text" of the Second Amendment, not an "ancillary" regulation like the regulation at issue in *McRorey*. *See id*.

---

[7] *Id*. at 9.
[8] Def's Reply 2, ECF No. 31.

In *United States v. Allam,* the Fifth Circuit further explored the constitutionality of "sensitive place" restrictions. 140 F.4th 289 (5th Cir. 2025). In *Allam*, the constitutionality of a statute that prohibited "both possession of a firearm on school grounds and within a 1,000-foot 'buffer zone' around school grounds" was at issue. *Id.* at 293. Although school grounds and government buildings are quintessential examples of "sensitive places" according to *Heller*, the Fifth Circuit determined that "the Second Amendment's plain text covers [the Defendant's] conduct, keeping a rifle in his car ostensibly for self-defense," and thus, a *Bruen* analysis is required. *Id.* at 296. The Fifth Circuit ultimately found the law constitutional only because it was "consistent with the principles that underpin our regulatory tradition." *Id.* at 300. In a footnote, the Circuit explained that it did not need to address the sensitive places doctrine to resolve *Allman*, and reiterated *McRorey's* assertion that sensitive place laws "are likely subject to *Bruen*'s historical analysis." *Id*. at 295 n. 7.

Considering the Fifth Circuit's rationale in *McRorey* and *Allman*, and because § 930(a) and § 232.1(l) target the keeping and bearing of arms, the Court finds that the Government's burden-shifting argument is incorrect. Accordingly, because possessing a firearm for self-defense within a post office or on post office property is an activity that falls within the plain text of the Second Amendment, the Government must show that banning firearms within a post office or on post office property "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

  ii. <u>§ 930(a) and § 232.1(l) are not Consistent with this Nation's Tradition of Firearm Regulation</u>

"Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id*. at 34 (quoting *Heller*, 554 U.S. at 634) (emphasis in original). The

7

Second Amendment was ratified in 1791. *Id*. Accordingly, to determine the constitutionality of federal regulations, the Court must determine the scope of the Second Amendment around that time. *See id*. at 37–38. If "a challenged regulation addresses a general societal problem that has persisted since [the founding] the lack of a distinctly similar historical regulation addressing [the] problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 26. Similarly, "if earlier generations addressed the societal problem, but did so through materially different means," that also is relevant evidence "that a modern regulation is unconstitutional." *Id*. at 26–27.

Post offices predate the founding of the United States. The first official mail service began in the American colonies in 1639. OFFICE OF THE HISTORIAN, CORPORATE AFFAIRS, UNITED STATES POSTAL SERVICE: AN AMERICAN HISTORY 2 (2025) (hereinafter POSTAL SERVICE HISTORY). From 1707 until the Revolution, the British government controlled the postal system in North America. *Id*. Concerned that colonists's letters would be opened by British post riders and "construed into treasonable Conspiracies," an American postal service was organized. *Id*. at 3. By 1775 the American postal service rivaled the British's "with nearly 50 post offices stretching from Maine and Virginia." *Id*. On July 26, 1775, nearly a year before declaring independence, the Continental Congress named Benjamin Franklin as the first American postmaster. *Id*. at ii. After independence, the Constitution established Congress's power to "establish Post Offices and post Roads." U.S. CONST. art. I, § 8, cl. 7. Congress rapidly established new post offices growing from 75 in 1790 to 28,498 in 1860. POSTAL SERVICE HISTORY at 8. To quantify the importance of the post offices to the growing United States, in 1831 "postal employees accounted for 76 percent of the civilian federal workforce." *Id*. at 9.

Our Nation has grappled with threats to mail carriers and post offices since the Founding. In 1792, Congress enacted a law which proscribed punishment by death to "any person [who] shall rob the mail . . . or shall steal and take . . . from or out of any post- office, any letter or packet."[9] A few years later, in 1799, Congress sought to protect postal employees by punishing robbery of a postal employee in which a dangerous weapon was used with death if the robbery was successful, or if it was unsuccessful, with public whipping or imprisonment.[10] That the Founders were acutely aware of threats to post offices and postal employees, yet chose to criminalize the offending behavior rather than banning firearms outright, is telling.

Threats to the postal system only intensified after the Founding. In the nineteenth-century, mail carrying stagecoaches faced attacks from robbers or Indians. POSTAL SERVICE HISTORY at 17. And in "the latter half of the nineteenth century, when locomotive became the dominant way to move mail, bandits threatened postal workers aboard trains." *United States v. Ayala*, 711 F. Supp. 3d 1333, 1341 (M.D. Fla. 2024) (citing *Colorado Train Robbers*, N.Y. Times, 2 Sept. 1891, at 8.). "By the 1920s, so many bandits were targeting mail trains that the postmaster general armed railway mail clerks with government-issued pistols." POSTAL SERVICE HISTORY at 23. Even then Congress never sought to ban firearms.

The Government contends that "the lack of Founding era, post-office-specific firearm restrictions is neither dispositive nor surprising, because dedicated postal buildings were rare or non-existent at that time."[11] This is because until the early 1900s most post offices were provided by postmasters—often in the postmaster's home or other place of business, such as a general store.[12] As such, the Government argues that the Founders could not have perceived a threat to

---

[9] Pls.' App. Supp. Mot. Summ. J. App. 144, ECF No. 24.
[10] *Id*. at App. 167.
[11] Def.'s Combined Mot. Summ. J. and Resp. Pls.' Mot. Summ. J. 24, ECF No. 27.
[12] *Id*. at 25.

post offices in the modern sense.[13] But even after the Government started housing post offices in federal buildings in the early 1900s, it waited until 1964 to prohibit guns in federal buildings and 1972 to specifically prohibits firearms on postal property. *See Ayala*, 2024 WL 132624, at *5 ("As the United States acknowledges, the first prohibition on firearms possession in government buildings was not codified until 1964. And the first regulation specifically banning arms on post office property was codified in 1972." (internal citations omitted)). In fact, the Government concedes that the prohibition on firearms in post offices was only imposed a little over 50 years ago.[14] In other words, even though Congress and the Founders were aware of the "general societal problem" of violence towards the postal service, the prohibition against firearms in post offices or on postal property did not appear until nearly 200 years after the founding.

    iii.    <u>Post Offices are not Sensitive Places Akin to Legislative Assemblies, Polling Places, and Courthouses</u>

Returning to the Government's sensitive places argument, the Government posits that *all* government buildings, including post offices, are sensitive places "because of the functions performed inside of them."[15] In the Government's eyes, any government business renders a building a sensitive place.[16] Plaintiffs dispute this claiming that the sensitive places *Bruen* describes—legislative assemblies, polling places, and courthouses—are sensitive places because at the Founding all were "protected by heightened, government-provided security, reducing the public's need for individual weapons."[17] In the Court's view, both miss the mark.

---

[13] *Id*.
[14] *Id*. at 3.
[15] *Id*. at 21.
[16] *Id*. at 12–13, 23–24.
[17] Pls.' Br. Supp. Mot. Summ. J. 14, ECF No. 23.

As the Government points out, under Plaintiffs' theory, whether a location is considered sensitive would turn on if armed guards are present that day.[18] In other words, a location could be sensitive one day because security is present but not the next if security is absent. Moreover, it is clear from the Parties' briefing that there are diverging opinions on whether the "doorkeepers," "sergeants-at-arms," and "sheriffs" that Plaintiffs allege provided security were indeed armed and present in a protective or administrative role.[19]

Likewise, the Government's theory that all buildings occupied by the government are sensitive places is equally misplaced.[20] To support it theory, the Government cites to an English law enacted in 1313 and the Statute of Northampton enacted in 1328.[21] But *Bruen* was clear that "the Statute of Northampton," which was enacted more than 450 years before the Constitution was ratified, "has little bearing on the Second Amendment adopted in 1791." *Bruen*, 597 U.S. at 41. Beyond this, the Government provides no historical evidence that firearms were prohibited in all government buildings around the Founding.

What is more likely, is that around the Founding certain legislatures recognized that the activities taking place in legislative assemblies, polling places, and courthouses were central government functions involving weighty matters of public concern which might be influenced or disturbed by the presence of firearms. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 246–47 (2018) (explaining that "the origins of the sensitive places laws in medieval England . . .

---

[18] Def.'s Combined Mot. Summ. J. and Resp. Pls.' Mot. Summ. J. 24, ECF No. 27.
[19] *See* Plfs.' Consl. Reply and Resp. Def's Mot. Summ. J. 18–19, ECF No. 29; Def's Reply 8, ECF No. 31.
[20] Def.'s Combined Mot. Summ. J. and Resp. Pls.' Mot. Summ. J. 12–13, ECF No. 27.
[21] *Id*. at 23.

were greatly concerned about violent intimidation of the courts of justice"). Thus, some legislatures enacted laws to combat this.

Reasoning by analogy, it is hard to see how post offices, while important, rise to the same level of importance or provide the same weighty government functions as legislative assemblies, polling places, and courthouses. Absent a relevantly similar historical analogue, it is hard to envision that the Founders would countenance banning firearms in the post office—particularly because they did not do so themselves. Thus, the Government has not carried its burden.

* * *

Because of "the lack of a distinctly similar historical regulation addressing" firearms in an ordinary post office and "earlier generations" "materially different means" of addressing the same problem, § 930(a) and § 232.1(l) are incompatible with America's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 26.

> iv. <u>The Government's Property Owner Theory Cannot Sidestep the Second Amendment.</u>

In a Hail Mary attempt, the Government argues that the *Bruen* analysis should not apply in this case because the "constitutional dimensions are different here than in the Supreme Court's recent cases."[22] Namely, because the Government "owns (or at least leases) the property at issue"[23] it is insulated from the Second Amendment's requirements by the Constitution's Property Clause and Post Office Clause. The Government cites a handful of cases to support its position, but none stand for the proposition that the Government as a property owner can bypass parts of the Constitution it deems unfavorable. *See Ex parte Jackson*, 96 U.S. 727, 728 (1877); *United States v. City & Cnty. of San Francisco*, 310 U.S. 16, 29 (1940); *United States v. Gliatta*, 580 F.2d 156

---

[22] *Id*. at 10.
[23] *Id*.

12

(5th Cir. 1978); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015). In fact, *Bonidy* supports the opposite proposition. The court there explained that the "[postal service] is a state actor rather than a private business, so its actions must comply with the Constitution." 790 F.3d at 1126.

This is congruent with *Bruen's* affirmation that the Second Amendment is "not a second-class right." *Bruen*, 597 U.S. at 70. A recent Third Circuit opinion recognized the same, holding that "[firearms] restrictions affecting government property are subject to the same historical inquiry as other firearm regulations, rather than a categorical carveout." *Koons v. Attorney Gen. New Jersey*, No. 23-1900, 2025 WL 2612055, at *24 (3d Cir. Sept. 10, 2025), as amended (Sept. 17, 2025).

The Government cites one almost compelling Fifth Circuit case which could be read to suggest that the Property Clause excuses firearm regulations under the Second Amendment. *See United States v. Dorosan*, 350 F. App'x 874, 875 (5th Cir. 2009). But *Dorosan* is an unpublished, pre-*Bruen* decision that was ultimately decided on interest-balancing grounds—a practice specifically repudiated by *Bruen*. *See Bruen*, 597 U.S. at 29 n.7. ("This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry . . . . the Second Amendment is the "product of an interest balancing by the people," not the evolving product of federal judges.").

Unpersuaded by *Dorosan*, the Court joins with courts who have held that the Government as a property owner must abide by *Bruen's* Second Amendment analysis. Thus, because the Government has not shown any relevantly similar historical analogue to support banning firearms in ordinary post-offices or on postal property, the Court finds that 18 U.S.C. § 930(a) and 39 C.F.R. § 232.1(1) violate the Second Amendment with respect to the possession and carriage of firearms

in post offices and on post office property. Accordingly, Plaintiffs' Motion for Summary Judgment is **GRANTED** and Defendant's Motion for Summary Judgment is **DENIED**.

## IV.    REMEDIES

Having found in favor of Plaintiffs on the merits, the Court must finally consider the proper remedy. Plaintiffs seek (1) seek a declaration that the 18 U.S.C. § 930(a) and 39 C.F.R. 232.1(1) are unconstitutional as-applied to carrying firearms in a post office or on post office property, and (2) a permanent injunction enjoining the Government enforcing 18 U.S.C. § 930(a) and 39 C.F.R. 232.1(1) against Plaintiffs or their members with respect to the possession or carrying of firearms in post offices or on post office property. Because Plaintiffs have agreed to limit their relief to ordinary post offices not located in restricted areas like military bases or where the Government provides armed security, the Court likewise limits its remedies to ordinary post offices.[24]

### A. Declaratory Relief

Plaintiffs are entitled to declaratory relief in this case. Under the Declaratory Judgment Act, a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.* The Declaratory Judgment Act is "an enabling Act, which confers . . . discretion on the courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (citation omitted). And "[t]he existence of another adequate remedy [such as a vacatur or injunction] does not preclude a declaratory judgment that is otherwise appropriate." FED. R. CIV. P. 57. Thus, the Court **DECLARES** that:

---

[24] *See* Plfs.' Consl. Reply and Resp. Def's Mot. Summ. J. 27, ECF No. 29.

14

1. 39 C.F.R. § 232.1(l) is unconstitutional under the Second Amendment with respect to Plaintiffs' (and their members) possession and carrying of firearms inside of an ordinary United States Post Office or the surrounding Post Office property. An ordinary United States Post Office is defined as a United States Post Office that is not located inside of (1) a Military Base or similarly restricted access area, or (2) a Federally owned or leased building housing government functions other than a United States Post Office in which carrying a firearm would otherwise be prohibited.

2. 18 U.S.C. § 930(a) is unconstitutional under the Second Amendment with respect to Plaintiffs' (and their members) possession and carrying of firearms inside of an ordinary United States Post Office or the surrounding Post Office property. An ordinary United States Post Office is defined as a United States Post Office that is not located inside of (1) a Military Base or similarly restricted access area, or (2) a Federally owned or leased building housing government functions other than a United States Post Office in which carrying a firearm would otherwise be prohibited.

### B. Permanent Injunctive Relief

Plaintiffs are entitled to permanent injunctive relief. A permanent injunction is proper when a plaintiff (1) prevails on the merits, (2) there is no adequate remedy at law for the plaintiff's otherwise irreparable injury, (3) the balance of the harms favors the plaintiff, and (4) an injunction would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiffs satisfy each of these elements.

As explained earlier in this Order, Plaintiffs satisfy the first requirement because they succeed on the merits of their Second Amendment claims. Regarding the remaining injunction factors, Plaintiffs are suffering and will continue to suffer irreparable harm due to credible threats of enforcement, compliance costs, and the chilling of constitutional rights.[25] Likewise, the balance of the equities and the public interest factors are in Plaintiffs' favor. The Government has not identified any concrete injuries to counterbalance the real harms facing Plaintiffs. And there is no public interest in unlawful government action. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021). Accordingly, having considered the arguments, evidence, and relevant law, the Court holds that the relevant factors weigh in favor of entering a permanent injunction.

Because Plaintiffs carry their burden as to each of the permanent injunction factors, the Court next addresses the scope of the injunction. When ordering equitable relief, the Court is obligated to state "specifically" and "in reasonable detail . . . the act or acts restrained or required" under the injunction. FED. R. CIV. P. 65(d)(1)(b)–(c). The scope of injunctive relief is "dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). An injunction "should be crafted to provide 'complete relief to the plaintiffs.'" *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (quoting *Yamasaki*, 442 U.S. at 702). At the same time, the injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). And it must be tailored to "redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018).

Therefore, the Court determines that an injunction focused on enforcement and implementation remains necessary to wholly redress Plaintiffs' injuries. Here, declaratory relief is

---

[25] *See* Pls.' Br. Supp. Mot. Summ. J. 2–4, ECF No. 23.

not enough without the additional protection that flows from the clarity of permanent injunctive relief, specified below. Thus, the Court **ENJOINS** the Government from the following actions against Plaintiffs:

1. Interpreting or enforcing 39 C.F.R. § 232.1(1) to prohibit Plaintiffs' (and their members) possession and carrying of firearms inside of an ordinary United States Post Office or the surrounding Post Office property. An ordinary United States Post Office is defined as a United States Post Office that is not located inside of (1) a Military Base or similarly restricted access area, or (2) a Federally owned or leased building housing government functions other than a United States Post Office in which carrying a firearm would otherwise be prohibited.

2. Interpreting or enforcing 18 U.S.C. § 930(a) to prohibit Plaintiffs' (and their members) possession and carrying of firearms inside of an ordinary United States Post Office or the surrounding Post Office property. An ordinary United States Post Office is defined as a United States Post Office that is not located inside of (1) a Military Base or similarly restricted access area, or (2) a Federally owned or leased building housing government functions other than a United States Post Office in which carrying a firearm would otherwise be prohibited.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (ECF No. 22) is **GRANTED**, and Defendant's Motion for Summary Judgment (ECF No. 27) is **DENIED**.

**SO ORDERED** on this **30th day** of **September, 2025**.

_Reed O'Connor_
**CHIEF UNITED STATES DISTRICT JUDGE**